IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF EASTERN DISTRICT OF VIRGINIA

--------------------------------------------------------X

DRY HANDY INVESTMENTS LTD.,     :
                       :

         Plaintiff,       :
                       :

   -   against -        :     Civil Action No. 2:13 CV 678-MSD-DEM
                       :

CORVINA SHIPPING CO. S.A.      :
and COMPANIA SUD AMERICANA DE  :
VAPORES S.A.,               :
                       :

         Defendants.    :

--------------------------------------------------------X

**DECLARATION OF NICHOLAS JOHN ASHLEY SHAW
IN SUPPORT OF PLAINTIFF'S OPPOSITION TO THE MOTION OF
LIMARI SHIPPING LTD. TO QUASH MARITIME ATTACHMENT**

1.     I am a solicitor of the Supreme Court of England & Wales (admitted in 1992) and a partner in the Shipping Group of Reed Smith LLP, formerly Richards Butler LLP, continuously since 1999. I have the conduct of this matter on behalf of the Plaintiff, Dry Handy Investments Ltd ("DHI") and I am duly authorised to make this declaration on their behalf.

2.     The aim of this declaration is to explain in further detail the reasons why the Joint Venture Agreement dated 20 November 2003 ("JVA") as supplemented and amended is a maritime contract. Further, to clarify the claim commenced by Corvina Shipping Co. SA ("Corvina") under the JVA and DHI's counterclaims.

3.     The JVA, as amended by the Deed of Accession dated 17 December 2007, describes at Clause 5 the "Business of the Company", which can be summarized as the purchasing of shares in various subsidiaries with a view to the JVA shareholders (each of which

are within the same corporate group of two well-known corporate entities respectively) becoming the prospective owners of vessels due to be delivered to those subsidiaries.

4.      However, by way of an addendum signed in 2006 ("Addendum No. 2"), DHI and Corvina agreed to expand the purpose of the JVA to include a new subsidiary, DBCN, that chartered in and out ocean-going vessels. DBCN was a separate joint venture company in which Corvina and DHI each owned 50% of the shares. The parties agreed to transfer their shares in DBCN to DBHH so that particular entity became a subsidiary of DBHH and within the terms of the JVA. A true and accurate copy of Addendum No. 2 is attached as Exhibit 1.

5.      Addendum No. 2[1] provided as follows:

*"1.2 To insert the following new recitals (N), (O), (P) and (Q):*

(N)      *"A Share Sale Agreement dated 9th December 2005 was entered into between Corvina Shipping Co. S.A. as Transferor and the Company as Transferee, pursuant to which Corvina Shipping Co. S.A. have agreed to transfer to the Company the 50% of the shares in DBCN Corporation of Panama;*

(O)      *"A Share Sale Agreement dated 9th December 2005 was entered into between DBC as Transferor and the Company as Transferee, pursuant to which DBC have agreed to transfer to the Company the other 50% of the shares in DBCN Corporation of Panama;*

(P)      *The Parties also agreed to jointly set up and establish Handymax[2]/Panamax[3] operation, having considered the new market environment in which it is becoming more*

---

[1] LIMARI's Memorandum in Support of the Motion to Quash fails to meaningfully discuss fully the Second Addendum but rather merely refers to it at footnote 2 appearing on page 6 of its Memorandum advising that the Second Addendum added a new §5.5.

[2] The term "Handymax" refers to an ocean going ship that is typically 150–200 m (492–656 ft.) in length. Modern handymax designs are typically 52,000-58,000 DWT in size, have five cargo holds, and four cranes of 30 tonnes lifting capacity.

[3] The term "Panamax" refers to an ocean going ship with a  size limit for traveling through the Panama Canal.   The respective limits are, generally, length: 950 ft (289.56 m). width (beam) 106 ft (32.31 m), draft 39.5 ft. (12.04 m) Tropical Fresh Water and air draft 190 ft. (57.91 m).

*economical to use Handymax/Panamax Drybulk carriers and the competitive advantages related to the possibility to offer services in all dry cargo segments. The above Handymax/Panamax operation started with inbound cargoes into Chile, Peru and South America combined with other cargoes from those areas into USEC/USGulf/Trinidad. For these operations, modern tonnage of about 55.000 dwt has been used and, in addition, the Parties agreed to charter in tonnage and, therefore, for the above purposes, the Parties have established under the Laws of Panama the corporation under the name of "DBCN Corporation" (hereinafter referred to as "DBCN", when mentioned separately from the other Subsidiaries) being the fully controlled subsidiary of the Company as from the date of Sale Agreements mentioned in recitals (N) and (O) above; furthermore, DBCN have entered into various time charter agreements, COAs and FFA in connection with this Handymax/Panamax operations.*

*(Q)*    *The Handymax/Panamax commercial and operational management will be provided to DBCN by CC Transport Holding Ltd. (hereinafter referred to as the "Manager"), in accordance with the terms and conditions of a management agreement entered into between DBCN and the Manager on the 1st October 2004 as amended or supplemented from time to time ("the Management Agreement"). The Management Agreement has to be considered integral part of this Joint Venture Agreement and the Parties do hereby acknowledge and are aware of the terms and conditions of the Management Agreement.*

*1.3*    *As and with effect from the date of this Agreement the following definitions contained in the recitals and in Clause 1 of the Joint Venture Agreement shall be amended as follows:*

*• In Accordance with the new recitals (N), (O) and (P) above, the Definition of "Subsidiaries" included in the Joint Venture Agreement is hereby supplemented and amended in order to include also DBCN, in addition to Virgo Navigation Inc., Magnes Navigation Inc. and Leo Inc.*

*• In Accordance with the new recitals (N), (O) and (P) above, the Definition of "Share Sale Agreements" included in the Joint Venture Agreement is hereby supplemented and amended in order to include also the Share Sale Agreements relating to DBCN under (N) and (O) above, in addition to the Share Sale Agreements relating to Virgo Navigation Inc., Magnes Navigation Inc. and Leo Inc.*

*• In Accordance with the new recitals (N), (O) and (P) above, the Definition of "Transferor" included in the Joint Venture Agreement is hereby supplemented and emended in order to include also Corvina Shipping Co. S.A. and DBC in accordance with the recitals N) and O) above.*

*...*

*2.2*    *Clause 2 "Acknowledgment" shall be supplemented with the insertion of the following Clause 2.2 at the end of existing clause 2.1:*

*2.2    "Parties do hereby acknowledge to be fully aware of the terms and conditions of the Management Agreement and that the terms of the Management Agreement are satisfactory and acceptable to all of them in all respect"*

2.3    *Clause 5 "Business of the Company" shall be supplemented with the insertion of the following Clause 5.5 after the existing clause 5.4:*

*"The parties agree that the objective of the Company shall also be to operate, through DBCN, in the Drybulk Handymax/Panamax segment, having started the activity with 5 chartered-in Vessels, 4 inbound and 4 outbound cargoes into Chile/Peru. The Parties hereby agree that as between themselves they will share, up to their equity contributions in the Company or other commitments thereto in all profits and/or losses emanating also from the above operations in proportion to their relevant percentage of participation to the Company's share capital and subject to clause 6.5, for the purpose to carry out the above Handymax/Panamax activities, DBCN may try to obtain credit lines to be made available from financial institutions in order to support the working capital requirements. The Company shall acknowledge and declare to be fully aware of the terms and conditions of the Management Agreement, by which the Manager has been appointed to be the operation and commercial managers of the Handymax/Panamax activity of DBCN".*

6.      The business purpose of the JVA was therefore extended to include a new subsidiary, DBCN, that charters in and out vessels, as well as entering into forward freight agreements ("FFAs")[4] and contracts of affreightment ("COAs").[5] Hence, the JVA went beyond solely owning shares in subsidiary vessel owning companies and sharing in any profits generated by those vessels, and expanded to include a subsidiary that is engaged in the actual chartering aspects in maritime commerce.

7.      In addition, to manage the new subsidiary and the expansion of the business operations, DHI and Corvina agreed, pursuant to Clause 1.2 (Q) of Addendum No.2 (as set out

---

[4]      A forward freight agreement ("FFA") is a financial forward contract that allows ship owners, charterers and speculators to hedge against the volatility of freight rates. It gives the contract owner the right to buy and sell the price of freight for future dates. FFAs are built on an index composed of a shipping route for tankers or a basket of routes for dry bulk vessels.  Contracts are traded 'over the counter' on a principal-to-principal basis and can be cleared through a clearing house.

[5]      A contract of affreightment is a contract between a shipowner and a charterer, in which the shipowner agrees to carry goods for the charterer in the ship, or to give the charterer the use of the whole or part of the ship's cargo-carrying space for the carriage of goods on a specified voyage or voyages or for a specified time. The charterer agrees to pay a specified freight for the carriage of the goods or the use of the ship.

above), that the commercial and operational management of DBCN would continue to be delegated to C Transport Holding Ltd (formerly known as CC Transport Holding Ltd.) (the "Managers") pursuant to a Management Agreement dated 1 October 2004, as amended and supplemented (the "DBCN Management Agreement"). Further, DHI and Corvina expressly agreed that the terms of the DBCN Management Agreement, as amended and supplemented, would be considered an integral part of the JVA. A true and accurate copy of the DBCN Management Agreement and Addenda are attached as Exhibit 2.

      8.    The DBCN Management Agreement provided as follows:

*"Subject to the terms and conditions herein provided, during the period of this Agreement the Manager shall carry out, as agent for and on behalf of DBCN, the following Management Services, provided that the Manager shall have no authority for those matters that are for the DBCN's Directors and Shareholders to decide, as per clauses 4 and 6 of the Joint Venture Agreement:*

*(a)  to negotiate the terms of, and conclude all contracts related to the Handymax Operations…*

*(b)  to negotiate the terms of, and conclude, all or any charters for chartered in vessels …*

*(c)   to make all necessary arrangements and to issue all necessary instructions for the proper employment of Handymax Vessels;*

*(d)  to appoint port and other agents for the Handymax Vessels;*

*(e)  to invoice for, and receive, all freights, deadfreights, demurrages, hire and other earnings of the Handymax Vessels and to recover all such amounts from those third parties who are properly obliged to pay the same;*

*(f)  to pay all brokerage, commissions, port and canal charges and expenses, bunkers and any other expenses properly incurred in relation to the employment of, and the provision of services in relation to, the Handymax Vessels;*

*(g)  to negotiate the supply of bunkers in accordance with specifications to be provided by the Shipowners and/or DBCN, the provision of towage, agency and other agreements necessary for the proper performance of the employment of the Handymax Vessels;*

*(h)  to issue in its own name and for its own account bills of lading, waybills, consignment notes, delivery orders and like documentation relating to the shipment, carriage and*

discharge of cargoes carried on board the Handymax Vessel in accordance with the relevant charterparties, COAs;

(i) to advise the DBCN regularly of the trading of any Handymax Vessel and to co-operate with the Shipowners and DBCN in relation to drydocking and/or repairs planned by the Shipowners : this provision to apply for any Handymax Vessel which may be owned by DBCN or a subsidiary and employed in the Handymax Operations;

(j) in conjunction with the Shipowners and DBCN, to undertake all actions and other legal proceedings and demands arising in connection with the employment of, and the provision of services in relation to, the Handymax Vessels and, within the limits prescribed by the Joint Venture Agreement and subject always to the agreement of any relevant P&I association and/or club, to compromise, refer to litigation or arbitration, abandon, submit to judgment or settle any such action or proceedings;

(k) to keep such separate books, records and accounts relating to its activities concerning the employment of the Handymax Vessels in order to enable the fulfilment of the requirements of clause 8 of the Joint Venture Agreement;

(1) to effect Ship Managers' Legal Liability Insurance;

(m) unless the same are determined by the Manager (following consultation with the DBCN to be in place) the Manager shall be entitled but shall not be obliged to effect such of the following insurances and/or such other insurances as the Manager may determine in consultation DBCN to be required for the efficiency of the Handymax Operations:

    (i) Loss of Hire and/or Freight Insurance;
    (ii) Charterers' FD & D Coverage

and shall be entitled to reimbursement in full for the costs of such insurances from DBCN;

(n) to promote transportation and operational services and undertake any market research, trade forecasts and market analysis that the DBCN deems necessary to further achieve the objectives and the Business of the Handymax Operations; and

(o) to take all such further steps and actions as shall be incidental to the matters referred to above and/or as shall, in the Manager's. view, further the objectives and Business of the Handymax Operations."

9.      All of the above formed part of the business of the JVA and were strictly maritime activities.

10.     In addition, DBHH entered into a management agreement with the Managers on 26 November 2007 (the "DBHH Management Agreement"). A true and accurate copy of the

DBHH Management Agreement is attached as Exhibit 3. For a period of about a year, the DBCN and DBHH Management Agreements remained in place. This is because the DBCN Management Agreement was for a period of one year only and was not renewed after DBHH entered into the DBHH Management Agreement, which continues until one party terminates the contract.

11. The DBHH Management Agreement continues to be in force and provides inter alia:

*"3 Management Services*

*Subject to the terms and conditions herein provided, during the period of this Agreement the Manager shall carry out, as agent for and on behalf of DBHH, the following Management Services:*

*(a) to negotiate the terms of all contracts related to the Operations, provided always that, in this respect, the authority of the Manager, as agent of DBHH hereunder, shall (as the Manager hereby acknowledges) be subject to any limitations imposed on the authority of DBHH by DBHH 's Board of Directors resolutions;*

*(b) to negotiate the terms of all or any charters for chartered-in vessels provided always that, in this respect, the authority of the Manager any limitations imposed on the authority of DBHH by DBHH's Board of Directors resolutions. Notwithstanding the provision;*

*(c) To negotiate the terms of all or any contract for the Purchase or Sale of the Vessels under the guidelines and directives of DBHH ...;*

*(d) to make all necessary arrangements and for the proper employment of the Vessels chartered-in by DBHH or by its Subsidiaries and of the Vessels purchased or to be purchased by DBHH or by its Subsidiaries;*

*(e) to appoint port and other agents for the Vessels;*

*(f) to invoice for, and receive, all freights, deadfreights, demurrages, hire and other earnings of the Vessels and to recover all such amounts from those third parties who are properly obliged to pay the same;*

*(g) to pay all brokerage, commissions, port and canal charges and expenses, bunkers and any other expenses properly incurred in relation to the employment of, and the provision of services in relation to, the Vessels;*

*(h) to negotiate the supply of bunkers in accordance with specifications to be provided by DBHH, the provision of towage, agency and other agreements necessary for the proper performance of the employment of the Vessels;*

*(i) to issue in its own name and for its own account bills of lading, waybills, consignment notes, delivery orders and like documentation relating to the shipment, carriage and discharge of cargoes carried on board the Vessels in accordance with the relevant charterparties, COAs;*

*(j) to advise DBHH regularly of the trading of any Vessel and to cooperate with DBHH in relation to dry-docking and/or repairs planned by DBHH: this provision to apply for any Vessel which may be owned by DBHH or a subsidiary and employed in the Operations;*

*(k) to undertake all actions and other legal proceedings and demands arising in connection with the employment of, and the provision of services in relation to the Vessels and, subject always to the agreement of any relevant P&I association and/or club, to compromise, refer to litigation or arbitration, abandon, submit to judgment or settle any such action or proceedings;*

*(l) to effect Ship Managers' Legal Liability Insurance;*

*(m) unless the same are determined by the Manager the Manager shall effect such of the following insurances and/or such other insurances as the Manager may determine in consultation with DBHH to be required for the efficiency of the Handymax Operations:*

*(i) Ship Managers' Legal Liability Insurance;*

*(ii) Loss of Hire and/or Freight Insurance;*

*(iii) Charterers' F .D. & D. Coverage*

*and shall be entitled to reimbursement in full for the costs of such insurances from DBHH;*

*(n) to promote transportation and operational services and undertake any market research, trade forecasts and market analysis that the DBHH deems necessary to further achieve the objectives and the Business of the Operations; and*

*(o) to take all such further steps and actions as shall be incidental to the matters referred to above and/or as shall, in the Manager's view, further, the objectives and Business of the Operations. "*

    12.    Hence, under both the DBCN and DBHH Management Agreements, the Managers were delegated the responsibility to carry out the operational and commercial

management of DBHH's fleet of vessels to be purchased and/or chartered-in by DBHH and/or by its subsidiaries. In return, the Managers were paid a fee based on the percentage of hire paid on chartered in and out vessels, gross freight and/or Memoranda of Agreement ("MOA") sale prices.

13. Further, since the formation of the JVA, DBHH no longer owns any vessels. Both the company and its subsidiary now only charter in and out vessels in the names of DBHH and DBCN. These vessels are managed by the Managers as per the terms of the DBHH Management Agreement.

*JVA Dispute*

14. The background to this dispute has been set out in the Verified Complaint, but to recap, where the Shareholders (viz. Corvina and DHI) have agreed that one of them (or a member of their respective Groups) provide (inter alia) a guarantee in favour of third parties, then the other Shareholder is under an obligation to provide the counter-guarantee(s) referred to in clause 9.8. Giving effect to the plain and natural meaning of the words used, all that is required in order to give rise to Corvina's obligation to provide the Counter-Guarantees is that Corvina and DHI should have agreed that the original Guarantees be provided, for example, as demonstrated by the "Unanimous Written Consents of the Shareholders" adopted in respect of the majority of the Charterparties in question (as set out at Exhibit 4). The Charterparties also expressly state that DBHH is to be guaranteed by DryLog. True and accurate copies of the Charterparties, save for those that contain confidentiality clauses, are attached at Exhibit 5.

15. Limari has contended that express provisions of the JVA preclude DHI's claim regarding the counter-guarantees. In making this argument, Limari relies exclusively on selected

language from clause 9.6 of the JVA. However, as I have explained above, Corvina's obligation to provide the Counter-Guarantees arises under JVA clause 9.8, which provides:

*"Throughout the term of this Agreement and for the purposes of clauses 9.6 and 9.7, in the event that the Shareholders agree that one of them participates (or agrees to procure that members of its Group participate) in any guarantee, bond or financing arrangement with any bank of financial institution and/or any performance guarantee in favour of third parties, whether as guarantor or in any other capacity whatsoever, then, in consideration of that Shareholder granting its guarantee and indemnity as above, the other Shareholder shall issue end deliver in favour of the grantor Shareholder (and in favour of each member of its Group, as applicable) a Guarantee and Indemnity Letter in the form attached hereto as Exhibit M (in the case of Corvina, supported by a Guarantee from CSAV in the form attached hereto as Exhibit S)."*

Thus, as the Unanimous Written Consents of Shareholder (Exhibit 4) make clear, the Shareholders (viz. DHI and Corvina) in fact agreed that DHI's affiliate, DryLog, would issue the performance guarantees, thus triggering Corivna's obligations to provide counter-guarantees under JVA clause 9.8.

16.     Post the global financial crisis of 2007-2009, which had a significant and well-publicized negative impact on the shipping industry, with many well-known and long standing shipping companies declaring insolvency or bankruptcy, the shipping industry changed dramatically, with many of the surviving shipowning companies routinely demanding performance guarantees from charterers when chartering out their vessels.

17.     Without issuing these performance guarantees it is most unlikely that the Japanese Shipowners would have entered into the long-term Charterparties with DBHH and as such DBHH would have no business. DHI has advised that the Japanese long-term charter market is difficult to enter and is in fact only open to a small group of companies. Further, it is usual practice for Japanese Shipowners to require performance guarantees and this is well known

within the shipping market. Hence, the failure to offer a guarantee from an entity that is acceptable to the Japanese Shipowners is usually a deal breaker.

18.     Further, it is very common where a shipping JVA entity is chartering in vessels for one JVA partner to issue a performance guarantee to the owners of those vessels and for the other JVA partner(s) to in turn issue a counter-guarantee equal to their share in the JVA entity.

19.     DryLog, a company affiliated with DHI, issued the guarantees to guarantee the performance of DBHH under the Charterparties and to secure the Charterparties with the Japanese Shipowners. Each guarantee remains in place until all of DBHH's obligations under the Charterparty are fulfilled. The Charterparty periods range from a minimum of 7 years and 10 years and include options exercisable by DBHH to extend the period further. Each guarantee will therefore remain in place until DBHH has fully satisfied its obligations under the Charterparty in question.

20.     Despite being formally required to remedy those breaches  and despite being given every opportunity to do so, Corvina failed and refused to provide the Counter-Guarantees, whether within the 21 Business Days required by clause 13 of the JVA, or at all. This constitutes an "Event of Default" within the meaning of clause 13, with the consequence that DHI was entitled to issue Corvina with a formal notice requiring Corvina to sell its shares to DHI.

21.     DHI has taken this step and procured two valuations from Deloitte. The valuation has been based on a mark to market analysis of the Charterparties going forward as well as the cash reserves of DBHH derived from its chartering activities. Mark to market is a method of valuating shipping assets whereby the value is determined by reference to its current market value as opposed to its book value.

22.     The only partner under the JVA currently bearing the risk of default under the Charterparties by DBHH is DHI. This is a serious concern to DHI because, based on future financial projections, they reasonably believe that DBHH will reach the point in 2014 where they have insufficient funds (generated from its chartering activities) to meet its charter hire payment obligations under the Charterparties with the Japanese Shipowners. If this occurs, this will have a direct effect on those Charterparties and the guarantees issued by DryLog will be called upon by the Japanese Shipowners.

23.     In addition to having a direct effect on its obligation to pay hire under the Charterparties, DBHH is likely to also be unable to pay any management fees under the DBHH Management Agreement. This may therefore also open DBHH to a claim from the Managers.

24.     It has been necessary for DHI to seek relief from the Court because its JVA partner, Corvina, has refused to honour its obligations under the agreement. Corvina benefited significantly when the shipping market was buoyant and must be expected to honour its JVA obligation during any down turn. DHI is the only partner in the JVA that is taking DBHH's obligations to the Japanese Shipowners and other parties seriously. Further, DHI reasonably believes that due to the financial difficulties experienced by Corvina, it will be unable to satisfy any amounts assessed to be due to DHI in the LCIA arbitration proceedings.

25.     The commercial operations of DHI and Corvina under the JVA have extended and the business continued to grow. The dispute in question however relates directly to DHI's potential exposure under guarantees issued on its behalf in respect of DBHH's obligations under the Charterparties to the Japanese Shipowners and DBHH's potential inability to meet its financial obligations under the Management Agreement.

26. In my view therefore, and for the reasons set out above, the nature of the JVA plus addenda, involves the operation and management of ocean going vessels and extends beyond a corporate agreement governing the relationship between two shareholders and is undoubtedly a contract with commercial maritime duties and obligations.

27. Corvina's breach of the JVA as aforesaid will have a direct and substantial effect on maritime commerce by undermining DBHH's ability to meet its maritime obligations as they fall due under the various Charterparties, COA's, FFA's and the DBHH Management Agreement. The natural consequences of failure to meet such obligations may reasonably be forecast to include: (a) terminated Charterparties; (b) re-delivery of Vessels in various jurisdictions to their owners; (c) non-delivery of cargoes; and (d) non-payment of bunkers, repairs, supplies, marine insurance, port and canal expenses, brokerages, commissions, tugs, port agents, and other maritime related expenses arising from the commercial operation of the DBHH vessels.

Pursuant to 28 U.S.C. § 1746, I solemnly declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 4th day of December, 2013 at London, England.

(N. J. A. SHAW)