# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
<u>Norfolk Division</u>

DRY HANDY INVESTMENTS LTD.,

          Plaintiff,

                                Civil Action No. 2:13 cv 678

v.

CORVINA SHIPPING CO. S.A.

and COMPANIA SUD AMERICANA DE

VAPORES S.A.,

          Defendant.

## <u>DECLARATION OF SHAW</u>

Exhibit 5B – Charterparties

**2ND** ORIGINAL

# Time Charter

**GOVERNMENT FORM**

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1    **This Charter Party,** made and concluded in   *Monaco, this*    15th    day of  ... September ............................19 2006

2    Between    *BATANAGAR SHIPPING CORPORATION to be guaranted by Okouchi Kaiun Co.,Ltd., Japan*

3    Owners of the good *flag* .................................................................................................................................. of *see Clause 29*...................................

4    of................. ~~tons gross register, and~~ Steamship/Motorship *Imabari TBN- Hull No. S-Z263* .......................... ~~indicated horse power~~

5    ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ ....... ~~tons net register, having engines of~~ ..................................

6    at........................................ ~~of about~~ .......................... ~~cubic feet bale capacity,~~ and about *see Clause 29*............ tons of 2240 lbs.

7    deadweight capacity ~~(cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8    ~~allowing a minimum of fifty tons)~~ on a draft of *see Clause29* feet ........ inches on ............... Summer freeboard, inclusive of permanent bunkers,

9    which are of the capacity of about ......................................................... tons of fuel, and capable of steaming, fully laden, under good weather

10    ~~conditions about~~ ..................... ~~knots on a consumption of about~~.............. ~~tons of best Welsh coal~~  best grade Diesel fuel oil,

11    *during the currency of this Charter Party as set in Clause No.29* now ...........................................................................................................................................

12    ...... and Messrs. DRY BULK HANDY HOLDING INC. of Panama or its nominee to be guaranteed by Drylog Ltd. Charterers of the City of

     *Bermuda*

13    **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14    about *a fixed period of minimum 81/maximum 87 months exact period Charterers' option. Optional periods to be as follows: Charterers'*

15    *option declarable no later than the end of the 78th month to extend the charter period for a further minimum 33/maximum 39 months time charter, exact period Charterers' option, such option commencing at 0001 hours on the 1st day of the 85th month after delivery. Alternatively, Charterers' option declarable no later than the end of the 78th month to extend the charter for a further period minimum 10/maximum 14 months time charter, exact period Charterers' option, such option commencing at 0001 hours on the 1st day of the 85th month after delivery plus Charterers' option declarable no later than the end of the 90th month to extend the charter for a further minimum 10/maximum 14 months time charter, exact period Charterers' option, such option commencing at 0001 hours on the 1st day of the 97th month after delivery plus Charterers' option declarable no later than the end of the 102th month to extend the charter for a further minimum 10/maximum 14 months time charter, exact period Charterers' option, such option commencing at 0001 hours on the 1st day of the 109th month after delivery within below mentioned trading limits.*

16    Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17    the fulfillment of this Charter Party.

18    Vessel to be placed at the disposal of the Charterers, at *on dropping dock master at shipyard any time, day or night, Sundays and Holidays*

19    *included.* ...............................................................................................................................................................................................................................

20    ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21    ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on her delivery to be

22    *clean on arrival at loading port for Charterers' intended cargo* ~~ready to receive cargo with clean swept holds~~ and tight, staunch, strong and in

23    every way fitted for the service, having water ballast, ~~winches and~~

24    ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one~~ and the same

     time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-

25 disc, including petroleum or its products, in proper containers, excluding *see Clause 46*.

26 (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,

27 all necessary fittings and other requirements to be for account of Charterers) in such lawful trades, between safe port and/or ports in British North

28 America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or

29 Mexico, and/or South America ................................................................................................. and/or Europe

30 and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between

31 October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic,

32 *Worldwide trade via safe port(s), safe berth(s), safe anchorage(s), always afloat, except as per lines 68/70 always within Institute*

33 *Warranty Limits See Cläuse 56.* ........................................................................................

34

35 as the Charterers or their Agents shall direct, on the following conditions:

36 1.   That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew; shall pay for the

37 insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water *and fresh water* and maintain her

class and keep

38 the vessel in a thoroughly efficient state in hull, machinery and equipment *with inspection certificates necessary to comply with current*

*requirements at port of call* for and during the service.

39 2.   That the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *Canal and River Tolls*, Pilotages,

*including customary and recommended Pilotages,* Agencies, Commissions,

40 Consular Charges (except those pertaining to the Crew *and flag of the vessel*), and all other usual expenses except those before stated, but when the

vessel puts into

41 a port for causes for which *Owners are* vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42 illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited *and canal transited* while vessel is

employed under this

43 charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period

44 of six months or more.

45 Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but

46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards

47 for dunnage, they making good any damage thereto.

48 3.   That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on

49 board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................ tons and not more than

........ *See Clause 37*...tons.

50 ................................................................ tons and to be delivered with not less than ................

51 4.   That the Charterers shall pay for the use and hire of the said Vessel at the rate of *See Clause 44* ................................

52 ................................................. United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53 stores, on ................................... summer freeboard, per Calendar Month, commencing on and from the day *and hour* of her delivery, as aforesaid, and at

54 and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary

55 wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot at a safe port within following range in Charterers'*

56 *option any time, day or night, Sundays, Holidays included:*

*- Aden/passing Muscat outbound/India/Singapore/Japan range including Philippines, Republic of China, People's Republic of China,*

*Indonesia, South Korea*

*- Skaw/Mediterranean Turkey range including United Kingdom and Erie*

*- Gibraltar/Luanda range*

*-Boston/Buenos Aires, Vancouver/Valparaiso range*

unless otherwise mutually agreed. Charterers are to give Owners not less than *30/20/15/7* days *approximate and 5/3/2/1 days definite*

notice of vessel's expected date of re-delivery, and probable port.

57 5.   Payment of said hire to be made in *Japan* New York in cash in United States Currency, semi-monthly in advance, and for the last half month

58 or

59  part of same the approximate amount of hire, ~~and should same not cover the actual time, hire is to be paid for the balance day by day as it becomes~~

60  ~~due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the~~

61  ~~hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-~~

62  terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. *See Clause 41* ~~Time to count from 7 a.m. on the working~~

63  ~~day~~

64  ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~

65  ~~to have the privilege of using vessel at once, such time used to count as hire~~

66  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject

67  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application

68  of such advances.

69  6.    That the cargo or cargoes be laden and/or discharged in any *safe* wharf or *safe* place that Charterers or their Agents may

70  direct, provided the vessel can safely lie always *within IWL* ~~afloat~~ at any time of tide, except at *Brazil, River Plate and Argentina, Urgual* ~~such~~

71  ~~places where it is customary for similar size vessels to safely~~

    lie aground. *However Charterers have the right to request vessel to break IWL prior Owners or Owners underwriter's consent but not*

    *force ice or follow icebreakers and Owners are to consider such requests on a case by case basis.*

    also

72  7.    That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can reasonably *and safely* stow and carry),

73  accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,

74  tackle, apparel, furniture, provisions, stores and fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers~~

75  ~~paying Owners~~ ......................... ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~

    ~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~ *No passengers and no cargo on deck.*

76  8.    That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with *vessel's* ship's crew and

77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and

78  agency; and Charterers are to load, stow, *tally, secure and discharge and* trim the cargo at their expense under the supervision *and direction* of the

    Captain, who is to sign Bills of Lading for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts *without prejudice to this Charter Party.*

80  9.    That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on

81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments, *but this provisions does not affect*

    *Charterers right to advance any claim or require arbitration under Clause 17 of any dispute regarding the conduct of the Master in*

    *prosecution of the voyage and in carrying out the orders and directions of the Charterers.*

82  10.    That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted

83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the

84  rate of $10.00 per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85  Clerks, Stevedore's Foreman, etc., Charterers paying *a lumpsum of US$81,500.00 per month or pro rate for victualling/communication.* ~~at the~~

    ~~current rate per meal, for all such victualling.~~

86  11.    That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the

87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-

88  terers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the con-

89  sumption of fuel.

90  12.    That the Captain shall use diligence in caring for the ventilation of the cargo.

91  ~~13.    That the Charterers shall have the option of continuing this charter for a further period of~~ .................................................................

92  ~~on giving written notice thereof to the Owners or their Agents~~ .................... ~~days previous to the expiration of the first-named term, or any declared option.~~

93  14.    That if required by Charterers, time not to commence before *1st January, 2008* ......................................................... ~~and should vessel~~

94  not have given written notice of readiness on or before *30th June, 2008 at Owners' option*............... but not later than *24.00 hours 4* p.m. Charterers or

95  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. *Owners' are to be narrowed at 3*

96  *month spread by 31st January, 2007.*

97   15.   That in the event of the loss of time from deficiency of men *including strike of Master/Officers and crew* or stores, fire, breakdown or
98 damages to hull, machinery or equipment,
99 groundings, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
100 preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be reduced by
101 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102 thereof, and all extra expenses shall be deducted from the hire.
103   16.   That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
104 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
105 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
106   The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
107 purpose of saving life and property *which in case all costs shall be for Owners and Charterers equal shared*.
108   17.   That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at ~~London~~ New York,
109 one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for
110 the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial/*shipping men, who are*
111 *members of London Maritime Arbitration Association.*
110   18.   That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114   19.   That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled in *London*, according to ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F~~
116 ~~of~~
~~York-Antwerp Rules *1974 as amended 1990* 1924, at such port or place in the United States as may be selected by the carrier, and as to matters not~~
117 ~~provided for by these~~
118 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
119 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
120 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
121 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
122 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
123 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
124 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
125 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
126 ~~United States money.~~
   ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~
132   Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133   20.   Fuel used by the vessel while off hire, also for cooking, ~~condensing water, or for grates and stoves to be agreed to as to quantity, and the~~
134 cost of replacing same, to be allowed by Owners.
135   21.   ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 ...........................................................................................................................................
139 ...........................................................................................................................................
140   22.   Owners shall maintain the gear of the ship as fitted, providing gear (for all derricks) capable of handling lifts up to *their maximum capacity in*

141 *accordance with the description clause* three tons, also
142 ~~providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~
 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel *power and electric light on*
143 *deck in cargo holds sufficient for night work in all holds simultaneously.* ~~lanterns and oil for~~
144 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
 Charterers to have the use of any gear on board the vessel.
145 23. Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during loading and discharging;
146 ~~steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150 thereby.
151 24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February 1893, and entitled "An Act relating to Navigation of Vessels;~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder.~~

*General* ~~U. S. A.~~ Clause Paramount, *as attached*

155 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
156 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
157 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
158 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~

New Both-to-Blame Collision Clause

160 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
161 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
162 ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
163 ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
164 ~~carrying ship or her owners to the owners of said goods and set off, recouped or received by the other or non-carrying ship or her~~
165 ~~owners as part of their claim against the carrying ship or carrier.~~
166
167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, *acts of pilots and tugboats,* insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 2 1/2 per cent is payable by the Vessel and Owners to
173
174 .................................................................................................................................................................. on the hire earned and paid to *Charterers* .................. per cent is payable to *Charterers*
 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2 1/2 ~~1.25~~ per cent on the hire earned and paid under this Charter.

**CLAUSE NOS. 29 TO 97 BOTH INCLUSIVE, AS ATTACHED, ARE CONSIDERED TO BE FULLY INCORPORATED IN THIS CHARTERERS PARTY.**

*Owners:*

*Kasuke Okouchi*
*President*
*Batanagar Shipping Corporation*

*Charterers:*

*Vayis Harams*
*Director*
*Dry Bulk Handy Holding Inc.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), Inc, using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-Z263
DATED 15th September, 2006

29    Description of vessel

One Vessel about 53,400MTDW type bulk carrier to be built by Imabari Shipbuilding Co., Ltd., Japan (hereinafter called "Builder") based on Builder's Spec. D—0207FA—00. Further details to be informed later.

All figures "about"

IMABARI TBN-HULL NO. S-Z263
53,400MTDW type bulk carrier to be built at Imabari (Hull No. S-Z263)

Type: Bulk carrier, geared
Flag: TBA
Class: NK.
SDWT/draft: 53,450 mt on 12.8 m draft
LOA: 189.9 m Breadth (moulded): 32.26 m
Depth (moulded): 17.30 m
Cargo Holds capacity: 68,870 cu.m. (grain)
5 holds /5 hatches
Hatch size:
No.1-5   21.12 m (L) x 17.6 m (B)

Main Engine: Man B&W 6S60MC (Mark7)
9,480 kw (12,889 ps) at 127 RPM MCR

Above details, all about, according to Builder's plan and subject to reconfirmation on delivery. Final full details will be advised to Charterers Prior to or on delivery unless Owners can advise earlier.

Determination clause for Speed/Consumption:

Laden at 12.30 m draft,
About 14.2 knots at 35.0 MT/day for M/E only
Ballast Condition:
About 14.8 knots at 35.0 MT/day for M/E only

Auxiliary Engine Consumption

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September 2006

| | |
|---|---|
| Steaming | about 1.5 MT/day IFO |
| In port (Working) | about 3.8 MT/day IFO |
| In port (Idle) | about 1.0 MT/day IFO |

No diesel oil at sea, but the vessel entitle to use diesel oil for main engine/generator engines when maneuvering in narrow/shallow waters canals, rivers, in/out port, shift of generator engine, overhauling piston etc. under the discretion of the Master.

Radio-control type grabs (4sets x 12m3) to be fitted.

TPC 53.3 mt at summer draft

Economic speed and consumptions (given without guarantee basis), to be advised later it available.

All supplied fuel and diesel oils must be in accordance with ISO 8217:1996(E)' RMG35 or where available ISO 8217:2005 RMG380 or subsequent amendments and DMB or better as updated from time to time. If bunker supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the vessel's engines or auxiliaries, the Owners shall not be held responsible for any reductions in the vessel's speed performance and/or increased bunker consumption, nor for any time lost. and any other consequences.

The consumption figures outlined above are to be the maximum figures for Charter Party purposes. The following clause will apply with respect to the Speed consumption warranty.

The actual average service speed/fuel and diesel consumption shall not be Greater than those set forth in the description clause and shall be mutually determined by the Owners and the Charterers after the first 6 (six) months of The Charter period on the basis of the vessel's performance during such 6 (six) months period and then incorporated into this Charter Party by way of an addendum. Such the determined service speed/fuel and diesel consumption shall be reviewed after 5 (five) years of the Charter period.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September 2006

In determining the vessel's performance during the first 6 (six) months of Operation, the parties agree to make due and proper allowance for the effect of weather, current and laden and ballast condition on performance.

Whatever are the agreed actual laden/ballast speed/consumption figures, Owners shall be entitled to add one additional metric ton to such consumption figures.   All agreed consumption figures will be about and basis good weather conditions up to and including Beaufort Force 4 and Douglas Sea State 3.

Any saving in fuel consumption to be offset against reduction in speed or vice versa.

30      Stevedore Clause

The stevedore, although appointed and paid by Charterers / Shippers / Receivers and /or their Agents, to remain under the direction and control of the Master who will be responsible for proper stowage and seaworthiness of this vessel.

Charterers to be responsible for damage caused by negligence of stevedores in loading and discharging vessel only when such damage is duly substantiated by the Master's prompt notice of claim served in writing upon the party responsible immediately on occurrence of damage or at latest on completion of loading and / of discharging of the vessel at the port concerned except in case of hidden damage which to be notified as soon as practicable after discovered prior to redelivery. Such notice to specify the damage in details and to invite Charterers to appoint a surveyor to assess the extent of such damage, if required.

Stevedores' damage report to be issued prior to sailing and copy of all correspondence exchanged in this connection must be forwarded promptly to Charterers. Master shall also cooperate with Charterers or their Agents to obtain a written acknowledgement by the responsible party causing damage, unless the damage should have been made good in the meantime.

Any stevedore damage affecting seaworthiness to be repaired at the Charterer's expenses and time without delay but Charterers have the option to

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

redeliver the vessel without repairing such stevedores' damage that do not affect the seaworthiness of the vessel or normal working and trading of vessel. Owners agree that damage not affecting seaworthiness or efficiency and safe working of the ship may remain for occasional repair when the ship is to dock for Owners' account so that Charterers to pay the actual cost of repairs of stevedores' damage and additional time used against the production of repair bills by repairers or dock yards, if any.

31  Vessel to work day and night if required by Charterers and to supply lights as on board.

32.  Owners warrant that the vessel under present Owner has not traded to Cuba. Vessel under present Owners is eligible for bunkers in the United States, its territories and possessions in accordance with United States office of International Trade, Directive 703.

33.  Fumigation required at first loading port on account of the vessel to be done in Owners' time and at their expenses. Fumigation required as a result of cargo carried or local port regulations to be for Charterers' account.

34  Owners shall have the liberty of using diesel oil entering and leaving ports and for manoeuvring in shallow/narrow waters.

35  Should the vessel put back while on voyage by reason of an accident or breakdown, the hire shall be suspended from the time of hire putting back until she again be in the same or equidistant position and the voyage resumed therefrom.
If the vessel is off-hire consecutively for thirty (30) days or more due to any cause(s) other than Charterers' responsibility, the Charterers shall have the option to cancel this Charter Party, without prejudice to any other rights, remedies or claims which the Charterers may have. Such option shall be exercised by the Charterers by giving written notice of cancellation to the Owners and the vessel shall be redelivered as soon as practicable thereafter once free of cargo properly and duly discharged under any applicable contract of carriage.
In that case, prior to executing such Charterer's option, Charterers and

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO. S-2263
DATED 15th September, 2006

Owners shall firstly discuss the situation and alternative agreement mutually in good faith.

36   Charterers shall leave the vessel in seaworthy trim and with cargo on board safely stowed to Master's satisfaction between loading berth/port and between discharging berth/ports, respectively; any expenses resulting shall be for Charterers' account and any time used shall count.

37   Bunker Clause

The Charterers on delivery, and the Owners on redelivery, shall take over and pay for all fuel oil and diesel oil remaining on board the vessel as hereunder. The vessel shall be delivered with bunkers as on always sufficient to reach nearest main bunkering port. The vessel shall redelivered with bunkers as on board but sufficient to reach nearest bunkering port. Bunker prices for both ends to be according to Owners' / Charterers' purchased priced of last supply to delivery / redelivery with supporting vouchers, Charterers prior to delivery and Owners prior to redelivery to have the option of bunkering the vessel for their own account provided same does not interfere with Owners' / Charterers' operations.

38   Should the vessel be on her voyage towards the port of redelivery at the time when payment / payments of hire is/are due, said payments shall be made for such length of time as Owners or their Agents and Charterers or their Agents may agree upon as the established time necessary to complete the voyage. Bunkers to be taken over by the vessel and agreed disbursements for Owners' account and any difference shall be refunded by Owners or paid by Charterers as the case may be.

39   In the event of any of the following countries: U.S.A., Japan, Great Britain, Russia, Communist China becoming engaged as an actual participant in a war or warlike operation with one or more of the other named countries, directly affecting due fulfillment of this Charter, Charterers and/or Owners shall have the right to cancel this Charter Party without liability. If the Charter Party is cancelled such cancellation shall take place at the port of destination after discharge of any cargo on board, but always subject to the

# RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
## DATED 15th September, 2006

provisions of the attached Baltime War Risk Clause.

40    Charterers to give 30/20/15/7 days approximate and 5/3/2/1 days definite redelivery notice and intended port.

41    Payment of hire in cash shall mean by bank telegraphically transfer to a bank designated by Owners for credit to Owners. When there is any failure to make punctual and regular payment due to oversight or negligence or error or omission of Charterers' employees, bankers of Agents or otherwise for any reason where there is absence of intention to fail to make payment as set out, Charterers shall be given by Owners three (3) banking days or telegraphic notice to rectify the failure and where so rectified the payment shall stand as punctual and regular payment. Charterers not to be responsible for banking delays due to Owners' bank's fault provided Charterers gave correct instructions for such remittance.

Hire to be paid to: (Reverting later)

42    Crew to open and close hatches before, during and after stevedores' work when and where required and when permitted by shore regulations and weather.

43    In the event that the vessel is delayed or rendered in-operative by strikes, labour stoppages or any other difficulties due to flag, ownership or crew of the vessel, such time lost to be considered as off-hire.

44    **Hire**

All hire is payable monthly in advance including overtime by telegraphic transfer to Owners' bank account.

Charterers shall pay for the use and hire of the vessel at agreed rate.

USD1,500 per month or pro-rata for victualling / communications for either vessel.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September 2006

45    The vessel is guaranteed suitable for grab discharged and without any
obstacles in her clear holds with vertical corrugations. It is understood and
agreed that the Charterers have the privilege of authorizing the use of a
bulldozer in vessel's holds.

46    Cargo Exclusion

Vessel to carry lawful merchandise excluding cargoes injurious to vessel and/or
crew and/or stevedores, inflammable, explosives, hazardous or dangerous
cargoes, acids, asphalt, ferro silicates, radioactive materials and its waste,
borax and borates, direct reduced iron, direct reduced iron ore pellets and
briquettes including hot briquette iron, ammonium nitrate (allowed provided
fertilizer grade only), bones, fishmeal, black powders, blastings and detonator
caps, logs, nuclear products, arms, ammunition, hides, naphtha, tar, pitch,
petroleum, or its products, copra, livestock, creosote and creosoted goods,
expellers, motor blocks and turnings, sunflower seed except pellets which are
allowed, calcium carbide, charcoal, calcium hypochlorite, caustic soda, asphalt,
asbestos, Indian coal, sponge iron and cotton, livestock, mahogany log, beam
cutting and cut beams, nitrate, calcium carbite, TNT, pesticides, copra
products, turpentine, chlorine and derivatives thereof, soft pitch in bulk,
bitumen, quebracho, oil of any kind and in any form, gasoline, calcium
hypochloride, resin, ammonia, ammonia sulphate, pyrites, oilseeds, soyacakes,
oilcakes, seedcakes, manioc and manioc pellets, yellow phosphorous, no ondeck
cargo allowed and other required $CO_2$ fitting cargo.
All cargoes are to be carried as per IMO regulations in respect of carriage of
cargo. Charterers may load consentrates always within IMO regulations and
recommendations.

Charterers are allowed to carry each year

a) max. 3 cargoes of petcoke
b) max. 3 cargoes of salt
c) max. 2 cargoes sulphur
d) max. 2 cargoes of cement in bulk including cement clinker

Lime coating for loading Salt/Sulphur clause

Charterers to lime-coat vessel's holds prior to loading salt/sulphur and remove

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

lime-coating after completion of discharge upto Master's satisfaction at Charterer's time and expense.

Crew to carry out lime-coating/removal, if requested by Charterers at Charterers time and expenses, for which Charterers shall pay lumpsum US$2,500 in addition to the normal hold cleaning allowance.

Alternatively Charterers to use Hold Block 10 vessel's holds prior loading and remove Hold Block 10 after completion of discharge up to Master's satisfaction at Charterers time and expenses. Crew to carry out Hold Block 10/removal, if requested by Charterers at Charterers time and expenses, for which Charterers shall pay lumpsum US$2,500 in addition to the normal hold cleaning allowance.

Charterers assure to take following procedures:

- Charterers to provide the products prior loading together with all equipment necessary for the application.
- Charterers to provide vessel's crew personal instruction from suitable qualified person during the application process.
- Upon completion of discharge, a further product to be supplied together with all equipment necessary for the removal and again crew to be provided suitable instruction.
- The cost of the product, the equipment and the instruction to be met by Charterers.

Petcoke Clause
Charterers are permitted to load maximum 3 cargoes per year which not to be consecutive not to be the last cargo prior to redelivery.
After discharging petcoke any time used for hold cleaning including necessary washing equipment and/or chemical additive to be for Charterers' account. Charterers shall pay lumpsum US$2,000 as extra hold cleaning allowance in addition to normal hold cleaning allowance.

Salt Clause
Salt be loaded in accordance with IMO regulations. Charterers are permitted to load maximum 3 cargoes per year which to be consecutive nor to be the last cargo prior to redelivery and the following procedure to be arranged:
Where customary accordingly to local regulations, holds to be thoroughly washed by vessel's crew with fresh water before loading and after discharging

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

at Charterers' time, risk and expenses.
Charterers shall pay lumpsum US$3,000 as extra hold cleaning allowance in addition to normal hold cleaning allowance.

Sulphur Clause

Charterers are permitted to load only "lump and coarse grained sulphur" formed to a specific shape (E.G. prills, granulates, pellets, pastilles or flakes). Provided, however, that the same should be loaded always in accordance with IMO and SOLAS regulations.
Fine grained sulphur, molten sulphur and flowers of sulphur in bulk should always be excluded.
Charterers shall pay lumpsum US$3,000 as extra hold cleaning allowance in addition to normal hold cleaning allowance.

Cement in bulk and cement clinker loading Clause
Charterers to provide all necessary equipment / supplies for the carriage of cement in bulk or cement clinker and cleaning of holds after discharge at Charterers' time and expenses. Crew to carry out cleaning of holds, if required by Charterers, at Charterers' time and expense.
Charterers shall pay lumpsum US$3,000 as extra hold cleaning allowance in addition to normal hold cleaning allowance.

In case existing cement holes not suitable to shippers, Charterers have the right to cut up maximum two(2) holes per hatch at Charterers' time and expenses. Holes not to be cut within the frame space with existing holes and only to be cut at the suitable place of hatch covers in accordance with vessel's class attendance and recommendation.
The Charterers to redeliver the vessel with such modifications to be restored to master's and class surveyor's satisfaction at Charterer's time and expenses. All class surveyor's fee for cutting and restoring cement holes to be for Charterers' account."

Scrap loading clause
Charterers may load maximum 2 cargoes of shredded/proler scrap and HHDW, HMS 1 and 2 excluding motor block and turnings per 12 month period. Such cargo to be loaded with soft-loading clause to apply.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

First layer reaching up to 2 meters from tank top shall be loaded softly so as to provide a proper cushion. Charterers shall at their time and expenses arrange holds survey before loading and after discharging to ascertain damages to the holds.

In case of carriage of steel slabs, side to side stowage to be applied.

47    The vessel shall be equipped with INMARSAT C&B in addition to telegraph and VHF telephone to comply with international regulations to allow the vessel to communicate with land stations. Charterers and supercargo have the right of using vessel's means of communications.

48    If the vessel calls at any U.S.A. port for the purpose of loading and/or discharging cargo, vessel's equipment shall comply with the regulations established by U.S. Public Law 85/742, Part9 (Safety and Health Regulation for Longshoring) and amendments hereto.

If longshoremen are not permitted to work due to failure of Owners and/or Master and/or Owner's Agents to comply with the aforementioned regulations, any delay and expenses shall be for Owners' account. Vessel to comply with provisions of U.S.Coast Guard Regulations for Federal Water Pollution Control Act, Section 154/155/156 and 33 C.F.R as amended and any delays to vessel as a result of failure to comply to be for Owners' account.

49    **Weather Routing Clause**

The Charterers may supply an independent weather routing company's advice to the Master during voyages specified by the Charterers. The Master shall comply with the reporting procedures of the routing service selected by the Charterers, and follow company's suggestions concerning routing, but Master, at his reasonable discretion, may not follow the suggested routes subject to overriding factors of safety, in which case he has to detail in log book and report to Charterers the reason of diverting from them. Should the actual performance of the vessel show any failure to satisfy one or both speed and consumption representations, the hire shall be correspondingly decreased by an amount not more than required to indemnify the Charterers to the extent of

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

such failure, this charter remaining otherwise unaffected.

Failure, if any, to be irrevocably assessed by the independent weather routing company's performance reports, which are to be binding on both parties.

In the event of consistent discrepancies between the two (2) sources, then both parties hereto shall discuss for the solution in a good faith in order to avoid arbitration, but if both parties cannot ultimately reach agreement on final settlement, the dispute to be merged into arbitration clause.

Throughout the currency of this charter, Owners warrant that the vessel shall be capable of maintaining and shall maintain on all sea passages the guaranteed average minimum speed and guaranteed average maximum consumption as stipulated in the vessel's description clause.

50    Owners guarantee Officers and crew are employed under a bona fide Seamen Union Agreement equivalent to I.T.F.

51    Deleted

52    Cargo claims to be settled according to latest New York Produce Interclub Agreement and amendments/revisions thereto.

53    Deleted

54    Deleted

55    Draft Survey Clause
Owners warrant that vessel has on board capacity plan, hydrostatic curves and tables of displacement, tank calibration and trimming correction tables, all sounding tables to be in good maintenance conditions and free from impediments and vessel to have ballast tanks either empty or pressed full and trim to be reduced to minimum and not to exceed trim table corrections. If vessel does not comply with above Master requirements, will be put off-hire until able to perform such survey.
Master to keep written record of drainage moisture pumped out/in. If required Master to forward to Charterers upon arrival at unloading port and before

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

start discharging a certificate indicating all records of liquids pumped overboard.

56    Trade Exclusions

Worldwide trading always afloat, always via safe berth(s)/safe port(s)/safe anchorage(s), always afloat always within Institute Warranty Limits excluding Cuba, Lebanon, Albania, former Yugoslavis, but Koper, Bakar, Rijeka, Plomin, Ploce to allowed, Cambodia, North Korea, Somalia, Turkish occupied Cyprus, Ethiopia, North Yemen, Libya, Syria, all Russian Pacific Port(s), Nigeria, Angola (including Cabinda), Eritrea, Sierra Leone, Yemen, Zaire, Israel and war or war like zones and any other places where the vessel to be prohibited to call from time by the national authorities including United Nations under which the vessel is during the currency of the Charter Party.

It is however understood that if any of the above countries become acceptable to normal trading, as far as exempted from extra war risk insurance premium and not being banned by trading by United Nations but always North Korea/Israel excluded, and Charterers may direct the vessel to load/discharge/bunker at port of these countries subject to Owner's prior consent which not to be unreasonably withheld..

Vessel not to be ordered to/from Taiwan directly after or prior calling People's Republic of China or other communist controlled countries.

The vessel shall not be required to enter or remain in any icebound port or area where lights or lightship have been or are about to be withdrawn by reason of ice, nor where there is risk that in the ordinary course of things, the vessel will not be able on account of ice to safely enter remain in the port or area or to get after having completed loading or discharging.

In any event vessel no to force ice or follow icebreaker.

Whenever Owners consent is required it is understood that Owners will take immediate step in order to give reply to Charterers as soon as possible.

In case the political status of any of the above countries changes during the course of this Charter, Owners may not unreasonably refuse vessel to call there.

57    Off-Hire Periods

Charterers to have the option to add to original Charter period any off-hire period during this Charter Party. Charterers to give at the end of the timecharter period at least 60 days advance notice of exercising such option. However, last charter hire rate shall be applied to such extended period due to off-hire. This not effect the Charterer's obligation to give redelivery notice of the vessel. The Charterers are in any event required to give redelivery notice at least 30days prior to the intended actual redelivery time.

Lay-up clause

Charterers may at any time, request the Owners to lay-up the vessel.

Unless unforeseen events the lay-up period cannot be less than four months.

Beyond such period Charterers may ask for recommissioning which is to be effected within maximum three weeks. Once lay-up decision has been notified to the Owner he will decide, in agreement with the Charterers, the place of laying-up. The cost of bringing the vessel directly from the last discharging port to the lay-up place, and possible cost, duly evidenced, for the commissioning and recommissioning of the vessel will be for Charterer's account. However drydocking expenses after lay-up, if necessary will be paid by Charterers in so far as this drydocking takes place before the normal date and will be apportioned to the advance in time of the operation. For this purpose the Owners will indicate, before the lay-up the date at which the next drydocking was scheduled.

During the lay-up period the bunker cost including bottom cleaning if required by Owners will be for Charterers' account and Owners not responsible for any loss of speed due to marine growth until vessel's next Drydock or Bottom cleaning.

Hire shall continue to be paid for the period of such lay-up but it is agreed that the aforementioned credit of economies to Charterers shall be effected by adjustment to hire.

58    Suez / Panama Canal

The vessel is adequately fitted (including necessary documents required on

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

board) and suitable for the transit of the Suez or Panama Canal at all times on the maximum permissible draft for this type of the vessel. Should there be any delay for measurement to be taken because of initial transit in canals, same to be for Owners account.

59   Bills of Lading

a) Discharging port(s) shown on Bills of Lading do not constitute a declaration of discharging port(s) and Charterers to have the right to order the vessel to any port(s) within the term of this Charter Party. In this case Charterers to give prior notice thereof well in advance to Owners.
Charterers hereby indemnify Owners against any claim and any additional expenses brought by holders of Bills of Lading by reason of change of destination. If required by Owners, Charterers are to provide Letter of Indemnity as per Owners P&I Club, without bank guarantee.

b) Should Bills of Lading not arrive discharging port(s) in time, then Owners to release the entire cargo without presentation of original Bills of Lading if so instructed by Charterers. Charterers hereby indemnify Owners against all consequences of discharging cargo without presentation of original Bills of Lading, if required by Owners, Charterers are to provide a Letter of Indemnity as per Owners P&I Club without bank guarantee.

c) Charterers and/or their Agents are hereby authorized by Owners to sign on Master's and/or Owners' behalf Bills of Lading as presented in accordance with Mate's, Tally Clerk's receipt without prejudice to this Charter Party.

d) All Bills of Lading issued by vessels while performing under this timecharter party shall contain the following clauses (as attached) :
New Both to Blame Collision Clause
New Jason Clause
General Clause Paramount, P&I bunker deviation Clause, U.S.A., Canadian Clause Paramount, whichever applicable Baltime War Risk Clause as attached to be deemed incorporated in this timecharter party.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

60    Insurance

a)    Charterers to have the benefit of any return insurance premium receivable by Owners from Underwriters or P&I Club (as and when received) by reason of the vessel being in port for a minimum of 30 days.

b)    Any additional of war risk premiums and breaching International Warrantee Limit premiums on hull and machinery and crew for trading to restricted area to be for Charterers' account. Crew war risk bonus, if any, to be for Charterers' account.

c)    P&I: Owners guarantee that the vessel is entered and shall remain for the duration of this Charter Party in a Protection and Indemnity Association with normal full cover.

d)    Vessel is covered by (Reverting later)

61    If requested by Charterers, the vessel's crew to perform cleaning cargo holds after each laden voyage if permitted by local shore regulations, if weather and sea condition permit to do so. Charterers will pay a lumpsum of USD 500.00 per hold as compensation to such cleaning.

The crew will do the best to clean the cargo holds as quick as possible but they are not responsible for any delay or extra cost should the inspection of cargo holds cannot be passed.

The Owners not to be responsible for hold cleaning and vessel to remain on hire until passed.

62    New Jason Clause, New Both-to-Blame Collision Clause, General Clause Paramount, P&I bunker deviation clause, U.S.A. or Canadian Paramount Clause whichever applicable and Baltime War Risk Clause as attached are deemed to be incorporate in this Charter Party and to apply.

63    Vessel at first loading port to be clean and ready to load Charterer's intended cargo to the satisfaction of local surveyor, failing which vessel to be put off-hire

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

until ready to load and all extra expenses incurred to be borne by Owners.

64     Boycott Clause

The Owners guarantee that vessel's Officers and crew are employed under terms and conditions approved by ITF during the whole period. Should the vessel be boycotted, picketed, blacklisted or similar incident at any port or place by shore and/or port labours and/or tugboat and/or pilots, or by government and/or any authority by reason of the vessel's flag/registry/meaning or ownership or terms and conditions on which members of Officers/crew are employed, or by reason of trading of this vessel or other vessel under the same ownership, management, operation or control, or by reason of the vessel's construction and/or her fittings and/or any other equipment, all direct consequences and any direct extra expenses incurred therefrom to be for Owners' account and the Charterers are entitled to place the vessel off-hire for any time lost by such reasons.

65     Drydocking Clause

The Owners shall have the option to place the vessel in drydocking during the currency of this Charter Party at the convenient time and place to be mutually agreed upon between Owners and Charterers for bottom cleaning and painting and/or repair as required by class or dicated by circumstances.

However, the Owners shall notify the Charterers of the intention of such drydocking and/or periodical survey with 6 months prior notice except emergency case. Charterers will endeavour to allow the Owners to drydock the vessel in Far East/South East as voyage every two(2) and half years as possible.

66     Smuggling/Drugs Clause

Any delay, expenses and/or fine incurred on account of smuggling/drugs shall be for Owners' account if caused by the Officers and/or crew or shall be for Charterers' account if caused by the Charterers' supercargo and/or their staff or Agents.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

| 67 | Deleted |
|----|---------|

| 68 | Deleted |
|----|---------|

| 69 | Deleted |
|----|---------|

| 70 | Deleted |
|----|---------|

71     This Charter Party shall be governed by English law and arbitration to be held in London.

72     Double Banking Clause

The Charterers have the option to load or discharge a part of the entire cargo from/on the shore or from/into another vessel by means of trans-shipment which shall be done at berth or in Charterers' option in double banking system. However, Charterers shall provide sufficient fendering and double banking operation shall be conducted under Master's supervision and Master should always be to his satisfaction. Charterers to be responsible for all damages and all costs and expenses for fitting the vessel accordingly.

73     Mobile Crane

Charterers have the option to place cranes onboard the vessel at their own risk, provided such placement is safe and there is sufficient strength on deck or hatch covers to support such mobile cranes and placement on board the vessel of crane shall be always supervised by the Master. All cost and time in this clause to be for the Charterers' account.

74     Vessel to comply with all IMO recommendations/regulations for loading, carrying, discharging solid bulk cargoes.

75     Joint on/off-hire surveys to be carried out, the cost being equally shared between Owners and Charterers, but the time occupied for on-hire survey to be for Owners' account and the time occupied for off-hire survey to be for Charterers' account, both instances only actual time lost to count. On-hire

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

survey to be held at delivery port and off-hire survey in redelivery port.

**76**     Any tax levied by and government in respect or cargo or freight is for Charterers' account and any tax in respect of the vessel or vessel's flag or ownership or management is for Owners' account. However, all tonnage tax, harbour dues etc., at each port of call during this Charter period are to be for Charterers' account.

**77.**    U.S. Trade-Unique Bill of Lading Identifier Clause (SCAC)

The Charterers warrant that each cargo transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a unique Bill of lading identifier as required by the U.S. Customs regulations (19 CRF part4, section 4.7.A), including subsequent changes, amendments or modifications thereto, not Later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

**78**     Superficial Inspection

The Charterers at their time, risk and expenses shall have the option of holding a superficial inspection at any time of this Charter. The Owners and Master shall give every facility and assistance.

**79**     Remeasurement

The Charterers have the option to reduce vessel's deadweight subject to Owners classification society's approval at Charterers' time and expenses.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

The Charterers to restore original deadweight before redelivery at Charterers' time and expenses.

80   The Owners shall provide any documentation relating to the vessel that may be required to permit the vessel to trade within the agreed trade limits, including but not limited to deratisation and Certificates of Financial Responsibility for Oil Pollution, valid International Tonnage Certificate, Suez and Panama Tonnage Certificates, valid Certificate of Registry and certificates relating to the strength, stability, including grain certificates and/or serviceability of the vessel. The Charterers to advise Owners in advance of special certificates required other than usual trading certificates.

81   Split of Bills of Lading Clause

Charterers and/or Agents are hereby authorized by Owners / Master or Owners to split Bills of Lading and issue ship delivery orders in transferable form against collection of full set of original Bills of Lading by Owners or Master or Owners' Agents when nominated by Owners.

Delivery orders to be issued strictly in accordance with Mate's receipts and Bills of Lading including but not limited to any endorsements as to the condition and quantity of the cargo and all terms, conditions and exceptions set out in the Bill of Lading. The delivery orders shall not prejudice the shipowner's rights under the Bills of Lading.

All delivery orders issued pursuant to this Clause shall, without prejudice to the generality of the above, include the following Clauses:

a) Palamount Clause General

The International Convention for the Unification of Certain Rules of Low relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this "Delivery Order". When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of water such legislation may only regulate

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this "Delivery Order," save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this "Delivery Order".

The protocol signed at Brussels on 21 December 1979("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatory or by this "Delivery Order".

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the change of another carrier, or with respect to deck cargo and live animals.

Charterers shall indemnify and hold Owners harmless against any liability, loss damage or expenses arising as a result of Split Bills of Lading or Delivery Orders being issued pursuant to the terms of this charter party and issue Letter of Indemnity, when required, as per Owners P and I recommending form.

b) This shipment was loaded on board the vessel as part of one original lot of ............(enter description of cargo) of which...........(enter quantity) was loaded at ........(enter name of load port) and.........(enter quantity) was loaded at ........(enter second load port etc) with no segregation as to parcels. The vessel undertakes to delivery only that proportion of the cargo actually loaded which is represented by the percentage that the total amount specified in the delivery orders bears to the total of the undivided bulk delivered at destination. Neither the vessel nor the Owner assumes any responsibility for the separation of the undivided Bulk at the port if delivery.

SEA WAYBILL(S) CLAUSE

Charterers' option to issue sea waybill(s), instead of Bills of Lading in case of sea waybill(s) being issued instead of bill(s) of lading, the cargo to be released at discharging port(s) as per Charterers' written discharging instruction at the sole risk and responsibility of Charterers. Charterers shall indemnify and hold owners harmless against any liability, loss, damage and/or expense caused to and/or incurred by Owners by virtue of Owners' complying with Charterers'

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

instruction for release of the cargo under the seawaybill and/or by the use of sea waybill(s). Further more the following steps shall be taken.

In case the master is requested to authorize agents to sign sea waybill(s), copy of sea waybill(s) shall be sent on fax to the master soonest possible, latest before arrival at the discharging port.

Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

This clause to be applied for Japan discharging only.

82    Charterers to have the privilege of painting their markings on vessel's funnel at Charterers' time and expenses.

Owner's markings to be restored prior to redelivery at Charterer's time and expenses.

83    Holds on redelivery to be clean-swept, water washed. Charterers have the option of redelivering the vessel upon completion of discharge of cargo without cleaning vessel's holds by paying Owners US$5,000 lumpsum.

84    Freight tax, if any, for Charterers' account.

85    ISM Clause

Owners guarantee that the vessel's management company complies with the ISM Code and will be in possession of a valid Safety Management Certificate and will remain so for the entirety of her employment under this Charter Party. The Owners to provide Charterers satisfactory evidence of compliance if required to do so but Charterers request always to be reasonable. Owners to remain responsible for expenses and damages arising directly as a result of Owners' and/or vessel's non-compliance to the above-mentioned requirement of ISM Code and/or valid Safety Management Certificate.

86    This contract is subject to successful deliver of the vessel from the shipyard.

87    Deleted

88    Deleted

89    Purchase Option

Charterers have a purchase option exercisable under this Charter Party as
outlined Memorandum of Agreement and its addenda between Owners and
Charterers. Such Memorandum of Agreement shall be attached to this
Charter Party, incorporated herein and made a part hereof.  This Charter
Party shall remain in full force and effect for the entire charter period unless
and until the sale of the vessel shall have been duly consummated in
accordance with the Memorandum of Agreement and its addenda between
Owners and Charterers attached hereto and title to the vessel shall have
been duly transferred to Charterers.

Buyers shall have the right to purchase the vessel from Sellers on the
Following Basis (JP¥ = Japanese Yen):

Purchase option price

| | |
|---|---|
| At the end of the 36th month | JP¥3,100,000,000.00 |
| At the end of the 48th month | JP¥2,950,000,000.00 |
| At the end of the 60th month | JP¥2,800,000,000.00 |
| At the end of the 72nd month | JP¥2,650,000,000.00 |
| At the end of the 84th month | JP¥2,500,000,000.00 |
| At the end of the 96th month | JP¥2,350,000,000.00 |
| At the end of the 108th month | JP¥2,200,000,000.00 |
| At the end of the 120th month | JP¥2,050,000,000.00 |

The purchase option shall extend throughout the full charter party period
but it cannot be exercised prior to the end of the 36th month after delivery of
the Vessel. Such option may be exercised at any time during a given year
provided the Sellers is given by the Buyers a minimum of three (3) months

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-Z263
DATED 15th September, 2006

notice of its intention to do so.

The exact purchase price shall be determined on a pro-rata figure effective the day of purchase and to be calculated by linear interpolation between the preceding and succeeding year and purchase options set out above.

**06**  ISPS/MTSA Clause for Time Charter Party 2005

(a)(i)The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the interim International Ship Security Certificate) and the full style contact details of the Company Security Officer(CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owner's account, expect as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Master and the Owners with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

""The Charterers shall provide the Owners with their full style contact details

and, where sub-letting is permitted under the terms of charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch service, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

91    US CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTERPARTIES.

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);
ii) Have in place an ICB (International Carrier Bond);
iii)Provide the Owners with a timely confirmation of i) and ii) above; and
iv)Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

92    ARBITRATION CLAUSE

A) Arbitration clause: Should any dispute arisen between Owners and Charterers the matter in dispute should be referred to Arbitration in London of three persons according to the London Maritime Arbitrators' Association terms, one Arbitrator to be appointed by each of the parties hereto and the third Arbitrator by the two so chosen.

If the two arbitrators fail to agree upon the choice of the third, the president of the London Maritime Arbitrators' Association will appoint the third Arbitrator. The Arbitrators shall be persons suitably qualified to arbitrate in maritime affairs.   English Law to apply.

B)  Small claims clause: Notwithstanding anything to the contrary in this Charter Party, the parties agree that all arbitrations where the amount in issue in the dispute(s) is less than $50,000 shall be conducted according to small claims procedure of the London Maritime Arbitrators' Association (amended from time to time).

If after the commencements of such a reference it appears on reasonable grounds that the sum in issue in any dispute or disputes  exceeds U.S.$ 50,000.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

Either party shall be entitled to require in writing that the reference
henceforth should proceed without regard to the small claims procedure and
each party thereupon shall have seven days to appoint its arbitrator upon the
arbitration provisions set out elsewhere in this charter party with the small
claims procedure arbitrator sitting as umpire of third arbitrator.

93    P&I Bunker Deviation clause

The vessel in addition to all other liberties, shall have liberty as part of the
contract voyage and at any stage thereof, to proceed to any port or ports
whatsoever, whether such ports are on or off the direct and/or customary routes
to the ports of loading or discharging named in this charter party and there
take oil bunkers in any quantity at the direction of Owners even to the full
capacity of fuel tanks, deeptanks and any other compartment in which oil can
be carried, whether such amount is or is not required for the Charterers
voyage.

94    Bottom Fouling clause

If the vessel's speed capacity is reduced as a result of the bottom growing fouled
by reason of the vessel being in a port including the situation for shifting to
anchorage/berth and vise versa in the same area/ports/near-by within 50 miles
for a period in excess of 30 days, the Owners are not to be responsible for
reduction in speed and bunker consumption of the vessel up until such time as
her next scheduled dry-dock.
In that case, the Charterers shall clean bottom including painting at their time
and expenses.

95    Watchmen/Guards

All charges and expenses for watchmen and compulsory watchmen/guards
always to be for Charterer's account, except watchmen assigned at Master's
request for the safety of the ship and/or the crew to be paid by Owners.

96    Bunker Fuel Sulphur Content for Time Charter Parties 2005

(a)Without prejudice to anything else contained in this Charter Party, the
Charterers shall supply fuels of such specifications and grades to permit the
vessel, at all times, to company with the maximum sulphur content
requirements of any emission control zone when the Vessel is ordered to trade

within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, fines, costs or expenses arising or resulting from the Charterer's failure to comply with this Sub-clause(a).

(b)Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

(i)the vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and

(ii)the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(C)For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

97   Compulsory Modification clause

Should any compulsory modification be required to the vessel due to the change in the rules/regulations, such as the class, SOLAS, IACS, and/or other internationally recognized rules, the extra time/cost incurred for any customary modification to be for Charterers' account in the event Charterers declare purchase option.

When such modification or installments requires large expenditure and

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

accounted by Owners as in above, both parties mutually discuss how to reflect them to the purchase option price based on Owner's actual disbursement.

Both to Blame Collision Clause

If the liability for any collision in which the vessel is involved while performing this Charter Party falls to be determined in accordance with the laws of the United States of America, the following clause shall apply:-

The New Both to Blame Collision Clause

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the good carried hereunder will indemnify the carrier against all loss or liability represents loss of or damage to or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her owners to the Owners of the said goods and set off, recouped or recovered by the other or non-carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the Owners, operators of those in charge of any ship or ships or object other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract."

and the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

The New Jason Clause

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, the statute, contract or otherwise, the goods, shippers, consignees or owners of the goods, shall contribute with the carrier

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as is the said salving ship or ships belonged to strangers. Such deposits as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery."

If the vessel loads in the U.S.A. the Clause Paramount shall be incorporated in all Bills of Lading and shall read as follows.

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved 16 April 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such terms shall be void to that extent, but no further.

General Clause Paramount.

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussels, 25th August, 1921 and which is compulsorily applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from, or limitation of liability.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-2263
DATED 15th September, 2006

USA Clause Paramount

This Bill of Lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved 16 April, 1936, which shall be deemed to be incorporated herein and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this Bill of Lading be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

Canadian Clause Paramount

This Bill of Lading, so far as it relates to the carriage of goods by water, shall have effect, subject to the provisions of the Water Carriage of Goods Act, 1936, enacted by the Parliament of the Dominion of Canada, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the Carrier of any of its right or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any terms of this Bill of Lading be repugnant to said Act to any extent, such terms shall be valid to that extent but not further.

Baltime 1939 War Clause

A. The vessel, unless the consent of the Owners be first obtained, not to be ordered nor continue to any place or on any voyage nor be used on any service which will bring her within a zone which is dangerous as the result of any actual or threatened act of war, war hostilities, warlike operation, acts of piracy or of hostility or malicious damage against this or any other vessel or its cargo by and person, body or state whatsoever, revolution, civil commotion or the operation of international law, nor be exposed in any way to any risks or penalties whatsoever consequent upon the imposition of sanctions nor carry any goods that may in any way expose her to any risks of seizure, capture, penalties or any other interference of any kind whatsoever by the belligerent or fighting powers or parties or by any government or ruler.

RIDER TO THE CHARTER PARTY IMABARI TBN – HULL NO.S-Z263
DATED 15th September, 2006

B. Should the vessel approach or be brought to or ordered within such zone or be exposed in any way to the said risks (1) the Owners to be entitled from time to time to insure their interests in the vessel and/or hire against any of the risks likely to be involved thereby on such terms as they shall think fit, the Charterers to make a refund to the Owners of the premium on demand and (2) notwithstanding the terms of Clause 11, hire to be paid for all time lost including any lost owing to loss of or injury to the Master, Officers or crew or to the action of the crew in refusing to proceed to such zone or to be exposed to such risks.

C. In the event the wages of the Master, Officers and/or crew or the cost of provisions and/or stores for deck and/or engine room and/or insurance premiums being increased by reason of or during the existence of any of the matters mentioned in Section (A) the amount of any increased to be added to the hire and paid by the Charterers on production of the Owners' account therefore, such account being rendered monthly.

D. The vessel to have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or in any other wise whatsoever given by the government of the nation under whose flag the vessel sails or any other government or any person (or body) acting or purporting to act with the authority of such government or by any committee or person having, under the terms of the war risk insurance on the vessel, the right to give any such orders or direction.

E. In the event of the nation under whose flag the vessel sails becoming involved in war, hostilities, warlike operations, revolution or civil commotion, both the Owners and the Charterers may cancel the Charter and unless otherwise agreed, vessel to be redelivered to the Owners at the port of destination or, if prevented through the provisions of Section (A) from reaching or entering it, then at a near open and safe port at the Owners' option after discharge of any cargo on board.

F. If in compliance with the provisions of this Clause anything is done or is not done, such not to be deemed a deviation.



# PRINCIPAL PARTICULARS

OF

53,400 M.T. D/W TYPE BULK CARRIER

MARUBENI CORPORATION
SHIP BUSINESS SEC No.3
4-2 Ohtemachi, Ichome Chiyoda-ku
Tokyo Japan
SHIP DEPARTMENT

**CAUTION**

THIS DRAWING OR DOCUMENT IS THE PROPERTY OF IMABARI SHIPBUILDING CO., LTD

REPRODUCTION, COPYING, UTILIZATION FOR PURPOSES OTHER THAN AGREED, DISCLOSURE TO A THIRD PARTY, ARE STRICTLY SUBJECT TO PRIOR WRITTEN AGREEMENT BY IMABARI SHIPBUILDING CO., LTD.

SHIP DESIGN GROUP

IMABARI SHIPBUILDING CO., LTD.

D-0207FA-00

| | |
|---|---|
| APPROVED | K.TOKUNI |
| CHECKED | [signature] |
| CHECKED | H. KOYAMA |
| DRAWN | [signature] |

2

IMABARI SHIPBUILDING CO., LTD.

P-1

Principal Particulars of 53,400 M.T. D/W Type Bulk Carrier

1. Principal dimensions etc.

| | | | |
|---|---|---|---|
| Length | (o.a.) | abt. | 189.9 m |
| Length | (b.p.) | | 182.00 m |
| Breadth | (mld.) | | 32.26 m |
| Depth | (mld.) | | 17.30 m |
| Draught | (designed, mld.) | | 11.00 m |
| Draught | (scantling, mld.) | | 12.30 m |
| Deadweight (at designed draught) | | abt. | 46,350 M.T. |
| Deadweight (at assigned draught) | | abt. | 53,400 M.T. |
| Gross tonnage (I.C.T.M.) | | abt. | 30,050 |

Navigation area                                 Ocean going
Flag                                            Panama

2. Class and Rules

Class                    : NIPPON KAIJI KYOKAI (NK)
Classification characters : NS* (BULK CARRIER, STRENGTHENED FOR HEAVY
                            CARGOES, NOS.2 & 4 HOLDS MAY BE
                            EMPTY), (ESP) and MNS*
Installations characters  : CHG, MPP, LSA, RCF

Rules :
( 1) Rules and regulations for the construction and classification of
     ships 2001
( 2) Maritime regulations of the registered country
( 3) International convention on load lines, 1966
( 4) International convention for the safety of life at sea, 1974,
     its PROTOCOL 1978 and its PROTOCOL 1988
     (incl. 1981, 1983, 1988(GMDSS), 1989, 1990, 1991, 1992, 1994, 1996, 1997,
     1999 and 2000 amendments)
( 5) International convention for the prevention of pollution from ships,
     1973 (annex I, V (VI) and its PROTOCOL 1978
     (incl. 1984, 1985, 1987, 1989, 1990, 1991, 1992, 1994, 1995, 1997,
     1999 and 2000 amendments)
( 6) International telecommunication conventions (1997 GENEVA)
( 7) International regulations for preventing collisions at sea, 1972
     (incl. 1981, 1987, 1989 and 1993 amendments)
( 8) International convention on tonnage measurement of ships, 1969
( 9) Rules and regulations for bulk, grain cargoes of SOLAS 1974
     ("International grain code (Res. MSC. 23(59))")
(10) Rules of navigation of the Suez canal authority, 1995
     (incl. Tonnage measurement rules)
(11) Rules and regulations governing navigation of Panama Canal and
     adjacent waters and rules for the measurement of vessels shall be
     applied as far as practicable.

IMABARI SHIPBUILDING CO., LTD

(12) USCG regulations for foreign flag vessel without certificate
( only oil pollution prevention and marine sanitation )
(13) Waterside worker's federation of Australia 1977
(only for access to cargo hold)
(14) Regulations for crew accommodation on board ships
(15) Code for Safe Practice for Solid Bulk Cargoes (BC Code) for coal

3. Ship's type

Single screw, diesel driven, flush decker type bulk carrier
with aft machinery and aft accommodations

4. Kind of cargo

Grain, coal cargoes, ore cargoes (S.F.: abt. 17CF/LT), cement cargoes,
hot steel coil, long size steel, etc.

5. Hold and tank capacity (100% full)

Cargo hold (Grain) ------------------------------------------- abt. 68,870 m³
Fuel oil ------------------------------------------------------ abt. 2,110 m³
Diesel oil ---------------------------------------------------- abt. 150 m³
Fresh water (incl. Drinking water) --------------------------- abt. 390 m³
Ballast water (incl. No.3 cargo hold) ------------------------ abt. 28,450 m³

6. Strength base

2 port loading or unloading shall be designed as follows :
Full loaded holds : Nos.1,3 and 5 cargo holds or Nos.2 and 4 cargo holds
Empty holds : Nos.2 and 4 cargo holds or Nos.1,3 and 5 cargo holds
Stowage factor : abt. 48 CF/LT (Homogeneous cargo)
Bunker : Departure ( Full bunker )

7. Number of cargo hold

Cargo hold ----------------------------------------------- 5 holds

8. Number of transverse watertight bulkhead

Watertight bulkhead ------------------------------------ 7 bulkheads

IMABARI SHIPBUILDING CO., LTD.

## 9. Complement

Officer class ------------------------------------- 9 persons
Crew class ------------------------------------- 13 persons
Spare ------------------------------------- 2 persons
Grand total ------------------------------------- 24 persons

Pilot ------------------------------------- 1 person

## 10. Accommodation

Living quarters shall be located aft.

Single berth cabin shall be arranged for officers, crew and spares.

Day room, bed room and private lavatory with bath shall be provided for captain class.

## 11. Propelling machinery etc.

Main engine : 6S50MC-C ----------------------------------- 1 set
Maximum output 9,480 kW (12,889 ps) × 127 rpm
Normal output 8,060 kW (10,958 ps) × 120 rpm (85%)

Diesel generator : 500KVA(400kW), A.C. 450V ----------------------- 3 sets

Diesel engine : 440 kW (598 ps) × 900 rpm ------------------- 3 sets

Aux. Boiler : Composite system vertical type boiler ------ 1 set
Oil burning side : 0.6 MPa (6 kg/cm²)×1,100 kg/h
Exhaust gas side : 0.6 MPa (6 kg/cm²) × 950 kg/h

Propeller : F.P.P. (Ni-Al-Br.) ------------------------------ 1 set

Fuel Oil : At normal output 171.8 g/kW·h + 3% at 42,700 kJ/kg
consumption of (126.4 g/ps·h) (10,200 kcal/kg)
main engine abt. 35.0 t/day + 3% at 40,600 kJ/kg
(9,700 kcal/kg)

## 12. Ship's speed and endurance

Service speed at normal output on designed draught (11.00m)
with 15% sea margin : abt. 15.0 knots

Endurance at service speed : abt. 17,500 sea miles
(F.O. 88% full, S.G.=0.95, L.C.V.=40,600 kJ/kg, M/E only)



13. Cargo hatch size and type

(b)
Nos. 1~5 cargo hatches    (1) 21.12 m × 17.60 m

All cargo hatches shall be provided with folding type weather tight double skin steel hatch covers which are operated by Electro-hydraulic system.

14. Painting for outside shell and tanks

| Outside shell : | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Bottom area | TE A/C(HB) | V A/C | SP A/F | (24 months) |
| Boottop area | CR A/C | CR B/T | CR T/S | |
| Topside area | CR A/C | CR T/S | | |

Abbreviation
TE A/C —— Tar epoxy anti-corrosive paint
V A/C —— Vinyl modified anti-corrosive paint
SP A/F —— Self-polishing type anti-fouling paint not containing TBT
CR A/C —— Chlorinated rubber anti-corrosive paint
CR B/T —— Chlorinated rubber boottop paint
CR T/S —— Chlorinated rubber topside paint
(HB) —— High build type

Water ballast tanks : All inner surfaces shall be painted with tar epoxy paint.

Fresh water tanks and Drinking water tank : All inner surfaces shall be painted with non-solvent type pure epoxy paint.

No.3 cargo hold (water ballast tank) : All inner surfaces shall be painted with tar epoxy paint.

No final docking of the vessel shall be carried out.

15. Heating and ventilation

Air conditioned by central unit : All living quarters
Mechanical exhaust : Galley, provisions store and sanitary spaces
Mechanical supply : Engine room

16. Fire fighting system

Fire pump system : As per rule requirement
Portable fire extinguisher : As per rule requirement
Fire fighting system for engine room : High expansion foam system

IMABARI SHIPBUILDING CO., LTD

IMABARI SHIPBUILDING CO., LTD

17. Life saving appliance

Lifeboat with inboard engine : (24 persons) ------------------ 2 sets
Inflatable life raft : (25 persons) ------------------ 2 sets
( 6 persons) ------------------ 1 set

18. Deck machinery

Windlass (Electro-hydraulic) 25.8 tons ------------------ 2 sets
Mooring winch (Electro-hydraulic) 12.5 tons × 15 m/min ------------------ 2 sets
Steering gear (Electro-hydraulic) Pump (50% × 2) ------------------ 1 set
Ref. machine for provisions chamber ------------------ 2 sets
Ref. machine for air conditioning ------------------ 1 set
Lifeboat winch (Elect, motor driven) ------------------ 2 sets
Emergency fire pump (Elect, motor driven) ------------------ 1 set
Emergency generator (Diesel engine driven) ------------------ 1 set
Deck crane (Electro-hydraulic) 30.5 MT×26 mR ------------------ 4 sets
Grab bucket (Electro-hydraulic) 12m³(coal) ------------------ 4 sets

19. Wireless Installation

150W MF/HF transmitter (simplex operation type) ------------------ 1 set
MF/HF receiver ------------------ 1 set
Inmarsat standard-B (with facsimile) ------------------ 1 set
Inmarsat standard-C ------------------ 1 set
Navtex receiver ------------------ 1 set
V.H.F. radio telephone (simplex operation type) ------------------ 2 sets
Two-way radio telephone ------------------ 3 sets
Satellite EPIRB ------------------ 1 set
Radar transponder ------------------ 2 sets
A.I.S. ------------------ 1 set

20. Nautical Instrument

Magnetic compass (Reflector type) ------------------ 1 set
Gyro compass with auto pilot ------------------ 1 set
Echo sounder ------------------ 1 set
Electro magnetic Log ------------------ 1 set
Radar (20 inches : CRT display size, X-band) ------------------ 1 set
ARPA (with 28 inches : CRT display size, X-band) ------------------ 1 set
Electric revolution indicator of main engine ------------------ 1 set
Electric helm angle indicator of rudder ------------------ 1 set
Facsimile (10 inches) ------------------ 1 set
G.P.S. navigator ------------------ 1 set
Wiper ------------------ 3 sets
Loading computer ------------------ 1 set
V.D.R. ------------------ 1 set



*** ROUGH ARRANGEMENT ***

D-0207FA-00

L    *    B    *    D    *    d
182.00 * 32.26 * 17.30 * 11.00