# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## Norfolk Division

DRY HANDY INVESTMENTS LTD.,

        Plaintiff,

                                    Civil Action No. 2:13 cv 678

v.

CORVINA SHIPPING CO. S.A.

and COMPANIA SUD AMERICANA DE

VAPORES S.A.,

        Defendant.

## **DECLARATION OF SHAW**

Exhibit 5C – Charterparties

**SECOND ORIGINAL**

# Time Charter

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913—Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in Monaco, day of 18th May 19 2009

2  Between a Panamanian, Singapore or Hong Kong subsidiary company guaranteed by Nissen Kaiun Co., Ltd., Japan or its group
   company

3  Owners of the good Panamanian Steamship/Motorship Newbuilding Bulk Carrier to be named of about 58,100 DWT (Hull no.SC136), (the
   "Vessel") to be built by Tsuneishi Heavy Industries (Cebu) Inc., Philippines (the "Shipyard") of Tsuneishi Holdings Corporation of
   Japan (the "Builder") – see cls. 29 for details of

4  of _tons gross register, and             tons net register, having engines of         indicated horse power

5  and with hull, machinery and equipment in a thoroughly efficient state, and classed NK, NS*, (ESP) MNS*, CHG, MPP, LSA, RCF, M0

6  at        of about        cubic feet bale capacity, and about 58,100 metric tons of 2240 lbs.

7  deadweight capacity (cargo and bunkers, including fresh water and stores lubricating oil and vessel's spare parts not exceeding one and one-half
   percent of ship's deadweight capacity,

8  allowing a minimum of fifty tons) on a draft of        feet        inches on        Summer freeboard, inclusive of permanent bunkers,

9  which are of the capacity of about             tons of fuel, and capable of steaming, fully laden, under good weather

10 conditions about        knots on a consumption of about        tons of best Welsh coal best-grade fuel oil best-grade Diesel oil.

11 now on order

12 and Messrs. Dry Bulk Handy Holding Inc., Panama or its nominee, guaranteed by DryLog Ltd., Bermuda Charterers of the City of

13 **Witnesseth,** That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14 about a period of ten (10) years, plus in Charterers' option 30 months, 60 days more or less in Charterers'option on final period only.
   **The optional period to commence from the end of 120th month after delivery if declared. Optional period(s) to be declared by**
   **Charterers latest 3 months before the expiration for charter period, such optional period to be commenced from the mean date.**

15     within below mentioned trading limits.

16 Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17 the fulfillment of this Charter Party. Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligation hereunder.

18 Vessel to be placed at the disposal of the Charterers, at on dropping dockmaster at the Builder's yard in Philippines, at any time day and
   **night, Sundays and Holidays included, in Owners' option.**

19

20 in such dock or at such wharf or place (where she may safely lie always afloat, at all times of tide, except as otherwise provided in clause No. 6), as

21 the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5. Vessel on her delivery to be

22 ready to receive cargo with clean-swept holds and tight, staunch, strong and in every way fitted for the service, having water ballast, winches and

23 donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same

This document is a computer generated NYPE 46 form printed by BIMCO's *idea*. Any insertion or deletion to the form must be clearly visible, in event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original printed NYPE 1946 document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original printed NYPE 1946 document and this computer generated document.



| 24 | time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan- |
| 25 | dise, including petroleum or its products, in proper containers, excluding see clause 36 |
| 26 | (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk, |
| 27 | all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports in British North |
| 28 | America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or |
| 29 | Mexico, and/or South America                                  and/or Europe |
| 30 | and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between |
| 31 | October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding, when out of season, White Sea, Black Sea and the Baltic, |
| 32 | World wide trading, always within Institute Warranty Limits, always via safe port(s), safe berth(s), safe anchorage(s), except North |
| 33 | Korea, Israel, Cuba, Sierra Leone, Somalia, Angola, Eritrea, Rep. of Djibouti, D.R.C. (i.e. former Zaire), Syria, |
| 34 | Cambodia, Lebanon, Russian Pacific Ports during Gypsy Moth season i.e. June to October (Charterers shall fully indemnify Owners from any liability, loss of time, damage or expenses arising from Asian gypsy moth by calling at Russian pacific ports), Albania, Tanzania, Turkish occupied Cyprus, Haiti, West of Mantanzas of Orinoco River, North of San Lorenzo in the river Parana, any country/area banned and/or boycotted by UN or USA and war or warlike zones. When Charterers instruct the Vessel to trade from the Russian Pacific port(s) which is (are) determined as high risk port(s) for contamination of Asian Gypsy Moth by the United States Department of Agriculture (USDA) and/or Canadian Food Inspection Agency (CFIA) to the port(s) in U.S.A. and/or Canada, Charterers shall carry out the inspection to obtain Certificate of Freedom from Asian Gypsy Moth to be approved by USDA and CFIA for their time and expense. In case the Certificate of Freedom from Asian Gypsy Moth can not be obtained, any loss of time and expenses caused is born by Charterers (See Clause 37, 67 and Clause 94) |
| 35 | as the Charterers or their Agents shall direct, on the following conditions: |
| 36 | 1. That the Owners shall provide and pay for all provisions, wages immigration and consular shipping and discharging fees of the Crew also all consular fees necessitated because of the vessel's nationality of flag, also all compulsory/cargo related garbage removal; shall pay for the |
| 37 | insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water drinking water and lubricating oil and maintain her class and keep |
| 38 | the vessel in a thoroughly efficient state in hull, machinery and equipment with all certificates (including tonnage and measurement certificates but except tonnage dues certificates for port charges) necessary to comply with requirements at ports of call and canals for and during the charter period, falling which Owners are responsible for all time lost and expenses incurred thereby. Owners or Manager to be certified under Rules for compliance with International Safety ISM Management Code-Resolution A 741(18), for and during the service. |
| 39 | 2. That whilst the vessel is on hire the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, canal tolls, Pilotages, Agencies, Commissions, |
| 40 | Consular Charges (except those pertaining to the Crew and flag of the vessel), fresh water for hold cleaning and all other usual expenses except those before stated, but when the vessel puts into |
| 41 | a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of |
| 42 | illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this |
| 43 | charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period |
| 44 | of six months or more. Owners to provide and keep on board a valid deratization certificate throughout the charter party period. |
| 45 | Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but |

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document the original BIMCO approved text, other than the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

46 Owners to allow them the use of any dunnage ~~and shifting boards~~ already aboard vessel. ~~Charterers to have the privilege of using shifting boards~~
47 ~~for dunnage, they making good any damage thereto.~~
48 3. ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~                          ~~tons  and  not  more  than~~
50 ~~tons and to be re-delivered with not less than~~                          ~~tons  and  not  more  than~~                          tons. See clause No. 40
51 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of (see clause 81)
52 ~~United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and~~
53 ~~stores, on~~          ~~summer freeboard, per Calendar Month,~~ commencing on and from the day time of her delivery, as aforesaid, and at
54 and after the same rate for any part of ~~a month~~ day; hire to continue until the hour of the day of her re-delivery in like good order and condition,
ordinary
55 wear and tear excepted, to the Owners (unless lost) ~~at~~ on dropping last outward sea pilot at one (1) safe port within Japan-Singapore range
including People's Republic of China, South Korea, Philippines, Malaysia, and R.O.C. (Taiwan), Skaw/Passero range including United
Kingdom and EIRE, Vancouver/San Diego range, Singapore/India range, Kuwait/U.A.E. range, always within Institute Warranty
Limited and permitted countries/areas under Charter Party, excluding war or warlike zone(s), in Charterers' option any time day and
night Sunday and Holidays included
56 unless otherwise mutually agreed.  Charterers are to give Owners not less than 30 days
57 notice of vessels expected date of re-delivery, and probable port and 10/7/5 days definite notice with port of redelivery.
58 5. Payment of said hire to be made in ~~New York~~ Tokyo in cash in United States Currency, semi-monthly in advance, and for the last half
month or
59 part of same the approximate amount of hire, and should  same not cover the actual time, hire is to be paid for the balance expected day by day, as it
becomes
60 due, ~~if is required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the~~
61 ~~hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-~~
62 ~~terers, without prejudice to any claim they (the Owners) may otherwise have on to Charterers or their Agents. Time to count from 7 a.m. on the working day~~
63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire see cls. No. 55A and 55B.~~
65 Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 ½% commission and such advances shall  be  deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances see cls. No. 55B.
68 6. That  the  cargo  or  cargoes  be  laden  and/or  discharged  in  any  dock  or  at  any  wharf  or  place/anchorage that  Charterers  or  their
Agents may
69 direct, provided  the  vessel  can  safely  lie  always  afloat at any time of tide, except in Argentina, Uruguay, River Plate, but not north of San Lorenzo,
Santos, Paranagua, Rio Grande, Sao Francisco do Sul in Brazil, at such places where it is customary for similar size vessels to safely
70 lie aground. NAABSA to be allowed maximum two times per annum. NAABSA to be applied for grain loading port only.
71 7. That  the  whole reach of the  Vessels'  Hold,  Decks,  and  usual  places  of  loading  (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall  be  at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel,  furniture, provisions, stores and fuel. No passengers. ~~Charterers have the privilege of passengers as far as accommodations~~

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible, in event of any modification being made to the pre-printed text of this document such modification shall be clearly visible, the text of the original BIMCO approved document shall apply. BIMCO approved document and this computer generated document.

allow, ~~Charterers~~
~~paying Owners~~          ~~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
~~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense.~~

8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards vessel's employment and

agency; and Charterers are to load, stow, and trim secure and discharge the cargo at their expense under the supervision and responsibility of the Captain, who is to sign Bills of Lading for

cargo as presented, in conformity with Mate's or Tally Clerk's receipts.

9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the rate of $10.00 per day. Owners to victual Pilots and Customs Officers, **and provide accomodation, if available, and also, when authorized by Charterers or their Agents, to victual Tally**

Clerks, Stevedore's Foreman, etc., Charterers paying U.S.$ 5.00 at the current rate per meal, for all such victualling. A lumpsum of U.S.$ 2,000.- permonth for communication charge and including entertainment.

~~11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a true copy of daily Logs, showing the course of the vessel and distance run and the consumption of fuel. See cls. No. 34~~

12. That the Captain shall use diligence in the care and ~~eating~~ for the ventilation of the cargo.

~~13. That the Charterers shall have the option of continuing this charter for a further period of~~

~~on giving written notice thereof to the Owners or their Agents~~       ~~days previous to the expiration of the first named term, or any declared option.~~

14. That if required by Charterers, time not to commence before 1st June 2011 and should vessel

not have been delivered ~~given written notice of readiness~~ on or before 30th November 2011 but not later than 4 p.m. Charterers or their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness. **Intention to deliver September 2011. Owners to narrow laydays/cancelling to 90 days spread by 180 days prior commencement of laydays/cancelling, then to 30 days spread 90 days prior to the expected date of delivery and to 20 days spread 60 days prior to the expected date of delivery. Owners to serve 30/20/15/10 days approximate and 7/5/4/3/2/1 days definite notice of delivery to Charterers. Should the completion of the construction of the vessel delayed due to the cause attributable to the Shipyard, including but not limited to the causes categorized as force majeure in the Shipbuilding contract, the cancelling date under the Charter Party can be postponed automatically for the number of days of such delay but maximum upto 60 days.**

15. That in the event of the loss of time from default and/or deficiency and/or death of men or stores, fire, breakdown or damages to hull, machinery or equipment,

grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause whatsoever preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost; and if upon the voyage the speed be

74
75
76
77
78
79
80
81
82
83
84
85
86
87
88
89
90
91
92
93
94
95
96
97
98
99

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document, which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.
102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property, time and cost for such deviation to be equally shared between Owners and Charterers.
107 17. ~~That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.See cls. 70~~
110 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.
114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
116 York-Antwerp Rules 1994 as uptodated in London 1924, ~~at such port or place in the United States as may be selected by the carrier, and as to~~
117 ~~matters not provided for by these~~
118 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
119 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
120 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
121 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
122 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
123 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
124 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
125 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
126 ~~United States money.~~
127 ~~In the event of accident, danger, damage or disaster, before or after commencement of the voyage resulting from any cause whatsoever~~
128 ~~whether due to negligence or not, for which, or for the consequences of which, the carrier is not responsible, by statute, contract or otherwise, the~~
129 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
130 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
131 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
132 ~~ships belonged to strangers.~~
132 Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder.
133 20. Fuel used by the vessel while off hire, to be deducted from hire ~~also for cooking, condensing water, or for grates and stoves to be~~
134 ~~agreed to as to quantity, and the~~
134 cost of replacing same, to be allowed by Owners.

This document is a computer generated HYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.



135 ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~
138 **The Charterers shall endeavour to bring the vessel back to Japan/Singapore range for drydocking. The Owners**
139 **will give the Charterers five (5) months prior notice of their intention to carry out the drydock. (see clause 73)**
140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for ~~all derricks~~ for all cranes and grabs) capable of handling
141 lifts up to their maximum capacity in accordance with Clause 29 ~~three tons also~~

142 providing ropes, and maintaining runners, falls, slings and blocks as on board. ~~If vessel is fitted with derricks capable of handling heavier lifts,~~
143 ~~Owners are to provide necessary gear for~~
144 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.~~ Owners also to provide on the vessel lanterns and oil for
145 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The~~

Charterers to have the use of any gear on board the vessel. Owners also to provide and maintain in efficient working order adequate electric light for
night work on board.

23. Vessel to work night and day, if required by Charterers, and all cranes or grabs winches to be at Charterers' disposal during loading and discharging;

146 ~~steamer to provide one winchman per hatch to work winches day and night as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeyman for overtime work in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~ In the event of a disabled crane or crane(s) and grab(s), or insufficient power to operate cranes and grabs, charter-hire to be reduced pro-
rata for the period of such inefficiency in relation of the number of hatches workable, and Owners have to pay any extra costs including standby
time, but maximum one shift for shore labour. Charterers have the option to hire shore appliances to continue and for which Owners to pay but
Vessel in this case remaining on-hire. If the Vessel is detained as a result of disabled crane(s) or grab(s), which detention would not have occurred
had the crane(s) or grab(s) been available and efficient at all times, Vessel to be off-hired. In the event of a breakdown of crane(s) or grab(s) due to
proven negligence or rough handling by stevedores, the Vessel to remain on hire during any time spent for their repair and until cargo work is
resumed. Any such repair shall be settled in accordance with Clause 47.

151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~
152 ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153 ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154 ~~of which are to be included in all bills of lading issued hereunder.~~
155 U.S.A. Clause Paramount

156 ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157 ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158 ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159 ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160 Both-to-Blame Collision Clause

161 ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162 ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~



This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion in the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

163 hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss
164 or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-
165 carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her
166 owners as part of their claim against the carrying ship or carrier.
167 25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168 drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169 port or to get out after having completed loading or discharging. The vessel never to force nor to push ice, nor to followice breakers.
170 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171 navigation of the vessel, acts of pilots and tugboats, insurance, crew, and all other matters, same as when trading for their own account.
172 27. A commission of 2½ per cent is payable by the Vessel and Owners to
173
174 on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175 28. An address commission of 2½ per cent payable to          on the hire earned and paid under this Charter.

Clauses Nos. 29 to 97 both inclusive as attached, Annex "A" and Annex "B" as attached, the Both to Blame Collision Clause, The New
Jason Clause, Convartime 2004, P and I Bunkering Clause, MOA as attached (Nippon Sale 1993) are to be considered as part of this
Charter Party.

THE OWNERS

Panamanian, Singapore or Hong Kong subsidiary company
guaranteed by Nissen Kaiun Co., Ltd., Japan or its goup company

THE CHARTERERS

ATTORNEY IN FACT
Messrs. Dry Bulk Handy Holding Inc.,
Panama or its nominee, guaranteed by
DryLog Ltd., Bermuda

This document is a computer generated NYPE 46 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In event of any modification being made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense caused as a result of discrepancies between the original BIMCO approved document and this computer generated document.

**SECOND ORIGINAL**

**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

29.

SPECIFICATIONS

Vessel to be built and delivered in Cebu (Philippines). Description as per attached Annex A.

30.

GRAIN LOADING

The vessel is suitable for carrying cargoes of heavy grain in bulk in all holds without requiring
any securing arrangements. For the carriage of grain in bulk, the vessel to have on board at any
time of this time charter period valid documents and certificates issued by a recognised
classification society and certificates issued by Cargo Bureau on the basis of Solas 1974.
Furthermore, the vessel has on board approved table of heeling moments for "filled holds-
untrimmed ends" in accordance with IMCO BC XIX/INF.4 or latest uptodated amendment.

31.

ALTERNATE HOLDS LOADING

Vessel is strengthened for heavy cargoes and holds 2+4 may be left empty, leaving vessel able to
load a full DWT cargo in the remaining holds in accordance with loading manual approved by
Class.

Charterers have the option to install artificial separations for the purpose of separating different
grades of cargo. All associated time and costs of installation and removal of fittings to be for
Charterers' account. Work to be performed to Master's satisfaction and fittings to be removed
prior to vessel's redelivery. Charterers shall remain responsible for any claims arising from
cross-contamination between the grades thereby separated. In the event welding is necessary in
the holds to install separations, Charterers shall provide Owners with welding plans prior to
loading the cargo for Owners' approval which not to be unreasonably withheld.

32.

I.T.F.

It is hereby mutually agreed between Owners/Charterers that Owners of the vessel guarantee that
the minimum terms and conditions of employment of the crew are now, or will be prior to
representation of the vessel for delivery, and will remain for the period of this charter party,
covered by an I.T.F. Agreement or a Bona Fide Trade Union Agreement acceptable to the I.T.F.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

33.

## WATER BALLAST

Charterers have the right to instruct the master to utilise the vessel's maximum water ballast capacity, including floodable hold(s) in order to bring down the vessel's height to get into position under loading and/or discharging appliances however in conforming with freeboard and safety regulations.

34.

## INSTRUCTIONS/VOYAGE RECORD

Charterers shall furnish the Master from time to time with all requisite instructions and sailing direction, in writing or by telegram and the master shall keep a full and correct deck and engine log of the voyage or voyages, showing, inter-alia, the course of the vessel and distance run and the consumption of fuel oil, which is to be patent to Charterers or their agents a true copy of which is to be sent to Charterers (directly or via agents) from each port of call on the voyage and immediately after completion of the voyage, together with any other information which the master deems necessary. Deck and engine log to be written in English.

35.

## OCEAN ROUTES

The vessel shall be capable at all times during the currency of this Charter of steaming as per description.
For the purpose of this Charter "Good weather conditions" are to be defined as weather conditions with wind not exceeding Beaufort Force 4 and Sea Douglas 3.
Charterers may in their option and at their cost engage an independent weather routing company to Monitor vessel's course, position, speed, etc. in order to maximise vessel's performance, Master is to follow the independent weather routing company's suggestions concerning navigation but Master, at his reasonable discretion, may not follow suggested route in which case he has to detail in log book the reasons for departing from them.
Any deviation to be advised as soon as possible both to the independent weather routing company and to Charterers' stating reason. In the event of consistent discrepancy between deck log and the independent weather routing company, Owners and Charterers shall discuss in good faith, but if they cannot reach an agreement, the independent calculations carried out by the independent weather routing company to be accepted as binding by both parties. However, in the event of inconsistent discrepancy, calculations by deck log to be accepted as binding by both parties.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

36.

CARGO EXCLUSIONS

The vessel shall be employed in carrying lawful cargoes excluding any goods of dangerous, injurious, flammable or corrosive nature classified under the regulations and requirements of IMO, SOLAS and vessel's class.  Without prejudice to the generality of the foregoing, the following cargoes are specifically excluded from the carriage by the Vessel.

Livestock, arms, ammunition, explosives, nuclear and radioactive material and its waste, petroleum or its products (see below for petcoke), tar, pitch in bulk, borax in bulk, bitumen, quebracho, sodium sulphate, calcium hypochlorite, hydrochloride, bone meal, charcoal, turpentine, ferro-silicon, seed cake, oil cake (but all oil extracted pellets which is not dangerous grade in accordance with IMO code, to be allowed and to be carried), resin, cotton, nitrate, lime, Chilean nitrate, caustic soda, copra, pond coal, pebbles, Indian coal, sponge iron, asphalt, sunflowerseed expellers, ammonium nitrate,  naphtha and its products, direct reduced iron, direct reduced iron ore pellets, hot briquetted iron, asbestos, hides, scraps of any kind, motor blocks and turnings, creosoted goods, calcium carbide, acids, logs, lumber, brown coal, fish meal, motor spirits, industrial waste, on-deck cargo and any other cargoes (except coal and petcoke) listed Appendix B to BC Code.

See below for salt, sulphur, scrap and cement in bulk or cement clinker:

Charterers are allowed to carry a maximum of 5(five) dirty cargoes each year from the below list however such dirty cargoes are not to be carried on the final voyage before redelivery:

> a) max 3 cargoes of petcoke
> b) max 2 cargoes of salt
> c) max 3 cargoes of cement in bulk or cement clinker
> d) max 1cargo of sulphur
> e) max 1 cargo of scrap

In case of loading Petcoke

Three (3) cargoes of Petroleum Coke per year, but shall not be consecutive voyages and shall not be last voyage before redelivery.  If Petroleum Coke is loaded, Charterers are to thoroughly clean the vessel's hold to the Master's satisfaction at Charterers' time and expense.  Charterers may request the vessel's Crew to perform hold cleaning paying lumpsum bonus per hold (see Clause 42) in addition to regular intermediate hold cleaning fee subject to port authority, local regulations and weather permitting.

**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

---

<u>In case of loading Cement/Cement Clinker</u>

Three (3) cargoes of Cement or Cement Clinker per year, but shall not be consecutive voyages and shall not be last voyage before redelivery. If Cement or Cement Clinker is loaded, Charterers thoroughly clean the vessel's hold to the Master's satisfaction at Charterers' time and expense. Charterers may request the vessel's Crew to perform hold cleaning paying lumpsum bonus per hold (see Clause 42) in addition to regular intermediate hold cleaning fee subject to port authority, local regulations and weather permit.

<u>Painting (or lime/hold block 10 coating) clause for loading Salt/Sulphur:</u>
Charterers shall paint (or lime-coat or Hold Block 10 if compulsory) the vessel's holds prior to loading salt and remove after completion of discharging upto Master's satisfaction at Charterers' time, risk and expense. If required by Charterers, subject to port authority, local regulations and weather permitting, Crew to carry out painting (or lime-coating or Hold Block 10 if compulsory) and removal at Charterers' time, risk and expense, for which Charterers shall pay a lumpsum bonus per hold each for painting (coating) and removal respectively in addition to the normal hold cleaning allowance. (See Clause 42.)

Charterers assure to take following procedures:

Charterers to provide the products prior loading together with all equipment necessary for the application.

Charterers to provide vessel's crew personal instruction from suitable qualified person during the application process.

Upon completion of discharge, a further product to be supplied together with all equipment necessary for the removal and again crew to be provided suitable instruction.

The cost of the product, the equipment and the instruction to be met by Charterers.

<u>Salt Loading Clause:</u>
Salt be loaded, stowed and carried and discharged strictly in accordance with applicable national/international regulations and/or IMO regulations at Charterers' risk and expense. Charterers are permitted to load maximum two (2) cargos per year which not to be consecutive and not to be the last cargo prior to redelivery and the following procedure to be arranged. Where customary accordingly to local regulations, holds to be thoroughly washed by vessel's crew with fresh water before loading and after discharging at Charterers' time, risk and expenses. Charterers shall pay a lumpsum bonus per hold (see Clause 42) cleaning allowance in addition to normal hold cleaning allowance.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

Sulphur loading Clause
Charterers have to option to load maximum one cargo of "lump and coarse grained sulphur" formed to a specific shape (e.g. prills, granules, pellets, pastilles or flakes) per year, but it shall not be consecutive voyages nor to be last voyage before redelivery and to be loaded, stowed, carried and discharged strictly in accordance with regulations and requirements of IMO, SOLAS and the vessel's class at Charterers' risk and expense.
However, sulphur as above shall not be allowed to load, unless a DG certification from shipper proving that the cargo does not emit any dust and is not categorized as dangerous goods.
Even with such DG certification is obtained from shipper, such sulphur can be loaded in the holds except No.5 hold and within the strength and stability of the vessel.

Scrap loading clause:
Charterers have the liberty of carrying max one (1) cargo of scrap excluding motor spirits, turning, motor blocks each year if exercised on following conditions:

a) The first layer of scrap to be lowered as close as possible to vessel's tank top in order to provide a proper cushion to Master's satisfaction.
b) Scrap not to be the last cargo prior to redelivery.
c) Charterers to arrange, at their time and expense, holds survey before loading and after discharge to ascertain damages to the holds.
d) Should electro-magnets be used during loading or discharging, then the risk/time/expense of re-calibrating vessel's compass (if necessary) to be for Charterers' account.


37.


BREAKING I.W.L.


Charterers may break IWL subject always to a prior consent of Owners which not to be unreasonably withheld.


Charterers to pay any additional premium for breaking IWL as per Owners payment vouchers.


38.


BIMCO DOUBLE BANKING CLAUSE


a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

(b) The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

39.

Delete

40.

<u>BUNKERS ON DELIVERY/REDELIVERY</u>

The vessel to be delivered and redelivered with bunkers as on board, about 1000 metric tons of IFO and about 50 metric tons of MDO.

Bunker price on delivery to be applied at Owners purchasing price at port of replenishment prior to delivery and on redelivery to be applied at Charterers' purchasing price at port of replenishment prior to redelivery.

Before delivery/redelivery, Charterers/Owners are allowed to bunker the vessel in Owners'/Charterers' time provided such bunkering does not interfere with Owners'/Charterers' operation of the vessel.

Charterers shall supply to the vessel Intermediate Fuel Oil and Diesel Oil as specified in vessel's description throughout the currency of the Charter Party period.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

41.

HOLD CONDITION FOR FIRST LOADING

For the first voyage, the vessel to tender at loading port(s) with all holds cleaned and suitable in every respect for the purpose of loading grain in bulk to the satisfaction of the competent authorities and relative certificate obtained. The vessel's holds must be passed by official Grain Inspector for carriage of grain in bulk.

Should the holds not meet the satisfaction of the competent authorities, the additional cleaning as required to be at Owners' expense and hire to be suspended until holds are all accepted.

42.

HOLDS CLEANING BY CREW

The vessel's crew shall clean cargo holds if required by Charterers against Charterer's payment of crew bonus to be agreed, provided permitted by shore regulations of the port, weather permitting and enough time is allowed. Charterers shall supply necessary chemicals, materials, hatch sealing tapes, and equipments for hold/hatch maintenance required by master and/or Owners for Charterers' account.
Crew to perform holds cleaning at best of their capability, however Owners are not responsible for the vessel's not passing cargo hold inspection in all respects and any delay due to the failure to pass the cargo hold inspection shall not be considered as off-hire.
In case hold cleaning is not permitted by shore regulations of the port and shore labour is necessary to be arranged, the same to be for Charterers' account.

Vessel to have on board suitable equipment to perform such cleaning including but not limited to: extendible ladders, hoisting equipment, water pressure lines in order to facilitate crew and expedite operations.

Charterers to pay Owners a lumpsum compensation for such intermediate cleaning and per hold actually cleaned:

- USD 700 per hold actually cleaned for cargoes which require a grain standard
- USD 450 per hold actually cleaned for all other cargoes

In case petcoke or salt loaded, then Charterers to pay additional USD 600 (six hundred dollars) per hold for intermediate hold cleaning as bonus to crew. In case sulphur loaded, then Charterers to pay additional USD 700 (seven hundred dollars) per hold for intermediate hols cleaning as bonus to crew.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

In case of cement/cement clinker Charterers to pay additional USD 600 (six hundred dollars) per hold per intermediate hold cleaning. When cleaning tools equipment are needed over what is usually required to have on board as per paragraph 1 above, those to be supplied by the Charterers.

Subject to the provision below, if salt/sulphur is loaded, vessel's crew to whitewash vessel's holds paying additional USD 600 (six hundred dollars) per hold to crew and wash down holds with fresh water after completion of discharge at Charterers' time.

If sulphur is loaded:

a) Holds to be thoroughly washed by vessel's crew with fresh water before loading and after discharge at Charterers' time.
b) Subject to the provisions below, limecoating of holds for the carriage of sulphur , whether requested by Shippers or Charterers or Owners, to be arranged by vessel's crew at Charterers' time.
c) Similar procedures to apply for the limecoating removal.
d) The above operations and the carriage of sulphur to be arranged at Charterers' risk.

For the carriage of salt or sulphur in case shore regulations and/or Shippers do not permit and/or time between voyages does not allow crew to do the whitewashing or removal of whitewashing, limecoating or removal of limecoating, then Charterers to arrange at their time, risk and expenses the necessary to do so upto Master's satisfaction.

The Master and crew, although not responsible for the result of hold cleaning to render all customary assistance with regard to hold cleaning and will provide sufficient equipment and men to ensure that holds are cleaned without unnecessary delay.

In case of loading salt cargoes, even on consecutive voyages, cargo holds are to be lime coated for each voyage by crew at Charterers' time and expense prior to loading. Equipment and materials for same to be supplied by Charterers.


43.


HOLDS CLEANING ON REDELIVERY

The vessel shall be redelivered by Charterers to Owners with clean swept holds washed down and dried up free from residues. However Charterers shall have the option to redeliver the vessel with holds as are discharged and left by stevedores, in consideration of which Charterers shall pay a lumpsum compensation of U.S.$ 6000,-- to Owners.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

44.

CARGO HOLD PAINTING

Painting of vessel's cargo holds during the currency of this charter to be done only after consultation and with Charterers' express permission, in case required by Charterers, time and expenses (excepting such painting during drydocking) to be for Charterers' account.

Owners may paint holds in order to keep vessel's holds clean/rust free at the best of their capacity as usual maintenance without Charterers' permission.

45.

SUPERFICIAL INSPECTION

Charterers have the option of holding at any time of this Charter Party a superficial inspection at their time/expense/risk without interference with vessel's normal operation.
Owners or Master to give every facility and assistance to carry out this inspection.

46.

HATCH OPERATION

All opening and closing of hatches to be done by vessel's crew, if requested by Charterers, provided it is allowed by shore regulations and weather conditions.

47.

STEVEDORE DAMAGES

Vessel is guaranteed suitable for grab discharge, vessel has clear and unobstructed holds with no deeptanks or other provisions except Australian hold ladders. Master to notify in writing stevedores and all parties involved of any damage during loading and/or discharging as soon as possible, but not later than vessel's sailing from last discharging port of the voyage.

In any case, the Master to pay due diligence at loading port to discover and to declare the damage to the stevedores and to all parties involved. Master to endeavour to obtain written admission of liability from Party involved but Charterers are ultimately responsible for the settlement. Charterers have the privilege of using bulldozers in vessel's holds and any damages, except normal wear and tear, caused by bulldozers to be considered as stevedores damage.



RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009

---

Damages affecting class or seaworthiness or cargo worthiness to be repaired immediately at
Charterers' time and expenses and damages not affecting the same may be postponed to dry-dock
will be evaluated by reputable shipyard at the time of occurrence and Charterers to have the
option either to repair during such dry-dock or to reimburse as evaluated at the time of
occurrence which is settled as soon as possible.

48.

DUTIES

Any taxes levied by any government other than that of Owners' domicile or the ship's flag in
respect of the earnings of the vessel under time charter shall be for Charterers' account.

49.

SMUGGLING

Charterers to be responsible for any fines whatsoever imposed in the event of smuggling by
Charterers' employees, servants/agent or cargo interests but Owners to be responsible for any
such acts of their own officers and/or crew. Charterers to remain responsible for detention of the

vessel due to smuggling committed by Charterers' employees, servants/agent or cargo interests
only.

50.

BOYCOTT

Should the vessel be boycotted, picketed, blacklisted or similar incident may occur at any port or
place by shore and/or port labour and/or tugboat and/or pilot, or by Government labours and/or
any authority, by reason of vessel's flag/ registry/manning or the Ownership or terms and
conditions on which members of the officers/crew are employed or by reason of trading of this
vessel, or by reason of vessel's construction and/or her fitting and/or her other equipments, all
consequences and any extra expenses incurred therefrom to be for Owners' account and the
Charterers are entitled to place the vessel off hire for any time lost by such reason.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

51.

<u>VACCINATION</u>

Owners to arrange at their expense that the Master, Officers and crew of the vessel hold valid
vaccination certificates upon delivery of the vessel and throughout the time charter period.

52.

<u>DETENTION</u>

Should the vessel be seized or detained by any Government or legitimate authority or in
consequence of any legal action against Owners and/or the vessel during the currency of this
Charter, Charterers' liability shall cease from the time of such seizure or detention.

All time lost shall be treated as off-hire until the time of her release and return to the same or
equivalent position and any extra expenses, including the cost of bunkers consumed during such
period, to be for Owners' account unless such seizure or detention is occasioned by any personal
act or omission or default of Charterers or their agents, or by reason of cargo carried.

Charterers to have the option to cancel balance of charter period after the vessel has been off-hire
under this clause for not less than 30 consecutive days.

53.

<u>REQUISITION</u>

Should the vessel be requisitioned by the government of the vessel's flag during the period of
this charter, the vessel shall be deemed to be off-hire during the period of such requisition, and
any hire paid by the said government in respect of such period shall be retained by Owners.

The period during which the vessel is under requisition to the said government shall count as part
of the period provided for in this charter. If the period of requisition exceeds three months, either
party shall have the option of cancelling this charter and no consequential claim be made by
either party.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

54.

DRUG AND ALCOHOL

Owners to be signatory of the initiative sea carrier agreement and maintain a policy on drug and alcohol abuse applicable to the vessel which meets or exceeds the standard in the Oil Companies International Marine Forum Guidelines for the control of drugs and alcohol on board ships.

Owners to be responsible for all cost arising from detention, seizure and forfeiture of the vessel in the event of any contraventure of U.S.Antidrug Abuse Act of 1986 or subsequent amendments and vessel to be off hire for any period during such detention seizure or forfeiture unless caused by Charterers and/or Charterers' servant or Shippers in which case Charterers to be fully responsible for all consequences arising thereof.

55.

DELAY OF HIRE PAYMENT

Failing the punctual and regular payment of the hire, or on any fundamental breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Charterers without prejudice to any claims they (the Owners) may otherwise have on the Charterers.

At any time after the expiry of the grace period provided in clause 55 a) hereunder and while the hire is outstanding, the Owners shall without prejudice to the liberty to withdraw be entitled to withhold the performance of any and all of their obligations hereunder, after having given to Charterers formal notice of 3 days notice, and shall have no responsibility whatsoever for any consequence thereof, in respect of which the Charterers hereby indemnify the Owners, and hire shall continue to accrue and any extra expenses resulting from such withholding shall be for the Charterers' account.

55. A - GRACE PERIOD

Where there is a failure to make punctual and regular payment of hire due to oversight, negligence, errors or omissions of the part of the Charterers or their bankers, the Charterers shall be given by the Owners 3 banking days (in which bank are open both Charterers'/Manger's place of business and Tokyo, excluding the day in which notice is given) written notice to rectify the failure, and when so rectified the payment shall stand as regular and punctual.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

55. B -
Charterers deduct from any hire payment(s) any amount disbursed for Owners' account with Owners prior consent and supported by vouchers or necessary proof and from final payment(s) the estimated cost of bunker remaining on board, together with the estimated amount of disbursement for Owners' account to which vouchers have not yet received.

56.

DEVIATION AND PUTTING BACK

Should the vessel put back or put into any ports other than those instructed by the Charterers for any reason whatsoever, the hire shall cease from the time of her putting back or putting into such port until she be again in the same or equivalent position and the voyage resumed therefrom.

In the event of loss of time either in port or at sea, or deviation upon the course of the voyage, caused by sickness or of accident to the crew or any person on board the vessel other than the person placed on board by Charterers or by reason of a presence on board and/or embarking and/or disembarking from the vessel of any persons other than person placed on board by Charterers or by deficiency and/or default of men and deficiency of stores and/or fresh water, strikes by vessel's officers and/or crew, refusal by vessel's officers and/or crew to work and/or

sail and/or permit the vessel to perform, fire and/or breakdown and/or damages and/or defect in and/or lack of maintenance whether before delivery and/or during the charter period to hull, cargo spaces, machinery and/or equipment, grounding unless in case of unsafe port and/or detention by average accidents to ship and/or cargo, dry-docking for the purpose of examination or painting bottom, or by any other cause affecting full working of the vessel due to Owners' fault, the payment of hire and overtime shall cease for all time thereby lost (including

such time as may be needed to place the vessel in equivalent position to that at which the vessel commenced to be off-hire) and any item of expenditure incurred by reason thereof are to be for Owners' account and may be deducted from the hire.

If upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery and/or equipment, vessel to be off hire for the time so lost and any item of expenditure incurred by reason thereof to be for Owners' account and may be deducted from hire.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

57.

CONSECUTIVE OFF HIRE

If the vessel will be off hire for longer than 45 days continuously without justifiable reason, Charterers to have the option of cancelling this charter. (see also cls. 52)

58.

ADDING OFF-HIRE PERIOD

Charterers have the option to add all or any part of a period of more than five days off-hire time (excepted periodical docking) incurred during this charter party to the charter period, however same to be declared at least six months prior to definite redelivery of the vessel.

59.

OFF-HIRE DUE TO CREW

At loading and discharging port(s) any time lost by the vessel for reason of all the crew not being on board when the vessel is ready to sail to be for Owners' account as well as expenses deriving therefrom.

60.

ON/OFF HIRE SURVEY

Joint on/off hire survey to ascertain the vessel's condition and quantity of bunkers R.O.B. shall be carried out on delivery and redelivery. Joint on-off hire survey to be carried out by one mutually agreed independent surveyor. Time and cost to be shared between Owners and Charterers.

61.

OFF-HIRE DUE TO WATER POLLUTION

The vessel shall be off hire during any time lost on account of the vessel's non-compliance with government and/or safe regulations pertaining to water pollution.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

---

62.

BILL(S) OF LADING

The vessel to use Charterers' Bills of Lading or Bills of Lading approved by Charterers and/or
sub-charterers, which include the Both to Blame Collision Clause, New Jason Clause, A Clause
Paramount and Conwartime 2004, during the currency of this charter party.

In case of discharging cargo into barges/vessel, Bill(s) of Lading issued pursuant to this Charter
Party shall state "CARGO DEEMED TO BE DELIVERED WHEN CUSTOMARY
ANCHORAGE. THE VESSEL'S LIABILITY ENDS AT THE VESSEL'S RAIL."

If Charterers failed to insert above wording in Bill(s) of Lading, Charterers shall indemnify
Owners against any consequence arising out of not stating this wording in Bill(s) of Lading.

The master to sign bills of lading for cargo as presented in conformity with the Mate's or Tally
Clerk's Receipt. However, at Charterers' option Charterers or their agents may sign Bills of
Lading on behalf of the Master always in conformity with the Mate's or Tally Clerk's Receipt.

All Bills of Lading shall be without prejudice to this charter and Charterers shall indemnify
Owners from all consequences arising from Charterers and/or their agents signing Bills of
Lading not in conformity with the remarks in Mate's Receipts, also against all consequences or
liabilities which may arise from any inconsistency between this charter and any Bill of Lading
signed by Charterers or their agents under this charter.

63.

NON PRODUCTION OF B/L

In case of no original Bills of Ladings being represented to the Master, Charterers have a right to
order the master of the vessel to discharge the relevant cargo, in which case Owner/the Master
have no responsibility caused of such non-presentation of Bill of Ladings.

Charterers hereby state that they shall indemnify Owners in accordance with Owners P & I Club
wording (attached as Annex B) against all consequences arising from Owners conforming to
Charterers request in releasing cargo without original Bill(s) of Lading.
Charterers hereby surrender letter of guarantee with a copy of B(s)L attached to Owners strictly
conforming with Owners' P & I Club wording without bank guarantee.
Charterers also indemnify Owners and issue letter of guarantee in case of change of destination,
splitting the B(s)/L (ref clause 83) and Charterers issue such LOI at each occasion it is required.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

64.

## P AND I CLUB

Owners guarantee that the vessel will on delivery be entered with and throughout the currency of this Charter Party remains entered with a protecting and indemnity association, which is member of the International Group of protecting and indemnity clubs. Entry shall include, but not be limited to, full cover for cargo claims of any nature.

Charterers shall not be liable for any loss of life nor personal injury nor for any loss of damage arising out of an arrest, and seizure except the case caused by Charterers or any other incident involving the vessel or other fixed or floating objects, excluding the case due to unsafe port/berth/anchorage when such loss or damage would normally be a risk insured against under the rules of the said protecting and indemnity association or by virtue of a policy of hull insurance affected on the institute time clauses at Lloyd.

Charterers shall be entitled to the benefit of such entry to the extent that the Rules allow.

65.

## WAR CANCELLATION CLAUSE

If war or action hostilities break out between any two of the following countries: Great Britain, U.S.A., former States of USSR, P.R.C. and Japan, both parties to have consult on cancellation/continuation of this charter on the basis of good will.

66.

## CARGO CLAIM

Cargo claims to be settled in accordance with N.Y.P.E. Interclub Agreement 1996 or latest updated version.

67.

## WAR RISK INSURANCE

Charterers may trade the vessel to the area where additional war risk insurance premium is imposed subject to prior consent of the Owners.

Charterers shall pay any additional war risk insurance on the vessel including blocking trapping, loss of hire and crew war bonus if any.

**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

---

68.

## THE VESSEL'S CLASS/INSURANCE

Owners undertake to maintain the vessel classed NK or equivalent during the currency of this charter. Owners guarantee that the vessel will be insured full protection in respect of collision liability, Hull and Machinery Insurance shall include "Bering Sea Clause".

69.

## OIL POLLUTION ETC.

Owners warrant that throughout the currency of this charter they will comply fully with any legislation, rules and regulations enacted with respect to pollution of sea waters by oil or any other substances including any rules and/or regulations issued thereunder by any government thereof or other authorities.

However, Owners shall not be required to put the vessel for the trade which request to provide financial responsibility whose limitation is not limited and/or unavailable through P and I Club which is by reason of new requirements of any states or local rules which include OPA 90.
In the event of significant improvement, structural changes, considerable expensive new equipment and/or additional insurance or certificates becoming necessary for the continued operation of the vessel by reason or new requirements of any states or rules, regulations and/or ordinances introduced to the trade, Charterers and Owners shall discuss to mutually agree in compliance with such new requirements.

Charterers shall be under no responsibility for all consequences (including loss of time) of oil or other pollution damage caused by Owners' failure and Owners' inability to comply with the above warranty.

Any loss of time incurred thereby shall be off hire.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

70.

ARBITRATION

**A)** Arbitration clause: Should any dispute arisen between Owners and Charterers the matter in dispute should be referred to Arbitration in London of three persons according to the London Maritime Arbitrators' Association terms, one Arbitrator to be appointed by each of the parties hereto and the third Arbitrator by the two so chosen. If the two arbitrators fail to agree upon the choice of the third, the president of the London Maritime Arbitrators' Association will appoin the third Arbitrator. The Arbitrators shall be persons suitably qualified to arbitrate in maritime affairs. English Law to apply.

**B)** Small claims clause: Notwithstanding anything to the contrary in this Charter Party, the parties agree that all arbitrations where the amount in issue in the dispute(s) is less than $50.000 shall be conducted according to small claims procedure of the London Maritime Arbitrators' Association (amended from time to time). If after the commencements of such a reference it appears on reasonable grounds that the sum in issue in any dispute or disputes exceeds U.S.$ 50.000. Either party shall be entitled to require in writing that the reference henceforth should proceed without regard to the small claims procedure and each party thereupon shall have seven days to appoint its arbitrator upon the arbitration provisions set out elsewhere in this charter party with the small claims procedure arbitrator sitting as umpire of third arbitrator.

71.

LOADING/DISCHARGING IN U.S.A.

If the vessel calls at any U.S. port for purpose of loading or discharging cargo, the vessel's equipment shall comply with regulations established by U.S.Public Law 85-742 part 9 (Safety and Health Regulation for Longshoreman) which is valid at the delivery of the vessel.

If Longshoremen are not permitted to work, due to failure of the master and/or Owners and/or Owners' agents to comply with the aforementioned regulations, any delay resulting therefrom and any stevedore stand by time and other expenses involved shall be for Owners' account. In the event of significant improvement, structural changes, expensive new equipment and/or additional insurance or certificates becoming necessary by amendment to the aforementioned regulation, Charterers and Owners shall discuss to mutually agree later about such new requirements.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

72.

LAY-UP

Charterers may at any time, request the Owners to lay-up the vessel.

Unless unforeseen events the lay-up period cannot be less than four months. Beyond such period Charterers may ask for recomissioning which is to be effected as practically soon as possible. Once lay-up decision has been notified to the Owner he will decide, in agreement with the Charterers, the place of laying-up. The cost of bringing the vessel directly from the last discharging port to the lay-up place, and possible cost, duly evidenced, for the commissioning and recomissioning of the vessel will be for Charterers' account. However drydocking expenses after lay-up, if necessary will be paid by Charterers in so far as this drydocking takes place

before the normal date and will be apportioned to the advance in time of the operation. For this purpose the Owners will indicate, before the lay-up the date at which the next drydocking was scheduled.
During the lay-up period the bunker cost will be for Charterers' account.

73.

DRYDOCKING

Owners shall have the option to place the vessel in drydock during the currency of this charter at intervals of every about 24-30 months at a convenient time and place to be arranged by Owners for bottom cleaning and painting and/or repairs as required by class or dictated by circumstances.
Owners shall give Charterers five (5) months prior notice of their intention to drydock the vessel, except for emergency case and Charterers shall endeavour to bring the vessel back to Japan/Singapore range for such drydocking.
 In case drydocking can not be carried out due to the reason beyond control of Owners even if Charterers bring the vessel to Japan/Singapore range, Charterers shall endeavour to still bring / keep the vessel to / in Japan/Singapore range for the succeeding voyage(s).
 If the timing of the drydocking exceeds 30months from the delivery or last drydocking of the vessel due to the reason of Charterers not complaying to the above, Charterers shall not make speed/consumption claim before the drydocking is carried out.
Charterers shall cooperate with Owners for them to reserve the place for drydocking, such as informing the vessel's schedule closely to Owners as well as the employment after the drydocking in order to minimize the deviation / waiting time for the drydocking.
The off-hire period shall be the balance period between the actual time elapsed (last discharge port - dock - first nominated port) and the estimated time required under the artificial voyage going straight from the last discharge port to first nominated port.
The bunkers consumed to be calculated in the same manner, unless otherwise mutually agreed.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

74.

BOTTOM CLEANING

In the event of Charterers ordering the vessel to port(s) where the vessel's stay is extended for
more than 22 consecutive days in Tropical Zone or 35 consecutive days in other area or to lay-up
has to cause bottom fouling, Charterers to provide underwater cleaning at their time and expense,
otherwise Owners' representation of the vessel's speed and consumption to be null and void,
effective from the vessel's departure from such port(s), unless or until so cleaned.

75.

EXCEEDING CHARTER PERIOD

Charterers to have the option of exceeding the maximum charter period for the purpose of ending
the last commenced trip provided Charterers do not exceed the charter party by wilful
miscalculation and/or if it is apparent before commencement of the last voyage, the vessel will
not be able to redeliver within charter party period.

Any time in excess of charter party period to be calculated at prevailing market rates but in any
case not below the vessel's present charter party rate.

76.

TELE-COMMUNICATION EQUIPMENT

The vessel shall be equipped with INMARSAT C & F in addition to telegraph and VHF
telephone to comply with international regulations to allow the vessel to communicate with land
stations.

77.

AGENTS

Charterers agree that their officers and/or agents will deliver crew mail free of charge and assist
the master over minor ship's husbandry matters, debiting Owners with the actual costs involved.

For major ship's husbandry matters such as dry-docking, changes of major part of crew etc.
Owners will appoint their own agents.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

78.

CHARTERERS' COLOUR

Charterers to have the liberty of flying their own house flag and to have the liberty of painting the funnel in their own colours.

The time and expenses for painting the funnel initially and at any time during the currency of the charter period shall be for charterers' account.

The funnel shall be repainted to Owners' colours prior to redelivery at Charterers' time and expenses.

79.

Delete.

80.

CLEARANCE WATER LINE TOP OF HATCH COAMING

Charterers accepted the figure of water line top of hatch coaming.
Owners will cooperate to their best of the capacity and will instruct the Master to give attention to Charterers' requests, during the Charter Party period, to study all possible actions to lower this dimension in order to be able to use certain important berths around the world where Supramax or Panamax ships are usually fixed from or to.

However the Owners have full discretion whether they could apply any measure to be suggested/ requested by the Charterers or not, namely possibility of Ballasting additional hold other than No. 3 hold is not be taken into account.

81.

HIRE

- **US$16,500** (Sixteen Thousand Five Hundred U.S.Dollars) per day or pro-rata including overtime for the first 5 (five) years.(years 1-5)
- **US$17,000** (Seventeen Thousand U.S.Dollars) per day or pro-rata including overtime for the next 5 (five) years.(years 6-10)



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

Optional period: **18,500** (Eighteen Thousand Five Hundred U.S.Dollars) per day or pro-rata for the optional 30 months.

Such optional period to be commenced from the mean date.

Hire to be payable monthly in advance into Owners designated account as the fund available on the due date.
No address commission to Charterers.


82.

PURCHASE OPTION

**1.** Charterers have the option to purchase the vessel with following basis:

At the end of the 5th year at U.S.$ **40.00 million,** (Forty Million U.S.Dollars) thereafter to be de-escalated by **U.S.$ 2.0 Million** (Two Million U.S.Dollars) per year or pro-rata.

The purchase option shall extend throughout the full charter party period but the vessel cannot be delivered to the Charterers prior to the end of the 60th month after delivery of the vessel. Such option may be exercised at any time during a given year, provided the Owners is given by Charterers a minimum of five (5)months notice of its intention to do so.

The exact purchase option price shall be determined on a pro-rata figure effective the day of purchase and to be calculated by linear interpolation between the preceding and succeeding year and purchase options set out above.

No address commission.
Owners and Charterers have mutually agreed the MOA attached to this Charter Party.

Notwithstanding the foregoing, Owners shall endeavour to accept a shorter notice from the Charterers in case the purchase option is declared with a shorter notice than the agreed five (5) months.

The purchase option price hereinabove is subject to adjustment when the US$/Japanese Yen exchange rate falls outside the range of Yen 100/120 per US$ on the date of Charterers confirming their purchase.
In case falling outside this fairway range, the price to be adjusted as follows:
X= Exchange Rate
Y= Purchase Option Price



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

---

    a) When Japanese Yen is stronger than Japanese Yen 100 per US$
       Actual price after adjustment = 100 x Y/X
    b) When Japanese Yen is weaker than Japanese Yen 120 per US$
       Actual price after adjustment = 120 x Y/X

In case (a) Owners bear extra cost compulsorily for modification of the vessel's specifications or putting outfittings to the vessel due to the change or revision of applicable laws, rules or regulations by relevant authorities after execution of charter party until expiration of the charter period and (b) Charterers exercise the purchase option of the vessel in accordance with charter party, the Charterers will add the cost of (a) to the purchase option price provided that such extra cost is supported by original invoices from Owners. The additional cost added to the purchase option to be subject to de-escalated of four (4) percent per year or pro-rata if modification from the date of such modification.

**2.** Physical inspection of the Vessel and inspection of class records:

Before declaration of the purchase option, the Charterers shall carry out physical inspection of the Vessel and inspection of the class records and within five (5) business days after completion of the physical inspection, the Charterers shall declare by fax or telex via broking channel whether or not the result of inspection of the Vessel and its class records are acceptable to the Charterers.

In the event of the result of the inspection being acceptable to the Charterers, upon receipt by the Owners of the Charterers' message stating so, the Charterers' option to purchase the Vessel shall be deemed having been exercised by the Charterers automatically.

In the event that the Vessel is rejected by the Charterers after the inspection as aforesaid, Charterers' right to purchase the Vessel or inspect the Vessel again at a later stage under the C/P remains intact and valid. Numbers of inspection however shall be limited within reasonable times.

At time of inspection, the Charterers have right to inspect:

1) Forepeak, afterpeak, wingtanks and two double bottoms in empty condition.
2) Empty holds
3) Deflection readings
4) Vessel's deck and engine log book

Also the Charterers have right to inspect following items provided that crew allowance for arrangement of those items shall be paid by the Charterers (the same to be settled by succeeding hire) and the Vessel shall be kept on hire even in case extra time incurred thereby:
1) One cylinder of main engine at Charterers choice including measurement of liner wear
2) One cylinder of generator engine at Charterers choice



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

**3. Lay/can:**

Immediately after Charterers' option to purchase is declared, lay/can shall be mutually agreed in a such manner that the mean date of lay/can falls about three (3) months after signing the Memorandum of Agreement (hereinafter called the "MOA:', the form of which is attached hereto and incorporated as a part hereof. Actual time and place of delivery shall be mutually discussed and agreed on basis of Charterers intended operation schedule then within delivery range and lay/can as set forth in MOA. The Vessel shall be delivered under the MOA immediately after redelivery under C/P save for drydock time deviation, if any. (See Clause 1. hereof)

**4. Signing MOA:**

Concurrently with the agreement in respect of lay/can as mentioned in Clause 2 hereof, the MOA shall be signed by the Owners and the Charterers by fax first and original MOA shall be executed the both parties later. On the MOA, the Sellers shall mean the Owners and the Buyers shall mean the Charterers.

**5. Effect of cancellation of MOA due to late delivery:**

In the event that the MOA is cancelled by the Charterers by reason that the Vessel missed the cancelling date as set forth in the MOA, the Vessel shall be chartered by the Charterers in accordance with C/P as if Charterers' declaration to purchase the Vessel had not been made at all.

**6. Prorata of Purchase Option Price:**

Purchase option prices as set forth in item 1 hereof, shall be adjusted downward by prorating in accordance with following formula:

A = Purchase price to be mentioned on MOA.

B = Purchase option price at the end of one year before the year in which purchase option being declared.

C = Purchase option price at the end of the year in which purchase option being declared.

D = Number of days from the anniversary date of delivery of the year in which purchase option being declared until the day of delivery of the Vessel, always less number of days during which the Vessel was off-hire, if any.

$A = B - (B - C) \times D/365$



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

Deposit to be made based on the provisional price and final price to be adjusted based on the above formula.
On delivery of the Vessel to the Charterers under the MOA, hire payments to the Owners to cease.

**7.** Sale of the Vessel to a third party:

The Charterers' option to purchase the Vessel under C/P has been agreed by the Owners in the basic understanding that the Vessel shall be purchased by the Charterers themselves.

In the event that the Charterers are exercising the option to purchase the Vessel with intention to sell it to a third party concurrently with delivery of the Vessel from the Owners to the Charterers, the Charterers shall notify such intention to the Owners before carrying out physical inspection of the Vessel together with background of the third party

The Charterers are responsible for performing their obligations under the MOA towards the Owners, including but without limitation to payment of full purchase money of the Vessel to the Owners and the Charterers shall remain liable towards the Owners as sole counterpart on the MOA.

83.

SPLIT OF BILLS OF LADING CLAUSE

Charterers and/or Agents are hereby authorised by Owners/Master to split Bills of Lading and issue ship delivery orders in transferable form against surrender of full set of original Bills of Lading.

Delivery orders to be issued strictly in accordance with Mate's receipt and Bills of Lading including but not limited to any endorsements as to the condition and quantity of the cargo and all terms, conditions and exceptions set out in the Bills of Lading.
The delivery orders shall not prejudice the shipowners' rights under the Bills of Lading.

All delivery orders issued pursuant to this Clause shall, without prejudice to the generality above, include the following clauses:
The Chamber of Shipping Voyage Charter Clause Paramount 1958 amended to include the words "and/or delivery order" after the words "Bill of Lading" appearing in lines 12 and 16 thereof.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

This shipment was loaded on board the vessel as part of one original lot of …… (enter description of cargo) of which …..(enter quantity) was loaded at ….(enter name of load port) and ….. (enter quantity) was loaded at ……… (enter second load port, etc.) with no segregation as to parcels. The vessel undertakes to deliver only that proportion of the cargo actually loaded which is represented by the percentage that the total amount specified in the delivery orders bears to the total of the undivided bulk delivered at destination.
Neither the vessel not the Owner assumes any responsibility for the separation of the undivided bulk at the port of delivery.

84.

DELIVERY NOTICE CLAUSE

Owners to give Charterers 30, 20, 15, 10 days approximately and 7, 5, 4, 3, 2, 1 days definite notice of vessel delivery.

85.

ISM CODE CLAUSE

During the currency of this Charter Party, Owners shall procure that the vessel and "The Company" (as defined by ISM Code) shall comply with the requirement of the ISM Code.

Upon request the Owners shall provide a copy of the relevant documents of compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charter Party, loss damages, expense or delay caused by failure on the part of the Owners or "The Company" to comply with the ISM Code shall be for Owners account.

86.

DUAL DWT CERTIFICATE CLAUSE

The Charterers have the option to reduce vessel's deadweight with a sufficient prior notice acceptable to shipyard, subject to Owners' Classification Society's approval at Charterers' time and expenses.
The Charterers to restore original deadweight before redelivery at Charterers' time and expenses.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

87.

The Owners may sell the vessel to another party, which to be a company within the Owners' group, together with the Charter Party at any time during the course of the Charter Party, subject to the prior consent of the Charterers, which shall not be unreasonably withheld.

88.

The Charterers may transfer this Charter Party and the purchase option to another party, which to be a company within the Charterers' group, at any time during the course of the Charter Party, subject to the prior consent of the Owners, which shall not be unreasonably withheld.

89.

SEA WAYBILL(S) CLAUSE

Charterers' option to issue sea waybill(s), instead of Bills of Lading in case of sea waybill(s) being issued instead of bill(s) of lading, the cargo to be released at discharging port(s) as per Charterers' written discharging instruction at the sole risk and responsibility of Charterers. Charterers shall indemnity and hold owners harmless against any liability, loss, damage and/or expense caused to and/or incurred by Owners by virtue of Owners' complying with Charterers' instruction for release of the cargo under the sea waybill and/or by the use of sea waybill(s). Further more the following steps shall be taken.

In case the master is requested to authorize agents to sign sea waybill(s), copy of sea waybill(s) shall be sent on fax to the master soonest possible, latest before arrival at the discharging port. Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.

This clause to be applied for Japan discharging only.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

90.

BIMCO ISPS/MTSA CLAUSE

**(a)(i)** The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

**(ii)** Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

**(iii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

**(b)(i)** The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

**(ii)** Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

**(c)** Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew.
All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

**(d)** If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

91.

<u>U.S. CUSTOMS ADVANCE NOTIFICATION/AMS CLAUSE FOR TIME CHARTER PARTIES</u>

(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

i) Have in place a SCAC (Standard Carrier Alpha Code);

ii) Have in place an ICB (International Carrier Bond);

iii) Provide the Owners with a timely confirmation of i) and ii) above; and

iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

92.

Where and when new circumstances and/or situations and/or new regulations and/or legislation arise, after the finalization of this Charter Party, that may affect the trading of this vessel, either Charterers or Owners can propose clause (s) that should be inserted to cover the new circumstances/ situation/ legislation or regulation.
Charterers and Owners to discuss such new clause (s) in good faith and are mutually bound to agree a reasonable wording.

93.

This Charter Party is subject to successful delivery of the vessel from the Builder to Owners.

94.

Should the political, social and/or other situation for a normal trading of the vessel in the allowed or excluded countries/area change, then such country(ies)/area(s) shall be excluded or allowed through the mutual discussion, agreement and conditions if any.

95.

BUNKER FUEL SULPHUR CONTENT CLAUSE

(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels, of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.
It is expressly agreed that, Charterers and Owners shall cooperate in advanced planning of bunker replenishment in order to segregate fuels which may be ordered by Charterers specifically for the purpose of steaming in SECA.

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

SECA = Special Emission Control Area

96.

ISM CODE COMPLIANCE

Headowners as named in this charter and/or their managers (Owners) shall comply in all respects with the requirements of this Code, IMO Resolution A741 of 4th November 1993 as subsequently incorporated into the SOLAS (1994) Convention.

Owners further warrant the vessel shall comply and keep on board a valid Document of Compliance and Safety Management Certificate which certificates shall be maintained throughout the charter period. If required by Charterers Owners to provide copies of such'DOC'and'SMC.

Owners are aware of IMO Resolution and Annex A713(17) of 6th November 1991, and Owners warrant that the vessel, Master and crew shall comply with relevant recommendations throughout the currency of this charter."

97.

This charter is subject to the successful conclusion of novation agreement between Clio Marine Inc. and Lepta Shipping Co. Ltd. and Debilena Trading S.A., ("Novation Agreement") and successful performance by Lepta Shipping Co. Ltd. of their obligations under the Novation Agreement as attached.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

## "ANNEX A"

Panama, Singapore or Hong Kong Flag about 58,100 Dwt New Building Bulk Carrier
To be built at Tsuneishi Holdings Corporation including their subsidiary, Tsuneishi Heavy
Industries (Cebu) Inc.

All figures are "about" and contents of below the Vessel's description is based on the Builder's
designed figure without guarantee basis and subject to final Owners' / Builder's confirmation in
every respect.

| | | |
|---|---|---|
| Type of vessel | : | Flush deck type with F'cle Aft engine. Aft Bridge |
| Class | : | NK |
| Classfication Characters | : | NS* (CSR, BC-A, BC-X II, GRAB20)(ESP) MNS* ,M0 |
| Descriptive Note | : | Strengthened for heavy cargo loading where holds nos.2 &4 may be empty |
| Flag | : | Panama, Singapore or Hong Kong |
| Length overall | : | less than 190.00 M |
| Length between P.P. | : | abt. 185.600 M |
| Breadth (Mld.) | : | abt. 32.26 M |
| Depth (Mld.) | : | abt. 18.000 M |
| Designed draft (Mld.) | : | abt. 11.300 M |
| Fully loaded draft draft (Mld.) | : | abt. 12.800 M |
| Dead weight (at Design Draft) | : | abt. 49,500 MT |
| (at Scantling Draft) | : | abt. 58,100 MT |
| Gross Tonnage | : | abt. 32,600 tons |
| Net Tonnage | : | abt. 19,600 tons |
| No. of cargo holds/hatches | : | five (5)/five (5) |
| Hold capacity (grain) | : | abt. 72,500 M3 |
| Hatch size | : | No.1          17.160 m (L) x 17.00 m (B) |
| | | No.2-5         21.060 m (L) x 18.600 m (B) |
| Grain loading | : | No.2 hold may be slack. (if SF=42CF/LT) |
| Tank top local strength | : | No.1,3 & 5 holds   abt 25.2 MT/M2 |
| | | No.2 & 4 holds     abt 18.3 MT/M2 |
| Hatch Cover | : | End folding type, weathertight steel hatch covers shall be driven by electro-hydraulic system and cleated manually. |
| Main Engine | : | MAN-B&W 6S50MC-C Mark7 |
| | | MCO    :   8,400 kW x 113 rpm |
| | | CSO    :   7,140 kW x 107 rpm |



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18ᵀᴴ MAY 2009**

| | | |
|---|---|---|
| Generators | : | 480kW x 900rpm x 3sets |

| | | | | |
|---|---|---|---|---|
| Tank capacity | : | Fuel Oil | : abt 2,100 m3 | (100%full) |
| | | Diesel Oil | : abt  150 m3 | (100%full) |
| | | Fresh Water | : abt  150 m3 | (100%full) |
| | | Drink Water | : abt  150 m3 | (100%full) |
| | | Ballast Water tank | : abt31,800 m3 | (100%full) |
| | | (including No.3 hold) | | |

Speed / Consumption   :   In good weather condition i.e. in winds up to Beaufort Force 4 and height of swell up to Douglas scale 3. Bunker grade IFO (IF-380CST) ISO 8217 RMG380 and MDO ISO8217 DMA.

SPEED :

| | (1st-5th year) | (6th-7th year) | (8th-10th year) | (11th-12.5th year) |
|---|---|---|---|---|
| Laden at Scantling draft | : abt 13.5 knots | abt 13.3 knots | abt 13.1 knots | abt12.9 knots |
| Ballast condition | : abt 14.4 knots | abt 14.2 knots | abt 14.0 knots | abt13.8 knots |

CONSUMPTION AT SEA :

| | | |
|---|---|---|
| For Main Engine at sea for all of 3 cases above | : | abt 31.5MT IFO |
| For Aux Engine at sea for all of 3 cases above | : | abt 1.8MT IFO + abt 0.2 MT MDO |

Bunker quality shall be suitable for burning in the vessel's machineries.
Vessel entitles to use more diesel oil at narrow / shallow / busy water area, canals, in and out of ports and engine starting / stopping.

IN PORT CONSUMPTION :

| | |
|---|---|
| When idle | : abt 2.8MT IFO + abt 0.3MT MDO |
| When Working (24 hours) | : abt 5.0MT IFO + abt 0.5MT MDO |
| Ballast pump capacity | : 950M3/h x 2 sets |
| Deck crane | : Electro-hydraulic driven jib type fixed single deck crane 30MT x 26m S.R. x 4sets |
| Grab | : Radio Control Mechanical type Grabs (max 12m3) x 4sets |
| Cargo hold ventilation | : Natural ventilation |
| Fire fighting system (cargo hold) | : Sea water |

All figures "about" and subject to re-confirmation on or before the delivery of the Vessel.

- End -



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

---

### "ANNEX  B"

*Standard form letter of indemnity for non production of bill of lading*

### Letter Head of Charterers

[insert date]

To: [insert name of Owners]
    The Owners of the [insert name of ship]
    [insert address]

Dear Sirs

Ship:  [insert name of ship]
Voyage:    [insert load and discharge ports as stated in the bill of lading]
Cargo: [insert description of cargo]
Bill of lading: [insert identification numbers, date and place of issue]

The above cargo was shipped on the above ship by [insert name of shipper] and consigned to [insert name of consignee or party to whose order the bill of lading is made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bill of lading] but the bill of lading has not arrived and we, [insert name of party requesting delivery], hereby request you to deliver the said cargo to [insert name of party to whom delivery is to be made] at [insert place where delivery is to be made] without production of the original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:-

1.  To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of delivering the cargo in accordance with our request.

2.  In the event of any proceedings being commenced against you or any of your servants or agents in connection with the delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.  If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4. If the place at which we have asked you to make delivery is a bulk liquid or gas terminal or facility, or another ship, lighter or barge, then delivery to such terminal, facility, ship, lighter or barge shall be deemed to be delivery to the party to whom we have requested you to make such delivery.

5. As soon as all original bills of lading for the above cargo shall have come into our possession, to deliver the same to you, or otherwise to cause all original bills of lading to be delivered to you, whereupon our liability hereunder shall cease.

6. The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

7. This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully
For and on behalf of
[insert name of Requestor]
The Requestor

------------------------------------------------------------





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

*Standard form letter of indemnity to be given in return for delivering cargo at a port other than that stated in the bill of lading – "Change of Destination"*

### Letter Head of Charterers

To :      [insert name of Owners]                        [insert date]
              The Owners of the [insert name of ship]
              [insert address]

Dear Sirs,

Ship :      [insert name of ship]

Voyage :      [insert load and discharge ports as stated in the bill of lading]

Cargo :      [insert description of cargo]

Bill of lading : [insert identification numbers, date and place of issue]

The above cargo was shipped on the above ship by [insert name of shippers] and consigned to [insert name of consignee or party to whose order the bill of lading is made out, as appropriate] for delivery at the port of [insert name of discharge port stated in the bill of lading] but we, [insert name of party requesting substituted delivery], hereby request you to order the ship to proceed to and delivery the said cargo at [insert name of substitute port or place of delivery] against production of at least one original bill of lading.

In consideration of your complying with our above request, we hereby agree as follows:

1.      To indemnify you, your servants and agents and to hold all of you harmless in respect of any liability, loss, damage or expense of whatsoever nature which you may sustain by reason of the ship proceeding and giving delivery of the cargo against production of at least one original bill of lading in accordance with our request.

2.      In the event of any proceedings being commenced against you or any of your servants or agents in connection with the ship proceeding and giving delivery of the cargo as aforesaid, to provide you or them on demand with sufficient funds to defend the same.

3.      If, in connection with the delivery of the cargo as aforesaid, the ship, or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a



Page **36** of **42**

**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18ᵀᴴ MAY 2009**

caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify you in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified.

4.  The liability of each and every person under this indemnity shall be joint and several and shall not be conditional upon your proceeding first against any person, whether or not such person is party to or liable under this indemnity.

5.  This indemnity shall be governed by and construed in accordance with English law and each and every person liable under this indemnity shall at your request submit to the jurisdiction of the High Court of Justice of England.

Yours faithfully,

For and on behalf of
[insert name of Requestor]
The Requestor

Signature





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

---

*Standard form letter of indemnity for re-issuing bill of lading*

Date Month Year

To :

      The Owners of the M/V "------------------------------"
      *[insert address]*


Dear Sirs


Ship:         M/V "----------------------------"
Voyage:     *[insert load and discharge ports as stated in the bill of lading]*
Cargo:      *[insert description of cargo]*
Bill of lading: *[insert identification numbers, date and place of issue]*
Time Charter party: dated   between  and


While the above bill(s) of lading were once issued by the master of the vessel dated ----------------
at ----------------, we hereby request you to allow us to instruct the agents, ------------ to reissue
the said bill(s) of lading on the strict condition that we should collect the full set of 3 original
bill(s) of lading once issued dated -------------- to be stamped "null and void" and the full set of
the original bill(s) of lading should be handed to the master of the vessel or you prior to
commencement of discharging of the cargo.

In consideration of your complying with our above request, we hereby agree as follows:-

1. To indemnify you, your servants and agents and to hold all of you harmless in respect of any
   liability, loss, damage or expense of whatsoever nature which you may sustain by reason of
   reissuing the bill(s) of lading in accordance with our request.

2. In the event of any proceedings being commenced against you or any of your servants or
   agents in connection with reissuing the bill(s) of lading as aforesaid, to provide you or them
   on demand with sufficient funds to defend the same.

3. If, in connection with reissuing the bill(s) of lading as aforesaid, the ship, or any other ship or
   property in the same or associated ownership, management or control, should be arrested or
   detained or should the arrest or detention thereof be threatened, or should there be any
   interference in the use or trading of the vessel (whether by virtue of a caveat being entered on
   the ship's registry or otherwise howsoever), to provide on demand such bail or other security
   as may be required to prevent such arrest or detention or to secure the release of such ship or
   property or to remove such interference and to indemnify you in respect of any liability, loss,





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

damage or expense caused by such arrest or detention or threatened arrest or detention or
such interference, whether or not such arrest or detention or threatened arrest or detention or
such interference may be justified.

4. The liability of each and every person under this indemnity shall be joint and several and
   shall not be conditional upon your proceeding first against any person, whether or not such
   person is party to or liable under this indemnity.

5. This indemnity shall be governed by and construed in accordance with English law and each
   and every person liable under this indemnity shall at your request submit to the jurisdiction
   of the High Court of Justice of England.

Yours faithfully

.......................................
Signature



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK
CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES
(the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS
CORPORATION OF JAPAN (the "Builder")
DATED 18TH MAY 2009**

---

## NEW JASON CLAUSE

In the event of accident, danger, damage or disaster before or after commencement of the voyage
resulting from any cause whatsoever, whether due to negligence or not, for which or for the
consequences of which, the carrier is not responsible by statute, contract or otherwise, the goods,
shippers, consignees or owner of the goods shall contribute with the carrier in general average to
the payment of any sacrifices, losses, or expenses of a general average nature that may be made
or incurred, shall pay salvage and special charges incurred in respect of the goods. If a salving
ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship
or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to
cover the estimated contribution of the goods and any salvage and special charges thereon shall
if required, be made by the goods, shippers, consignees or owners of the goods to the carrier
before delivery.

## CONWARTIME 2004

(a)   For the purpose of this Clause, the words:

(i)     "Owners" shall include the shipowners, bareboat charterers, disponent owners,
managers or other operators who are charged with the management of the Vessel, and
the Master; and

(ii)    "War Risks" shall include any actual, threatened or reported:

war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations;
laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades
(whether imposed against all vessels or imposed selectively against vessels of certain flags or
ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body,
terrorist or political group, or the Government of any state whatsoever, which, in the reasonable
judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become
dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)   The Vessel, unless the written consent of the Owners be first obtained, shall not be
ordered to or required to continue to or through, any port, place, area or zone (whether of
land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew
or other persons on board the Vessel, in the reasonable judgement of the Master and/or
the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be
within any such place as aforesaid, which only becomes dangerous, or is likely to be or to
become dangerous, after her entry into it, she shall be at liberty to leave it.





**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i)  The Owners may effect war risks insurance in respect of the Hull and  Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefore shall be for their account.

(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the  actual bonus or additional wages paid shall be reimbursed to the Owners  by the Charterers at the same time as the next payment of hire is due, or  upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-

(i)      to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii)     to comply with the order, directions or recommendations of any war  risks underwriters who have the authority to give the same under the  terms of the war risks insurance;

(iii)    to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)    to discharge at any other port any cargo or part thereof which may  render the Vessel liable to confiscation as a contraband carrier;



**RIDER TO THE CHARTER PARTY OF M/V "NEWBUILDING TBN" 58,100MT DWT BULK CARRIER TO BE BUILT BY TSUNEISHI HEAVY INDUSTRIES (CEBU) INC., PHILIPPINES (the "Shipyard") WITH THE HULL No. SC136 (the "Vessel") OF TSUNEISHI HOLDINGS CORPORATION OF JAPAN (the "Builder") DATED 18TH MAY 2009**

---

(v)     to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.


## P.& I. BUNKERING CLAUSE

The vessel in addition to all other liberties shall have liberty as part of the contract voyage and at any stage thereof to proceed to any port or ports whatsoever whether such ports are on or off the direct and/or customary route or routes to the ports of loading or discharge named in this charter and there take oil bunkers in any quantity in the discretion of the Owners even to the full capacity of fuel tanks, deeptanks and any other compartment in which oil can be carried whether such amount is or is not required for the chartered voyage.


## BOTH-TO-BLAME COLLISION CLAUSE

If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non- carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

