# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
## <u>Norfolk Division</u>

DRY HANDY INVESTMENTS LTD.,

       Plaintiff,

                                  Civil Action No. 2:13 cv 678

v.

CORVINA SHIPPING CO. S.A.

and COMPANIA SUD AMERICANA DE

VAPORES S.A.,

       Defendant.

## <u>DECLARATION OF SHAW</u>

Exhibit 5K – Charterparties

# Time Charter

FIRST ORIGINAL

GOVERNMENT FORM

*Approved by the New York Produce Exchange*

November 6th, 1913 - Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1  **This Charter Party**, made and concluded in *Monaco, the 14th* ................................... day of *October* ..................... ~~19~~ *2011*

2  Between *Forever Shipping S.A., Omega Bldg., Samuel Lewis Ave., and 53rd St., Panama City, Republic of Panama, guaranteed by Hisafuku Kisen K.K.,* .............................

3  Owners of the ~~good~~ *One (1) Newbuilding Bulk Carrier of about 58,000MTDWT* ~~Steamship/Motorship~~ *to be named M.V. "BULK PATAGONIA", vessel's description See Clause 29,.* ~~of~~ *to be built at Kawasaki Heavy Industries with radio controlled single wire grabs*

4  ~~of ................................... tons gross register, and ................................... tons net register, having engines of ................................... indicated horse-power~~

5  ~~and with hull, machinery and equipment in a thoroughly efficient state, and classed~~ .............................

6  ~~at................................... of about................................... cubic feet bale capacity,~~ ................................... tons of 2240 lbs.

7  ~~deadweight capacity (cargo and bunkers, including fresh water and stores not exceeding one and one-half percent of ship's deadweight capacity,~~

8  ~~allowing a minimum of fifty tons) on a draft of................................... feet................................... inches on...................................~~ Summer freeboard, inclusive of permanent bunkers,

9  ~~which are of the capacity of about...................................~~ tons of fuel, and capable of steaming, fully laden, under good weather

10  ~~conditions about................................... knots on a consumption of about................................... tons of best Welsh coal best grade fuel oil best grade Diesel oil,~~

11  ~~now...................................~~

12  ................... and *Dry Bulk Handy Holding Inc.* ..... Charterers of the City of *Panama or its nominee, guaranteed by DryLog Ltd., Bermuda.*

13  **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for

14  about *period 7 years plus 1 year, plus 1 year, plus 1 year (i.e. 7+1+1+1 years) with 60days more or less in Charterers' option at the*

15  *end of the Charter period. The 1st/2nd/3rd optional year to commence from the end of 84th/96th/108th month after delivery respectively, if declared. Such option to be declared 3 months prior to the expiry of each period* within below mentioned trading limits.

16  Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for

17  the fulfilment of this Charter Party.

18  Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping dock master at the Builder's yard in Japan, at any time, day/night,*

19  *Sundays and holidays included in Owners' option.* .................................

20  ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No. 6), as~~

21  ~~the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No. 5.~~ Vessel on ~~her delivery~~ *arrival at first loading port* to be

22  ready *in all respects* to receive cargo with clean-swept holds *dry cargo spaces suitable for loading normal bulk cargoes to surveyor's satisfaction, fit and safe for the reception, carriage and preservation of cargo (see Clause 60), and to be maintained throughout the charter* ~~and~~ tight, staunch, strong and in every way fitted for the *ordinary cargo* service, *failing which to go off-hire,* ~~having water ballast, winches and~~

23  ~~donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the winches at one and the same~~

24  ~~time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-~~

25  ~~dise, including petroleum or its products, in proper containers, except~~ *(see Clause 63)*

26  (vessel is not to be employed in the carriage of Live Stock, ~~but Charterers are to have the privilege of shipping a small number on deck at their risk,~~

27  ~~all necessary fittings and other requirements to be for account of Charterers),~~ in such lawful trades, ~~between safe port and/or ports in British North~~

28  ~~America, and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or~~

29  ~~Mexico, and/or South America~~ ................................... ~~and/or Europe~~

30  ~~and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between~~

31  ~~October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea, Black Sea and the Baltic.~~

32  *worldwide trading always via safe port(s), berth(s), anchorage(s), always afloat, except NAABSA (sea also line 69), always*

33  *within IWL (see also Clause 66) and with war risk zones excluded,* .................................

34  .................................

35  as the Charterers or their Agents shall direct, on the following conditions:

36  1. That, *throughout the currency of this charter,* the Owners shall provide and pay for all provisions, wages and consular shipping and *non compulsory garbage removal and charges connected therewith and lubricating oil,* discharging fees of the Crew; shall pay for the

37  insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep

38  the vessel in a thoroughly efficient state in hull, machinery, *holds* and equipment, *her class, gear, crew and trading certificates valid, and such condition to be maintained throughout the service ~~and during~~ the service, perils of the sea excepted, with inspection certificates necessary to comply with current requirements at ports of call and canals. Owners to keep the vessel classed equivalent to Lloyds 100A1 with a member of the I.A.C.S. for the duration of the charter.*

39  2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *Canal Tolls, compulsory and customary* Pilotages, Agencies, Commissions,

40  Consular Charges (except those pertaining to the Crew *and her Owners*), and all other usual expenses except those before stated, but when the vessel puts into

41  a port for causes for which vessel is responsible, then all such charges incurred shall be paid by the Owners. Fumigations ordered because of

42  illness of the crew to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while vessel is employed under this

43  charter to be for Charterers account. All other fumigations to be for Charterers account after vessel has been on charter for a continuous period



44 of six months or more.

45     Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
46 Owners to allow them the use of any dunnage and shifting boards already aboard vessel. Charterers to have the privilege of using shifting boards
47 for dunnage, they making good any damage thereto.

48     3.  ~~That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on~~
49 ~~board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than~~ ..................................... tons and not more than
50 ............................ ~~tons and to be re-delivered with not less than~~ .......................................... ~~tons and not more than~~ .......................................... ~~tons.~~

51     4.  That the Charterers shall pay for the use and hire of the said Vessel at the rate of .......................................................................................

52     *-US$15,500- per day or pro-rata including over time for initial 7 years,*
    *-US$16,000- per day or pro-rata including over time for 1st optional year,*
    *-US$16,500- per day or pro-rata including over time for 2nd optional year,*
    *-US$17,000- per day or pro-rata including over time for 3rd optional year,*
.......................................................................*in* United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and

53 ~~stores, on~~ ............................. summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
54 and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
55 wear and tear excepted, to the Owners (unless lost) as *as per Clause 71* ............................................................................................................................
56 ............................................................................. unless otherwise mutually agreed. Charterers are to give Owners not less than .......... days
57 notice *as per Clause 59* of vessels expected date of re-delivery, and probable port.

58     5.  Payment of said hire to be made in *Tokyo* New York in cash *by telegraphic transfer remittance to Owners' designated bank - see Clause 40 -* in United States Currency, semi-monthly in advance, and for the last half month or
59 part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
60 due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise failing the punctual and regular payment of the
61 hire, or bank guarantee, or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the Char-
62 terers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers - *subject to Clause 30*. Time to count from 7 a.m. on the working day
63 ~~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~~
64 ~~to have the privilege of using vessel at once, such time used to count as hire.~~

65     Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66 to 2 1/2% *1 1/2%* commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67 of such advances.

68     6.  That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place/*anchorage* that Charterers or their Agents may
69 direct, provided the vessel can safely lie always afloat at any time of tide, except *in River Plate and major ports in Brazil and Uruguay (such as but not limited to Nueva Palmira, Santos, Rio Grande, Paranagua, San Francisco do Sul and Vitoria) where similar vessel are regularly calling.* at such places where it is customary for similar size vessels to safely
70 lie aground.

71     7.  That the whole reach of the Vessel's Hold, Decks, and usual places of loading (not more than she can reasonably stow and carry), also
72 accommodations for Supercargo, if carried, shall be at the Charterers' disposal, reserving only proper and sufficient space for Ship's officers, crew,
73 tackle, apparel, furniture, provisions, stores and fuel. Charterers have the privilege of passengers as far as accommodations allow, Charterers
74 paying Owners ................................................ per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are
75 incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.

76     8.  That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary assistance with ship's crew and
77 boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78 agency; and Charterers are to load, stow, and trim *and discharge* the cargo at their expense under the supervision of the Captain, who is to *authorize Charterers or their agents to* sign Bills of Lading for
79 cargo as presented, in conformity with Mate's or Tally Clerk's receipts *without prejudice to this Charter Party*.

80     9.  That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81 receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.

82     10.  That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel and see that voyages are prosecuted
83 with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table. Charterers paying at the
84 rate of $1.00 *as per Clause 67* per day. Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally

85 Clerks, Stevedore's Foreman, etc., Charterers paying at the current rate per meal, for all such victualling. *as per Clause 67.*

86     11.  That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87 Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88 terers, their Agents or Supercargo, when required, with a true copy of daily Logs, *including all Charterers'/sub-Charterers' forms supplied to the Master/vessel, all to be completed in English,* showing the course of the vessel and distance run and the con-
89 sumption of fuel.

90     12.  ~~That the Captain shall use diligence in caring for the ventilation of the cargo.~~

91     13.  ~~That the Charterers shall have the option of continuing this charter for a further period of~~ ...........................................................................
92 .............................................................................................................................................................................................................................................
93 ~~on giving written notice thereof to the Owners or their Agents~~ .................................. ~~days previous to the expiration of the first named term, or any declared option.~~

94     14.  ~~That if required by Charterers, time not to commence before~~ ............................................................................................ ~~and should vessel~~
95 ~~not have given written notice of readiness on or before~~ *The vessel to be deliverd 1st January, 2012 / 30th June, 2012 at the Owners' option, which to be narrowed by Owners to 3 months lay/can spread latest 1st July 2011 and to 45 days spread latest 3 months prior to the 1st day of the narrowed lay/can, further narrowing as per Clause 59.* but not later than 1 p.m. Charterers or
96 their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.

97     15.  That in the event of the loss of time from *default and/or* deficiency of men *including strike of Officers and/or Crew or deficiency of*



or stores, fire, breakdown or damages to hull, machinery or equipment,

98  grounding, detention by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99  *whatsoever* preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost *and all direct expenses caused thereby to be for Owners' account*, and if upon the voyage the speed be reduced by

100 defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
101 thereof, and all extra expenses shall be deducted from the hire.

102 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
103 returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
104 Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.

105 The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
106 purpose of saving life and property.

107 ~~17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at New York,~~
108 ~~one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them, shall be final, and for~~
109 ~~the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~ - *See Clause 83.*

110 18. That the Owners shall have a lien upon all cargoes, and for all sub-freights for any amounts due under this Charter, including General Aver-
111 age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
112 deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
113 might have priority over the title and interest of the owners in the vessel.

114 19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
115 Crew's proportion. General Average shall be adjusted, stated and settled *in London*, according to Rules ~~1 to 15, inclusive, 17 to 22, inclusive, and Rule F of~~
116 York-Antwerp Rules ~~1924~~ *1994 and subsequent amendments, if any.* ~~, at such port or place in the United States as may be selected by the carrier, and as to matters not provided for by these~~

117 ~~Rules, according to the laws and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into~~
118 ~~United States money at the rate prevailing on the dates made and allowances for damage to cargo claimed in foreign currency shall be converted at~~
119 ~~the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or~~
120 ~~bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier~~
121 ~~or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if~~
122 ~~required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the~~
123 ~~carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a special account at the~~
124 ~~place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in~~
125 ~~United States money.~~ *Hire not to contribute to General Average.*

126 ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting from any cause whatsoever,~~
127 ~~whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the~~
128 ~~goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,~~
129 ~~losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
130 ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same manner as if such salving ship or~~
131 ~~ships belonged to strangers.~~

132 Provisions as to General Average in accordance with the above *and New Jason Clause* are to be included in all bills of lading issued hereunder.

133 20. Fuel used by the vessel while off hire, also ~~for cooking, condensing water, or for grates and stoves~~ to be agreed to as to quantity, and the
134 cost of replacing same, to be allowed by Owners.

135 ~~21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a~~
136 ~~convenient place, bottom cleaned and painted whenever Charterers and Captain think necessary, at least once in every six months, reckoning from~~
137 ~~time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.~~

138 *In the event of Charterers ordering the vessel to port(s) where the vessel's stay is extended for more than 25 consecutive days in*
139 *Tropical Zone or 35 consecutive days in other area or to lay-up has to cause bottom fouling, Charterers to provide underwater cleaning at their time and expense, otherwise Owners' representation of the vessel's speed and consumption to be null and void, effective from the vessel's departure from such port(s), unless or until so cleaned.*

140 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all ~~derricks~~ *cranes and grabs*) capable of handling lifts up ~~to three tons, also~~ *their maximum capacity in accordance with Clause 29,*
141 *also* providing ropes *and maintaining runners*, falls, slings and blocks *as on board.* ~~If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for~~

142 ~~same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel lanterns and oil for~~
143 ~~night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
144 Charterers to have the use of any gear, *grabs* on board the vessel. *Owners also to provide and maintain in efficient working order adequate electric light for night work as on board.*

145 23. Vessel to work night and day, if required by Charterers, and all *cranes and grabs* ~~winches~~ to be at Charterers' disposal during loading and
discharging; *In the event of a disabled crane or cranes and grab(s), or insufficient power to operate cranes and grabs, charter-hire to be reduced pro-rata for the period of such inefficiency in relation to the number of hatches workable, and Owners to pay any extra costs including standby time, but maximum one shift for shore labour. Charterers have the option to hire shore appliances to continue work and for which Owners to pay but vessel in this case remaining on hire. If the vessel is detained as a result of disabled crane(s) or grab(s), which detention would not have occurred had the crane(s) or grab(s) been available and efficient at all times, vessel to be off-hired. In the event of a breakdown of crane(s) or grab(s) due to proven negligence or rough-handling by stevedores, the vessel to remain on-hire during any time spent for thier repair and until cargo work is resumed. Any such repair shall be settled in accordance with Clause 57.*

146 ~~steamer to provide one winchman per hatch to work winches day and night, as required, Charterers agreeing to pay officers, engineers, winchmen,~~
147 ~~deck hands and donkeymen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the~~
148 ~~port, or labor unions, prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or~~
149 ~~insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned~~
150 ~~thereby.~~

151 ~~24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained~~



152  ~~in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels,~~
153  ~~etc.," in respect of all cargo shipped under this charter to or from the United States of America. It is further subject to the following clauses, both~~
154  ~~of which are to be included in all bills of lading issued hereunder:~~
155  ~~U.S.A. Clause Paramount~~
156  ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April~~
157  ~~16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of~~
158  ~~any of its rights or immunities or an increase of any of its responsibilities or liabilities under said Act. If any term of this bill of lading~~
159  ~~be repugnant to said Act to any extent, such term shall be void to that extent, but no further.~~
160  ~~Both to Blame Collision Clause~~
161  ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the~~
162  ~~Master, mariner, pilot or the servants of the Carrier in the navigation or in the management of the ship, the owners of the goods carried~~
163  ~~hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her owners in so far as such loss~~
164  ~~or liability represents loss of, or damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-~~
165  ~~carrying ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her~~
166  ~~owners as part of their claim against the carrying ship or carrier.~~
167      25.  The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have been or are about to be with-
168  drawn by reason of ice, or where there is risk that in the ordinary course of things the vessel will not be able on account of ice to safely enter the
169  port or to get out after having completed loading or discharging. *In any case Vessel never to force nor push ice not to follow icebreaker.*
170      26.  Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The owners to remain responsible for the
171  navigation of the vessel, *acts of pilots and tugs*, insurance, crew, and all other matters, same as when trading for their own account.
172      27.  A *brokerage* commission of ~~2 1/2 per cent is payable by the Vessel and Owners to~~ *deductible from hire payment 0.5 per cent is*
173  .......................................................................................................................................................................
174  *payable to Bancosta* on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
175      28.  An address commission *deductible from hire payments of 0.5 per cent* ~~of 2 1/2 per cent~~ payable to *Charterers*....... on the hire earned and
paid under this Charter.

    *Additional Clauses 29 to 95 are deemed to be part of and incorporated in this Charter Party.*

This Charter Party is a computer generated copy of the NYPE (Revised 3rd October, 1946) form printed under licence from the Association of Ship Brokers & Agents (U.S.A), inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

*IN WITNESS WHEREOF, the parties hereto have caused this Charter Party to be duly executed on this*       *, 2011*

*Two original copies of this Charter Party are made, mutually signed and possessed by each party.*

                                *OWNERS:*                                            *CHARTERERS:*
                         *Forever Shipping S.A.*                             *Dry Bulk Handy Holding Inc.*

FOREVER SHIPPING, S.A.

CHIKASHI YAMANE, PRESIDENT                        ILIAS ILIOPOULOS
                                                          DIRECTOR

*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

**Clause 29  Vessel's Description**
Panama, Hong Kong, Singapore Flag about 58,000 DWT Type Motor Bulk Carrier to be built at Kawasaki Heavy Industries, Ltd. Japan

| | | |
|---|---|---|
| Class | : | NK, NS*, (CSR, Bulk Carrier-Type A, BC-XII, GRAB 20) ESP and MNS* (M0) |
| LOA / LBP | : | abt. 197.00 / 194.00 m |
| Breadth Molded | : | abt.  32.26 m |
| Depth molded | : | abt.  18.10 m |
| Deadweight (at design draught) | : | abt. 50,000 MT on abt. 11.30 m draft |
| Summer    (at summer draught) | : | abt. 58,000 MT on abt. 12.65 m draft |
| Hold Cubic (Preliminary) | : | Total  72,500 m3    (Grain) |
| Hatch Cover | : | Weathertight, steel, end folding by hydraulic cylinder. |

Hold No.        Length              Breadth
No.1            18.27 m  x  18.60 m
No.2-5          20.88 m  x  18.60 m

| | | |
|---|---|---|
| Cranes | : | 4 x Electro-hydraulic single deck crane x abt. 28 m radius-Cargo Gear System Hoisting Load about 299kN (30.5t) Hoisting load shows the one under hook of the crane. Maximum hoisting load shall be 235kN (24t) or less in case of grab bucket handling in accordance with the maker's recommendation. Hoisting Speed about 18m/min which may be slightly changed according to the maker's standard. |
| Grabs | : | Maker to be decided (but radio controlled single wire grabs (12m3) are to be on board) |
| Main Engine | : | MAN B&W 6S50MC-CMk7 MCO : 8,630 kW  x  116 min^-1 CSO : 7,340 kW  x  abt. 110 min^-1  (85% of MCO) |
| Speed / Consumption | : | In good weather condition i.e. in winds up to Beaufort Force 4 Bunker grade IFO (IF-380CST) ISO 8217 2010 RMG380 and MDO ISO 8217 DMB 2010 except ISO 8217 :2010 RMG180 in South Africa. |
| Hatch Cover Strength | : | (We are now checking with Hatch Cover Maker) |
| Tank Top Strength | : | No. 1 & 5      21MT/m2 (206kN/m2) No. 2 & 4      16MT/m2 (156kN/m2) No. 3          24MT/m2 (235kN/m2) |

SPEED :

|  | (1st-5th year) | (6th-8th year) | (9-10th year) |
|---|---|---|---|
| Normal ballast condition | : abt 14.5 knots | abt 14.3 knots | 14.2 knots |
| Laden at designed draft (on abt. 11.30 m draft) | : abt 13.9 knots | abt 13.7 knots | 13.6 knots |




### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT

Laden at summer draft (on abt. 12.65 m draft)   : abt 13.5 knots   abt 13.3 knots   13.2 knots

CONSUMPTION AT SEA  :
For Main Engine at sea for 3 cases above          :   abt 32.9 MT IFO
For Aux Engine at sea for all of 3 cases above   :   abt 1.8MT IFO + abt. 0.2MT MDO

IN PORT CONSUMPTION   :
When Idle                                 : abt. 2.8MT IFO + abt. 0.3MT MDO
When Working (24Hours)           : abt. 4.8MT IFO + abt. 0.5MT MDO

Bunker quality shall be suitable for burning in the vessel's machineries.
Vessel entitles to use more diesel oil at narrow / shallow / busy water area, canals, in and out of ports and engine starting / stopping.

Bunker Capacities IFO                   : abt. 2,000 m3 (including F.O. service tank and F.O. settling tank)
Cargo Hold Ventilation                  : Natural supply and natural exhaust system
Fire Extinguishing system in Holds  : Sea Water

All figures "about" and subject to re-confirmation on or before the delivery of the Vessel.

**Clause 30  Late Payment**
Notwithstanding anything contained herein to the contrary, if any time hire becomes due on a Saturday, Sunday or a national holiday, or outside normal office hours, payment shall be made on the last banking day preceding the date on which hire becomes due. Where there is any failure to pay hire on the due date because of an oversight or negligence, error or omission of Charterers' employees, bankers or their agents, or otherwise for any reason where there is an absence of intention to fail to make payment as set out, Owners shall give Charterers four banking days notice to rectify the failure, and where so rectified the payment shall stand as a punctual and regular payment.

**Clause 31  Hire Deduction**
Charterers may deduct from the monthly Charter-hire any amount disbursed for Owners' account and supported by vouchers or necessary proof.  Charterers may deduct from last payments of Charter hire the estimated expenses made by them for Owners' account including the estimated cost of bunkers remaining on board on redelivery, for which, however, vouchers have not yet reached Charterers for submission of Owners. Charterers will of course endeavor to settle as soon as possible after redelivery but will not waive their rights to claim Owners for Owners' matters even if vouchers in this respect should not be received within sixty (60) days after redelivery.

**Clause 32  Deviation**
Should the vessel put back or deviate on a voyage by reason of a breakdown or an accident the hire shall be suspended from the time of her putting back until she again be in the same or equivalent position and the voyage resumed therefrom, provided always that due allowance should be given for any distance made good towards the vessel's destination and any bunkers




### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT

saved, except if breakdown or accident is caused by Charterers, their servants or Agents, in which case vessel to remain on full hire.

**Clause 33  Return Premium**
Charterers to have the benefit of any return premium recoverable by Owners from their Underwriters (as and when received from their Underwriters) by reason of the vessel being in port for a minimum of thirty (30) days, if on full hire for this period, or pro-rata for the time actually on-hire.

**Clause 34  Laying-up**
The Charterers shall have the option of laying up the vessel at a safe designated berth or anchorage acceptable to vessel's Underwriters for any portion exceeding 30 days of this Charter in which case hire hereunder shall continue to be paid but there shall be credited against such hire the amount which the Owners shall save during such period of layup through reduction of expenses (understood Owners are not obliged to pay off Officers/crew), less any extra proven expenses to which the Owners are put as a result of such layup and as a result of restoring the vessel to service thereafter and provided always that in no case will hire hereunder be less than the agreed time charter hire covering the laid-up period. Owners shall not be held responsible for any deterioration in Vessel's speed/consumption performance as result of lay-up , and underwater cleaning as may be deemed necessary shall be conducted at Charterers' time, risk and expenses.

**Clause 35  On/Off-Hire Survey**
Considering the vessel is a new-building, on-hire survey to be omitted and vessel's condition and bunker quantity on delivery to be ascertained by the Master's figure.
Upon redelivery, joint off-hire survey to be carried out in Charterers' time but expenses to be equally shared between Owners and Charterers.

**Clause 36  The Vessel's Name**
Charterers shall have option to name the Vessel if the name is nominated at the latest two months prior to launching of the vessel.

**Clause 37  Superficial Inspection**
Charterers have the option of holding superficial inspection at any time, the Owners or Master giving every facility and assistance in carrying this out, provided no interference of vessel's work to be allowed.

**Clause 38  War Cancellation**
In the event of war, whether declared or undeclared between any two of the following countries: United States of America, Russia, United Kingdom, Italy, France, Japan, Germany, China, directly affecting the performance of this Charter Party, then Owners and Charterers to discuss in good faith a mutually agreeable solution.

**Clause 39  Taxes**
Any taxes, dues, charges on cargo freight, sub-freights to be for Charterers' account.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

Any taxes, dues on vessel, ownership and management, time charter hire in the country of residence of the Owners or their managers/agents/ representatives to be for Owners' account.

**Clause 40  Bank Details**
Owners' Bank Account : To be advised

Bank Name    :
A/C. Name    :
A/C.No.      :

**Clause 41  Opening/Closing Hatches**
Crew to open and close hatches before, during and after stevedoring work, when and where required, and when permitted by shore labour regulations.

**Clause 42  P&I Benefit**
Charterers to have the benefit of the Owners' Protection and Indemnity Association as far as its rules permit.

**Clause 43  War Risk Insurance**
Basic annual War Risk Insurance on Hull and Machinery and crew to be for Owners' account. Hull and machinery value and war risk value of the vessel is;
Subject to Owners' prior consent which not to be unreasonably withheld, Charterers may trade the vessel to and/or within areas which are, or may during the currency of this charter , become excluded under the vessel's war risk insurance cover but are reinstatable against additional premium, Charterers paying additional war risk premium on hull and machinery (excluding blocking and trapping) and crew war bonus to the crew, less any rebates or discounts, upon receipt of underwriters' invoice or debit note. Such additional premium not to exceed additional premium applicable as if covered at Lloyds of London. However vessel not to be traded to zones where war is actually taking place.

**Clause 44  Diesel/Maneuvering**
The vessel to have the liberty of using Diesel Oil when entering and leaving port and for maneuvering in shallow narrow waters.

**Clause 45  Canal Fitting**
During the currency of this Charter the vessel is to be adequately fitted and suitable for transit of the Suez and Panama Canals at all times on the maximum permissible draft for all vessels.

**Clause 46  Attached Standard Clauses**
Both-to-Blame Collision Clause, New Jason Clause and War Risks Clause for Time Charters, 2004 (Code Name : CONWARTIME 2004), as attached, are all considered part of this Charter Party and all Bills of Lading shall be subject to said Clauses.
USA/Canadian or General Clause paramount as applicable to be included in all Bills of Lading.

**Clause 47  Boycott**




*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

In the event of the vessel being subjected to boycott, being delayed or rendered inoperative by strikes, labour stoppages or any other difficulties arising from vessel's flag, ownership, crew or terms of employment of crew of chartered vessel or any other vessel under same ownership, operation and control, such time lost is to be considered as off-hire. Owners guarantee that on delivery the minimum terms and conditions of employment of the crew of the vessel will be acceptable to the International Transport Workers Federation and current requirements of the M.U.A. and will remain so during the duration of the Charter period.

**Clause 48  USA Trading**
If the vessel calls at any United States of America port for the purpose of loading and/or discharging cargo and/or embarking and/or disembarking passengers, vessel's cargo gear and all other equipment shall comply with the regulations established by United State Public Law No.85/742 Part 9 (Safety and Health Regulations for Long shoring) and amendments thereto. If Longshoremen are not permitted to work due to failure of the Owners and/or Master and/or Owners' Agents to comply with the aforementioned regulations, any delay and expenses resulting therefrom shall be for Owners' account.
Owners to remain responsible for ensuring that, insofar as applicable to the vessel, all appropriate and mandatory registration requirements of the U.S. Government (including U.S. Tax Reform Act/Public Law 99-514) and any subsequent amendments are complied with.
Charterers not to be responsible for the collection, application or payment of any resulting taxes or dues levied on the vessel and/or on the monies paid in accordance with Clause 4.

**Clause 49  Oil Pollution**
(1)     Owners warrant that throughout the currency of this charter they will provide the vessel with the following certificates:
(a)     Certificates issued pursuant to Section 311(p) of the U.S. Federal Water Pollution Control Act, as amended (Title 33 U.S. Code, Section 1321(p)) up to (insert the date upon which such certificate(s) is/are due to expire).
(b)     Certificates issued pursuant to Section 1016 (a) of the Oil Pollution Act 1990, and Section 108 (a) of the Comprehensive Environmental Response, Compensation and Liability Act 1980, as amended, in accordance with Part 138 of Coast Guard Regulations 33 CFR, from (indicate the earliest date upon which the owners may be required to deliver the vessel into the charter or, if later, the date inserted in sub-paragraph (a) above), so long as these can be obtained by the owners from or by (identify the applicable scheme or schemes).

(2)     Notwithstanding anything whether printed or typed herein to the contrary,
(a)     save as required for compliance with paragraph(1) hereof, owners shall not be required to establish or maintain financial security or responsibility in respect of oil or other pollution damage to enable the vessel lawfully to enter, remain in or leave any port, place, territorial or contiguous waters of any country, state or territory in performance of this charter.
(b)     Charterers shall indemnify Owners and hold them harmless in respect of any loss, damage, liability or expense (including but not limited to the costs of any delay incurred by the vessel as a result of any failure by the Charterers promptly to give alternative voyage orders) whatsoever and howsoever arising which Owners may

*Page 5*



### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT

sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph(1) hereof.

(c)   Owners shall not be liable for any loss, damage, liability or expense whatsoever and howsoever arising which Charterers and/or the holders of any bill of lading issued pursuant to this charter may sustain by reason of any requirement to establish or maintain financial security or responsibility in order to enter, remain in or leave any port, place or waters, other than to the extent provided in paragraph(1) hereof.

**Clause 50  Bunkering Off-Route**
Charterers have the liberty as part of the proposed voyages under this time charter of ordering the vessel to proceed to any port or ports excluding trading areas excepted, at which bunker oil is available for the purpose of bunkering at any stage of the said voyages whatsoever, whether such ports are on or off the direct and/or customary routes between any of the ports of loading and/or discharging for which the vessel is scheduled, and may take oil bunkers in any quantity in the discretion of Charterers, even to the full capacity with safety margin of fuel tanks as determined by Master.

**Clause 51  Grab Discharge**
The vessel is suitable for grab discharge.

**Clause 52  Alternate Hold Loading**
Vessel is strengthened for heavy cargoes and holds 2+4 may be left empty, leaving vessel able to load a full DWT cargo in the remaining holds.

**Clause 53  Loading Grain**
Vessel is able to carry a full cargo of heavy grain and/or its products in bulk in vessel's holds. During currency of Charter Party period the vessel to have on board valid stability particulars for grain cargoes issued by vessel's class society on basis latest SOLAS and further amendments, if any, including approved calculations for "untrimmed ends".

**Clause 54  Australian Regulation**
Owners guarantee that the vessel complies with all Australian Navigation (Loading and Unloading Safety Measures) Regulations 1961 and current related requirements and recommendations and Owners guarantee that throughout the currency of this charter, the vessel will comply with current and future hold ladder requirements as stipulated by the M.U.A.

**Clause 55  Vessel's Equipment**
The vessel is fitted with Inmarsat System – to be informed later.
Vessel's cargo gear and all other equipment shall comply with the regulations of the countries in which the vessel will be employed, and Owners are to ensure that the vessel is at all times in possession of valid current certificates of efficiency to comply with such regulations.
If stevedores, longshoremen or other workmen are not permitted, or refuse, to work due to failure of Master and/or Owners and/or Owners' agent to comply as aforesaid, Charterers may



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

suspend hire for the time thereby lost and Owners to pay all expenses incurred incidental to and resulting from such failure.

**Clause 56  Bunker Clause**
Vessel to be delivered with quantities to be mutually agreed.
Owners are able to accommodate Charterers' requirements in this respect.  Vessel to be redelivered with about same quantities as on delivery , but minimum sufficient to reach a nearest main bunkering port.

Prices at delivery and redelivery to be actual purchased price supported by vouchers.

**Clause 57  Stevedore Damage**
Charterers are not to be responsible for stevedore damage or other damage to the vessel unless notified by Master within 48 hours. and always prior to departure from port of occurrence, or if hidden damage, soonest possible thereafter. Master to hold stevedores/party responsible liable for the damage and Master to use his best endeavors to obtain signature from Stevedores for receipt of notification.  In any case time/cost of repairs to be for Charterers' account unless made good in the meantime by stevedores without loss of time and cost and unless such repairs are postponed to next vessel's drydock, in which case time will be for Owners' account and cost for Charterers' account. Hidden damages to be notified at time of discovery.
Damages affecting vessel's seaworthiness to be repaired at port of occurrence/discovery or at a suitable repair yard unless crew able to repair such damages as may be directed by the Vessel's Class at Charterers' time and expense.

**Clause 58  Hold Condition on Redelivery**
Vessel to be redelivered with clean holds or Charterers' option to pay US$ 5,000.- in lieu of hold cleaning.  See also protective clauses.

**Clause 59  Notices**
At delivery and redelivery notices to be the same: 30 days range, 20/15 days approximate, 10 days approximate notices and probable port, 7/5 days approximate, 3/2/1 definite notices.

Owners before delivery and Charterers before redelivery to keep the other party well informed if any changes in expected delivery and redelivery dates.

**Clause 60  Hold Condition on Delivery**
On arrival first load port after delivery vessel's cargo holds/cargo carrying compartments to be clean, dry, free of rust and/or scale and cargo (or yard) residues and ready in all respects to the satisfaction of the surveyor and/or such other recognized local authority or official as local regulations or shippers may require to receive permitted cargo which the vessel may be required to load. If, on presentation for loading at any or all of the loading port(s) of the first voyage the vessel should fail to pass the above cargo survey(s), then all expenses for cleaning and/or fumigation including the cost of labour standing by to be for Owners' account, and the vessel to be off hire from time of failing such survey(s) until it is in all respects ready to load and survey passed.

*Page 7*



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

If some holds/cargo carrying compartments are not accepted, Charterers shall have the option of accepting the vessel with those which are accepted, and in that case Charterers shall pay hire proportionate to the number of holds/cargo carrying compartments which have passed survey.

However, if thereafter there should be any delay owing to non-acceptance of any hold/cargo carrying compartment for vessel's first voyage, vessel shall be wholly off hire until the loading programme can be fully resumed.

**Clause 61  Intermediate Hold Cleaning**
Intermediate hold cleaning upon completion of discharge of each cargo to be carried out by crew who shall use their best endeavors to clean holds as if vessel traded for Owners' account, provided local labour regulations and weather permit, against Charterers paying crew via Owners lumpsum US$600.- per hold for sweeping and washing as required. Such cleaning to be carried out in port and/or en route to next loading port, provided this can be safely done and duration sufficient.

Crew to use their best endeavors to effect such cleaning but without guarantee and responsibility that cargo holds accepted on arrival at loading ports.

All chemicals, fresh water (in excess of what produced by vessel evaporator) and consumable material (if any) to be supplied by Charterers at their cost.

Vessel to have on board suitable general equipment to perform such cleaning including : extendible ladders, hoisting equipment, water pressure lines in order to facilitate crew and expedite operations.

**Clause 62  Cargo Separation**
Charterers have the option to install artificial separations for the purpose of separating different grades of cargo. All associated time and costs of installation and removal of fittings to be for Charterers' account. Work to be performed to Master's satisfaction and fittings to be removed prior to vessel's redelivery. Charterers shall remain responsible for any claims arising from cross- contamination between the grades thereby separated. In the event welding is necessary in the holds to install separations, Charterers shall provide Owners with welding plans prior to loading the cargo for Owners' approval.

**Clause 63  Cargo Exclusions**
Asphalt, pitch in bulk, logs, ammonium nitrates, ammonium nitrate fertilizer (Type A & B), acid, calcium, carbide, ferrosilicon, naphtha, chemical products, nuclear products and waste, arms, ammunition, creosoted goods, fishmeal, hides, turnings, direct reduced iron pellets, motor spirits, tar, explosives, dangerous and hazardous cargoes, live stock, motor blocks, caustic soda, copra, sodium sulphate, calcium hypochlorite, bonemeal, charcoal (but Australian Char permitted), turpentine, seed cake, oil cake, pond coal, pebbles, sponge iron, petroleum and its products, borax in bulk, bitumen, cotton (except cottonseeds/pellets allowed), quebracho, Chilean nitrate soda, Indian coal except to be allowed between 1st October and February 28th (Indian coal is coal mined in India), asbestos and categorized as Group B Cargo under IMSBC Code except Sulphur.



### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT

Permitted cargoes to include always manioca, tapioca and its products, rice bran, wheat bran and/or any of the products of these commodities and/or any agricultural products. All in bulk and/or in bags but always excluded sunflowerseed expellers and all injurious, inflammable, dangerous goods.

All cargo always to be loaded, stowed, carried and discharged in accordance with local and national regulations and in full compliance with I.M.O. recommendations.

Notwithstanding the cargo exclusions as above:
Charterers are allowed to carry 6 out of the below possible cargoes each 12 months from the delivery of the vessel under the charter party ;
    1) max 2 petcoke
    2) max 2 salt
    3) max 2 cement
    4) max 2 Scrap
    5) max 1 Sulphur

(1)    Charterers have the liberty carrying max two (2) cargoes of non oily petroleum coke (whether it be full or part cargo), per each year of charter if exercised on following conditions:

    a)    The petroleum coke mentioned herein is only limited to the type of non hazardous/non dangerous green delayed type and/or calcined type.

    b)    If Charterers exercise such options Charterers undertake to use the least number of holds possible, provided vessel's stability trim and stress permitting.

    c)    Such cargo to be loaded stowed trimmed, discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.

    d)    Should any additional/special wash down of holds before loading be reasonably/recommended/proposed/required by Master, Charterers undertake to arrange the same at their expense/time, however Master and crew to always cooperate with Charterers.

    e)    After discharging Charterers to arrange at their expense/time any additional/special wash down by chemicals of holds carrying such cargo as Master reasonably considers it necessary, however Master and crew to always cooperate with Charterers.

    f)    Such cargo not to be last cargo prior redelivery.

    g)    Any extra expenses resulting therefrom/incurred thereby and any detention through any of the above causes to be for Charterers' account.

(2)    Charterers have the liberty carrying max two (2) cargoes of salt (whether it be full or part    cargo), per each year of charter if exercised on following conditions:

    a)    Charterers undertake to use the least number of holds possible, provided vessel's stability trim and stress permitting.

    b)    Before loading all holds assigned for salt to be lime washed by Charterers at their time, expense and risk to the satisfaction of Master and independent surveyor appointed by Charterers at their expense.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

    c)     Such cargo to be loaded stowed trimmed, discharged strictly according latest IMO and/or any other latest regulations/rules applicable to such cargo.

    d)     After discharge Charterers to supply sufficient fresh water at their expenses for washing down of all holds.

    e)     Such cargo not to be last cargo prior redelivery.

    f)     Any extra expenses resulting therefrom/incurred thereby and any detention through any of the above causes to be for Charterers' account.

    g)     In case of loading/discharging salt, if Charterers require crew to perform lime coating and/or removal works other than usual hold preparation/cleaning, Charterers to remunerate crew with US$ 500.- per hold per each operation of coating and/or removal.

(3)     Charterers have liberty of carrying max two (2) cargoes of cement (whether it be full or part cargo), per each year of charter if exercised on following conditions:

    a)     Charterers undertake to use the least number of holds possible, provided Vessel's stability, trim and stress permitting.

    b)     In case the vessel is equipped with permanent cement feeder holes, Charterers to load cement through the same as long as the size and or location of the holes match with loading facilities. If not, or if the vessel has no permanent cement feeder holes, Charterers to have option with ample notice to Owners, to cut up to maximum of 3 holes in each hatchcover designated for cargo and shall restore the same at Charterers' time, risk and expense.

    c)     Owners/Master to provide Charterers agents with hatchcover schematics so that these may be forwarded to Class surveyor for hole position, recommendations/approval prior to cutting holes.

    d)     Holes not to be cut within same frame space with existing grain feeding holes and only to be cut at the suitable place of hatchcovers in accordance with Vessel builders' spec.

    e)     All cutting and restoring of the holes to be fully in accordance with Vessel's Class recommendations. When restoring, Charterers to obtain from the Vessel's Class a Certificate of Seaworthiness without any recommendation for future repairs at Charterers' time, risk and expenses.

    f)     Charterers to supply, if required by Master/Owners, tools for cleaning cement residues including but not limited to cherry-pickers, water/pneumatic comb guns, electric submersible mucking pumps and assembly scaffolding tower.

Charterers have the option of loading extra one more cargo per year in charter if occasion arises. Charterers' choice of such optional cargo is limited to one cargo among above non oily petroleum coke, salt and cement.

(4)     Charterers have liberty of carrying max two (2) cargoes of scrap per each year of charter if exercised on following conditions:

    a)     The first layer of scrap to be lowered as close as possible to vessel's tanktop in order to provide a proper cushion to Master's satisfaction.

    b)     Scrap not to be the last cargo prior to redelivery.



**RIDERS**
**BULK PATAGONIA**
**"KHI NEWBUILDING BULK CARRIER 58,000 DWT**

c)     Charterers to arrange, at their time and expense, holds survey before loading and after discharge to ascertain damages to the holds.

d)     Should electro-magnets be used during loading or discharging, then the risk/time/expense of re-calibrating vessel's compass (if necessary) to be for Charterers.

(5)     Charterers have the option to load maximum one (1) cargo of sulphur (only categorized under Group B&C, IMSBC Code is allowed) for each 12 months period starting from delivery of the vessel under this cp, but same to be loaded, stowed, carried and discharged strictly in accordance with regulations and requirements of IMO, SOLAS and the vessel's class.

If sulphur is loaded :

a)     Holds to be thoroughly washed by vessel's crew when requested by charterers with fresh water before loading and after discharge at Charterers' risk, time and expense.

b)     Subject to the provisions below, lime coating of holds for the carriage of sulphur, whether requested by Shippers or Charterers or Owners, to be arranged by vessel's crew at Charterers' risk, time, and expense.

c)     Similar procedures to apply for the lime coating removal, which always to be at Charterers' risk, time and expense.

d)     The above operations and the carriage of sulphur to be arranged at Charterers' risk, time, and expense.

Lime/hold block 10 coating clause for loading sulphur
Charterers shall lime-coat or Hold Block 10 at their risk, time and expense all holds in which sulphur is to be loaded and remove same after completion of discharging at Charterers' time, risk and expense.
If required by Charterers, subject to port authority, local regulations and weather permitting, Crew to carry out lime-coating or Hold Block 10 and removal at Charterers' time, risk and expense, for which Charterers shall pay USD500 total per hold for coating and removal in addition to the normal hold cleaning allowance of USD600.
Charterers assure to take following procedures :
  - Charterers to provide the products prior loading together with all equipment necessary for the application.
  - The cost of the product, the equipment to be covered by Charterers.

If Charterers do not require crew to clean holds, Charterers not to pay for the intermediate hold cleaning.
However if Charterers have only required crew to lime-coat or Hold Block 10 but not to clean, Charterers to pay additional bonus to crew of USD 250 per hold painted/coated.

(6)     In case of loading Iron ore fine or Nickel ore, Charterers shall provide, if are available, Transportable Moisture Limit Certificate (TML) and Flow Moisture Point Certificate (FMP) which are tested and issued by independent laboratory prior loading.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

Charterers agree, if so requested by Owners, to appoint an independent surveyor to perform a preloading survey of the cargo with time and cost equally shared but surveyor(s) to be arranged by Owners.

(7)     Steel cargoes to be sufficiently dunnaged/lashed/secured and unlashed/unsecured at Charterers' expenses, risk and time by stevedores under supervision of the Master and up to his satisfaction. Charterers agree, if so requested by Owners, to jointly appoint an independent surveyor to perform a preloading survey of the cargo with time and cost equally shared. Surveyor(s) to be arranged by Owners. Bills of Lading of steel products destined for U.S.A. may contain Retla Clause if requested by Charterers/ sub-Charterers.

(8)     In case of loading of pig iron, the first layer of pig iron to be lowered as close as possible to vessel's tanktop in order to provide a proper cushion to Master's satisfaction.

(9)     Deck cargo to be loaded, stowed, lashed, secured, chocked and dunnaged etc and discharged at the Charterers' risk and expense and to be loaded within vessel's deck/hatch cover strengths but always to Master's satisfaction as to vessel's trim and stability. Any lashing/securing material, if necessary, shall be for Charterers' account. Bills of Lading shall bear remarks = Carried on deck at Shippers' risk and without carrier's responsibility for loss or damage howsoever caused.

**Clause 64  Cargo Claim(s)**
Liability for cargo claims as between Owners and Charterers shall be apportioned in the manner as specified by the Interclub New York Produce Exchange Agreement as amended September 1996 Class 1 P and I coverage with

Charterers covering their Time Charterers' risk with P and I Club:

Owners warrant that the vessel will remain entered against all P&I and defense risks with an International Group P&I Club throughout the currency of this charter.

**Clause 65  Ocean Routing**
Charterers have the option, at their expense, to supply Ocean Route or similar advice to the Master during voyage specified by the Charterers. The Master to comply with the reporting procedure of the routing service. The vessel shall be capable, at all times during the currency of this Charter Party, of steaming as per description clause, except in the case as per Clause 21 and/or in other cases resulting from Charterers'/their servant's side responsibility. For the purpose of this Charter Party "good weather conditions" are to be defined as weather conditions in wind speeds not exceeding Beaufort Force 4 (included) and/or Douglas Sea State 3.

Evidence of weather conditions to be taken from the vessel's deck logs and independent bureau reports. In the event of any data discrepancies or dispute between deck log and ocean




*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

routing service, ocean routing data to be accepted as binding both parties to assess vessel's performance.

**Clause 66  Trading Exclusions**
Trading area to be worldwide within IWL – Charterers' option to break IWL sub Owners' prior consent, which not to be unreasonably withheld, and Charterers to pay all extras as charged by vessel's insurance company against Owners' underwriters' nett invoice which not to exceed premia charged at Lloyds of London – but excluding : –
Israel, all Russian Pacific ports where possibility of infestation of "Asian gypsy moth" exists, Iraq, Cambodia (Kampuchea), Cuba, Mozambique, Salvador, Congo (Brazzaville), Somalia, North Korea, Sierra Leone, Angola, Eritrea, D.R.C. (i.e. former Zaire), Syria, Lebanon, Tanzania, Turkish occupied Cyprus, Haiti, West of Matanzas of Orinoco River.
Should political situation and practices of international shipping change, Charterers and Owners may discuss in a bona fide spirit to agree to include or exclude any countries.
In Ukraine, if vessel/Owners are fined unjustifiably and without responsibility and same can be easily identified as blackmail, charterers to cover the cost of the fine.

**Trading Gulf of Aden and Indian Ocean :**
Conwartime 2004 is applied to this charter party worldwide except for the piracy risk at Gulf of Aden and Indian Ocean for which :

Owners confirm that even under Conwartime clause, the vessel will proceed via Gulf of Aden under below conditions agreed for transiting Gulf of Aden and Owners confirm vessel will proceed via Indian ocean  with conditions 1+2+3+4 of below Gulf of Aden conditions.

1. Charterers are to pay war AP as per Owners' underwriters' voucher.

2. Charterers are to pay K&R insurance.

3. Charterers are to pay crew bonus, as per supported voucher.

4. Even in case the vessel is hijacked, the vessel is not to be off-hire at all times.

5. The vessel is to join armed convoy or group transit. Waiting time/speed adjustment/deviation if any, shall not be off-hired.

6. Owners/Charterers mutually discuss the piracy preventive action,  such as but not limited to barbed-wire, barricade in good faith.

Lastly, in case crew wish to disembark the vessel due to the above reason, Owners would like to discuss the costs for crew change with Charterers in a sincere/mutual manner.

Should the piracy situation substantially change, Charterers and Owners shall discuss in a bona fide spirit and review above conditions (1 to 6) in relation to transit of Gulf of Aden and/or Indian Ocean from time to time, and Owners and Charterers shall agree through mutual decision/discussion on amendment and/or additions to those conditions.




*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

### Clause 67  Cables/Victualling/Representation

Charterers to pay Owners a lumpsum of US$ 1,750.- per month which shall cover all costs for cables/phone calls, victualling as per lines 84/85 and representation. Master to send all cables as required by Charterers/Sub Charterers.

Vessel will be fitted upon delivery to Charterers with Inmarsat or similar modern transmission system.

### Clause 68  Dry docking

The Owners have the right to place the Vessel in drydock during the currency of this   charter at intervals of every 24-30 months after the Vessel is delivered for bottom cleaning and painting and/or repair as required by class or dictated by circumstances, provided, however, that the Owners have the right to place the Vessel in drydock at any time and any place in case of emergency. The Charterers shall bring the Vessel to the range between Japan and Singapore. The Owners will give the Charterers six (6) months prior notice with regard to their   intention of the timing of drydocking of the vessel.

The off-hire period shall be the balance period between the actual time elapsed (last discharging port - dock - 1st nominated port) and the estimated time required under the artificial voyage going straight from the last discharging port to the 1st nominated port. The bunkers consumed to be calculated in the same manner unless otherwise mutually agreed. Charterers shall cooperate with Owners for Owners to reserve the place for drydocking, such as informing the vessel's schedule closely to Owners as well as the employment after the drydocking in order to minimize the deviation / waiting time for the drydocking.

### Clause 69  Vessel's Flag/ITF

Vessel's registry, name, flag, class or Ownership is not to be changed during the currency of this charter without Charterers' prior approval, which not to be unreasonably withheld. Neither registered nor beneficial Owners have or will have any direct or indirect connection with Cuba, Serbia, Montenegro, Iran, North Korea.

### Clause 70  Letter of Indemnity

a)   Should original Bills of lading not arrive at discharge port in time, then Owners agree to release entire cargo without presentation of original Bills of Lading. Charterers hereby indemnify Owners against all consequences of discharging cargo without presentation of original Bills of Lading. Letter of Indemnity as per Owners' P&I Club, wording as attached, to be issued prior commencement of discharge and signed by Charterers only and faxed and mailed to Owners.

b)   In the event that Charterers instruct the vessel to change discharging port after Bill(s) of Lading have been issued, the Owners shall comply with such instructions upon receipt of a faxed copy of Letter of Indemnity, on the Owners' standard P&I Club wording signed by the Charterers only.

### Clause 71  Redelivery Range

Vessel to be redelivered to Owners on dropping last outward sea pilot at one (1) safe port within Japan/Singapore range including PRC, South Korea, Philippine, Malaysia and R.O.C.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

(Taiwan), Skaw/Passero range incl. U.K. and Eire, Vancouver/San Diego range, Singapore/India range, Kuwait/U.A.E. range,  always within IWL and permitted countries/areas under C/P, excluding war or warlike zone(s) in Charterers' option, any time day/night, Sundays and holidays included,.

**Clause 72  Charters' House Flag/Funnel Painting**
Charterers have the privilege of flying their houseflag, to paint funnel in their house colours.

Everything then to be repainted in Owners' colours before termination of the Charter Party, cost and time of painting and repainting to be for Charterers' account.

**Clause 73**
Deleted.

**Clause 74  Delivery/Redelivery Time**
Both delivery and redelivery to be computed in GMT.

**Clause 75  Agency**
Charterers to endeavor to keep Owners closely informed of vessel's movements and probable employment, together with full style of Charterers' agents appointed at each port.

Charterers endeavor that Charterers' Agents will undertake vessel's normal matter on Owners' behalf without charging any additional agency fee, unless there should be some extraordinary matters such as attending to crew desertion/hospitalization, if any, or survey work for Owners' account in which case Owners shall pay agents the agency fees as per the tariff. However, if Charterers' agents refuse to act on behalf of Owners for normal or extraordinary matters, then Owners to appoint Owners husbandry handing same.

Any charges raised by Charterers' agents (agency fee excluded) for services rendered to Owners to be for Owners' account.

**Clause 76  Watchmen**
Watchmen for cargo to be for Charterers' account and gangway watchmen to be provided by Owners, but where compulsory to employ and pay gangway watchmen from shore, the expenses to be for Charterers' account.

**Clause 77  Smuggling**
In case of smuggling by Master/vessel's crew, Owners to be responsible for any delay to vessel/expenses/fines/penalties resulting therefrom but Charterers to be responsible for the same if caused by smuggling by Charterers' servants/agents.
Master and crew not to trade for their own account.

Owners signed = Seacarrier Initiative Agreement (SCIA) =

**Clause 78  Charter Party**



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

This Charter Party will be drawn up in two originals, one to be retained by Owners and the other by Charterers.

### Clause 79  Bunker Prior to Redelivery
Owners' option to bunker vessel for their account prior redelivery provided same does not interfere with Charterers' cargo operations.

### Clause 80  Bunker Grade
Bunkers supplied by Charterers to the vessel during the currency of this Charter Party to be in accordance with British Standards ISO 8217:2010 RMG380 except ISO8217: 2010 RMG180 in South Africa and not exceeding viscosity 380 cst for IFO and ISO8217 DMB for MDO. See also Clause 29.

### Clause 81  Lightening/Double Banking Clause
Charterers have the right to load and/or discharge, lighten or trans-ship on double banking basis, or by any other means available at loading and/or discharging port or at anchorages where vessels of similar size customarily accomplish such operations, subject always to Master's satisfaction.

Charterers are to supply at their time and expense any additional equipment or facilities, such as fenders, considered necessary by the Master for such transferal of cargoes. Loading at Amamapare, Karumba or similar anchorages may be performed from shippers' barges/vessels by grabs supplied by Charterers and/or by shippers' purpose built self-discharging barge. If at any time during such operations, the Master considers it unsafe to continue due to adverse weather conditions, Master may order the other vessel/barge(s) away from his vessel or to remove his own vessel in order to avoid prejudicing the safety of the vessel(s). Vessel always to remain on-hire during lightening/topping-up operations.

Any additional insurance premium, if levied by Owners' underwriters, to be for Charterers' account against presentation of underwriters' invoices.

### Clause 82  U.S. Ports
Calling of U.S. ports is possible under the following conditions:

A)      Charterers to give 24 hours' notice of entry into the port through the Charterers' Ship Agents prior to calling at the port in the USA.

B)      The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the USA shall have been endorsed with unique Bill of Lading identifier as required by the U.S. Customs Regulations (19 CRF Part Section 4.7.A) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.



### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT"

**Clause 83  Arbitration**

Any dispute arising under the Charter to be referred to arbitration in London, one Arbitrator to be nominated by the Owners, and the other by the Charterers. This Charter to be governed by and construed in accordance with English Law. In case Arbitrators cannot agree to a decision they will appoint an Umpire whose award will be final and binding upon both parties.

If either one of the appointed Arbitrator refuses to act, or is in incapable of acting, or dies, the party who appointed him may appoint a new Arbitrator in his place.

If one party fails to appoint an Arbitrator either originally or by way of substitution, as aforesaid, for seven clear days after the other party, having appointed his Arbitrator, has served the party making default with notice to make the appointment, the party who has appointed an Arbitrator may appoint that Arbitrator in the reference and his award shall be binding on both parties.

Where the amount claimed by the claimant is less than US$150,000.- excluding interest, the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA FALCA Rules.

Where the amount claimed by the claimant is less than US$50,000.- excluding interest, the reference shall be to a sole arbitrator and the arbitration shall be conducted in accordance with the LMAA Small Claims Procedure without right of appeal.

**Clause 84**
Deleted

**Clause 85  ISM Code Compliance**

Headowners as named in this charter and/or their managers (Owners) shall comply in all respects with the requirements of this Code, IMO Resolution A741 of 4th November 1993 as subsequently incorporated into the SOLAS (1994) Convention.
Owners further warrant the vessel shall comply and keep on board a valid Document of Compliance and Safety Management Certificate which certificates shall be maintained throughout the charter period. If required by Charterers, Owners to provide copies of such 'DOC' and 'SMC'.
Owners are aware of IMO Resolution and Annex A713(17) of 6th November, 1991 and Owners warrant that the vessel, Master and crew, shall comply with relevant recommendations throughout the currency of this charter.

**Clause 86  Change in applicable laws and regulations**

If the following circumstances affect the performance by owners of this charter, Charterers and Owners shall discuss the situation in good faith to settle down the problem;
(a)     When the existing laws and regulations which apply to this charter have been changed or revised by the relevant authorities during the currency of this charter.
(b)     When any laws and regulations have come into force during the currency of this charter.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

**Clause 87  Purchase Option**
Charterers have the option to purchase the vessel at anytime during the currency of the Charter Party but from the end of the 4th year. Purchase option to be declared by 3 months prior to the purchase, i.e. if the vessel to be purchased at the end of 4th year, Charterers to give notice latest by 45 months after delivery of the vessel.

(Purchase option price)
| | | |
|---|---|---|
| End of  4 th year | JPY | 3,500,000,000 |
| End of  5 th year | JPY | 3,325,000,000 |
| End of  6 th year | JPY | 3,150,000,000 |
| End of  7 th year | JPY | 2,975,000,000 |
| End of  8 th year | JPY | 2,800,000,000 |
| End of  9 th year | JPY | 2,625,000,000 |
| End of 10th year | JPY | 2,450,000,000 |

Price to be reduced as above or pro-rata per annum.
1% address commission to Charterers will be deducted from the price and settled at Charterers (buyers) side, in the event purchase option is declared.

Procedure:
1.      When the Charterers elect to purchase the vessel, they are to give not less than 3 months prior notice to the Owners in writing their firm intention to purchase the vessel, subject to the vessel's physical inspection and class record and class record inspection.
2.      Upon receipt of such notice, the Owners/Charterers shall mutually discuss and agree the earliest possible time/location when the vessel can be inspected by the Charterers in relation to the vessel's itinerary, also will allow the Charterers to inspect the vessel's class record as soon as practically possible.
3.      Within 2 weeks after the completion of the physical inspection, the Charterers are to declare by fax or Telefax whether or not the result of inspection of the vessel and its class records are acceptable to the Charterers. In the event of the result of the inspections being acceptable, upon receipt such notice by the Owners, the Charterers' option to purchase the vessel shall be deemed having been exercised by the Charterers.
4.      In the event that the vessel has been rejected by the Charterers after the inspection as aforesaid, the vessel continues to be traded under the Charter Party as if the Charterers have declared no intention of the purchase.
5.      Thereafter, the Charterers maintain their right to purchase the vessel or to inspect the vessel and her class records again at a later stage as long as the Charter Party remains in force. Numbers of inspection however shall be limited within reasonable times.
6.      When the vessel has been accepted under the Item 3 hereinabove, the Owners and the Charterers shall execute the Memorandum of Agreement, in the form attached hereto, subject only to logical amendments, unless otherwise mutually agreed, and filling in delivery range and lay/can for the sale delivery, that shall be amicably and mutually agreed between the Owners and the Charterers consistently and in relation with the vessel's itinerary. The place of delivery shall be safe port or anchorage convenient for the sale delivery acceptable to both parties. It is understood that sale delivery shall take place as soon as practicable after the Charterers have accepted the vessel under Item 3 hereinabove. In any event the term above



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

not to be considered a subject by which the Charterers or the Owners may decline the sale of the vessel nor to have any prejudice to the execution of the Memorandum of Agreement.

7.      In consideration of the fact that the vessel is being operated under the Charterers' (i.e. Buyers) Charter Party, it is specifically understood that the Lay/Can under the Memorandum of Agreement is intended to give target dates or range in which the sales delivery is to take place.

8.      The buyers under the Memorandum of Agreement shall be the Charterers themselves or their guaranteed nominee subsidiary or affiliate."

**Clause 88  Bimco ISPS Code**

(a)  (i) From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply with the requirements of the ISPS Code relating to the Vessel and "the Company".

Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners' account.

(b) (i) The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:
"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c) Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the

*Page 19*



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 89 US Customs Advance Notification/AMS Clause for Time Charterparties**
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations(19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i) Have in place a SCAC (Standard Carrier Alpha Code);
    ii) Have in place an ICB (International Carrier Bond);
    iii) Provide the Owners with a timely confirmation of i) and ii) above; and
    iv) Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage) and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

**Clause 90  Sea Waybill(s) Clause**
Charterers' option to issue sea waybill(s), instead of Bills of Lading in case of sea waybill(s) being issued instead of bill(s) of lading, the cargo to be released at discharging port(s) as per Charterers' written discharging instruction at the sole risk and responsibility of Charterers. Charterers shall indemnity and hold owners harmless against any liability, loss, damage and/or expense caused to and/or incurred by Owners by virtue of Owners' complying with Charterers' instruction for release of the cargo under the seawaybill and/or by the use of sea waybill(s). Further more the following steps shall be taken.
In case the master is requested to authorize agents to sign sea waybill(s), copy of sea waybill(s) shall be sent on fax to the master soonest possible, latest before arrival at the discharging port.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

Charterers shall give written discharging instruction including name of receivers, discharging port to the Master in time for arrival at the discharging port.
This clause to be applied for Japan discharging only.

### Clause 91  Split Bill of Lading(s) Clause
Paramount Clause General
The International Convention for the Unification of Certain Rules of Low relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this "Delivery Order". When the Hague-Visby Rules are not enacted in the country of shipment, the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.
When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this "Delivery Order" save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this "Delivery Order".
The protocol signed at Brussels on 21 December 1979("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatory or by this "Delivery Order".
The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the change of another carrier, or with respect to deck cargo and live animals.
Charterers shall indemnify and hold Owners harmless against any liability, loss damage or expenses arising as a result of Split Bills of Lading or Delivery Orders being issued pursuant to the terms of this charter party and issue Letter of Indemnity, when required, as per Owners P and I recommending form.

### Clause 92 New Rules
Where and when new circumstances and/or situations and/or new regulations and/or legislation arise, after the finalization of this Charter Party, that may affect the trading of this vessel, either Charterers or Owners can propose clause(s) that should be inserted to cover the new circumstances/ situation/ legislation or regulation.  Charterers and Owners to discuss such new clause(s) in good faith and are mutually bound to agree a reasonable wording.

### Clause 93 Cancellation
If the vessel will be off hire for longer than 90 days continuously without a reasonable justifiable cause.  Charterers to have the option of cancelling this charter.

### Clause 94 Bunker Quality Control Clause for Time Chartering
(1) The Charterers shall supply bunkers of a quality suitable for burning in the Vessel's engines and auxiliaries and which conform to the specification(s) mutually agreed under this Charter.

(2) At the time of delivery of the Vessel the Owners shall place at the disposal of the Charterers, the bunker delivery note(s) and any samples relating to the fuels existing on board.



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

(3) During the currency of the Charter the Charterers shall ensure that bunker delivery notes are presented to the Vessel on the delivery of fuel(s) and that during bunkering representative samples of the fuel(s) supplied shall be taken at the Vessel's bunkering manifold and sealed in the presence of competent representatives of the Charterers and the Vessel.

(4) The fuel samples shall be retained by the Vessel for 90 (ninety) days after the date of delivery or for whatever period necessary in the case of a prior dispute and any dispute as to whether the bunker fuels conform to the agreed specification(s) shall be settled by analysis of the sample(s) by (...) or by another mutually agreed fuels analyst whose findings shall be conclusive evidence as to conformity or otherwise with the bunker fuels specification(s).

(5) The Owners reserve their right to make a claim against the Charterers for any damage to the main engines or the auxiliaries caused by the use of unsuitable fuels or fuels not complying with the agreed specification(s). Additionally, if bunker fuels supplied do not conform with the mutually agreed specification(s) or otherwise prove unsuitable for burning in the ship's engines or auxiliaries the Owners shall not be held responsible for any reduction in the Vessel's speed performance and/or increased bunker consumption nor for any time lost and any other consequences.

**Clause 95  Bunker Fuel Sulphur Content Clause for Time Charter Parties 2005**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.
The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.
The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:
(i) the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the requirements of any emission control zone; and
(ii) the Vessel shall be able to consume fuels of the required sulphur content when ordered by the Charterers to trade within any such zone.
Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.




### RIDERS
### BULK PATAGONIA
### "KHI NEWBUILDING BULK CARRIER 58,000 DWT

(c) For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but not limited to, the EU and the US Environmental Protection Agency.

### NEW JASON CLAUSE

"In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the goods, Shippers, Consignees or Owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if such salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or Owners of the goods to the carrier before delivery."

And the Charterers shall procure that all Bills of Lading issued under this Charter Party shall contain the same clause.

### NEW BOTH-TO-BLAME COLLISION CLAUSE

If the liability for any collision in which the vessels involved while performing this Charter Party fails to be determined in accordance with the Laws of the United States of America, the following Clause shall apply :

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the Owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or non-carrying ship or her Owners insofar as such loss or liability represents loss of, or damage to, or any claim whatsoever of the Owners of the said goods, paid or payable by the other or non-carrying ship or her Owners to the Owners of said goods and set off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying ship or carrier."
The foregoing provisions shall also apply where the Owner, Operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contact.

### War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)

(a) For the purpose of this Clause, the words:
(i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(ii) "War Risks" shall include any actual, threatened or reported:
war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b)  The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c)  The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerent's right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.
(ii)  If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e)  If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the  actual bonus or additional wages paid shall be reimbursed to the Owners  by the Charterers at the same time as the next payment of hire is due, or  upon redelivery, whichever occurs first.

(f)  The Vessel shall have liberty:-
(i)  to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;



*RIDERS*
*BULK PATAGONIA*
*"KHI NEWBUILDING BULK CARRIER 58,000 DWT*

(ii)  to comply with the order, directions or recommendations of any war  risks underwriters who have the authority to give the same under the  terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv)  to discharge at any other port any cargo or part thereof which may  render the Vessel liable to confiscation as a contraband carrier;

(v)  to call at any other port to change the crew or any part thereof or  other persons on board the Vessel when there is reason to believe  that they may be subject to internment, imprisonment or other  sanctions.

(g)  If in accordance with their rights under the foregoing provisions of this  Clause, the Owners shall refuse to proceed to the loading or discharging  ports, or any one or more of them, they shall immediately inform the  Charterers. No cargo shall be discharged at any alternative port without  first giving the Charterers notice of the Owners' intention to do so and  requesting them to nominate a safe port for such discharge. Failing such  nomination by the Charterers within 48 hours of the receipt of such notice  and request, the Owners may discharge the cargo at any safe port of their  own choice.

(h)  If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

///// end of the C/P /////

*Page 25*



| Issued | 16/12/ 1965 |
|---|---|
| Amended | 13/ 7/ 1971 |
| Amended | 16/ 3/ 1977 |
| Amended | 9/ 9/ 1993 |

The Documentary Committee of The Japan Shipping Exchange, Inc.

# MEMORANDUM OF AGREEMENT

### Code Name : NIPPONSALE 1993

Copyright.
Published by
The Japan Shipping
Exchange, Inc.

Date *14th October, 2011* ...............................

1   IT IS THIS DAY MUTUALLY AGREED between the Sellers mentioned in (i) below ("the Sellers")

2   and the Buyers mentioned in (ii) below ("the Buyers") that the Sellers shall sell and the Buyers

3   shall buy the Vessel named in (iii) below in (iv) - (viii) below ("the

4   Vessel"), which has been accepted by the Buyers as a result of their superficial inspection of the

5   Vessel at .............. and examination of her Class Records; *therefore this sale is outright without further*

*inspection by the Buyers and/or any other parties on or before delivery of the Vessel except divers'*

*inspection as provided in clause 19 hereof.* ~~on the following~~

6   ~~terms and conditions:~~

7      (i)   Sellers: *Forever Shipping S.A., Panama City, guaranteed by Hisafuku Kisen K.K.* .............

8      ........................................................................................................................................

9      (ii)   Buyers: *Dry Bulk Handy Holding Inc. of Panama or its nominee, guaranteed by Drylog* ...

10      *Ltd. under the attached Charter Party and its MOA, however for the purpose of purchase*

*of the Vessel, the guaranteed nominee (if any) will have the right to nominate another*

*company signing the MOA.*

11      (iii)   Vessel's name: *M.V. "BULK PATAGONIA"* ............................................................

12      (iv)   Flag: ............................................................ (v) Class: *NK* .....................................

13      (vi)   Built (year and builder's name): *in* .............. at *Kawasaki Heavy Industries, Ltd., Japan* ...

14      (vii)   Gross register tonnage: *abt*      (viii)   Summer dead-weight tonnage: *abt 58,000MT*

15   **1.   PRICE**

16      The Purchase Price of the Vessel shall be *US$*                    *which shall be adjusted at*

17      *the time of delivery of the Vessel in accordance with Clause 87 of the Charter Party.* ...........

18   **2.   PAYMENT** *(See Clause 16 hereof)*

19      ~~(a)   As security for the fulfilment of this Agreement, the Buyers shall pay a deposit of ten (10)~~

20      ~~per cent of the Purchase Money to a bank nominated by the Sellers within three (3) banking~~

21      ~~days from the date of this Agreement, in the names of the Sellers and the Buyers, which~~

22      ~~shall be paid to the Sellers as a part of the Purchase Money in the same manner as the~~

23      ~~ninety (90) per cent of the Purchase Money hereunder. Any interest earned on the deposit~~

24      ~~shall be for the Buyers' account and any bank charges on the deposit shall be borne equally~~

25      ~~by the Sellers and the Buyers.~~

26      ~~(b)   The Buyers shall remit the balance of the Purchase Money by telegraphic transfer to the~~

27      ~~said bank immediately after the Notice of Readiness for Delivery is tendered by the Sellers~~



28   ~~as per clause 7 of this Agreement. This balance shall be paid out to the Sellers together~~
29   ~~with the said ten (10) per cent deposit against the Protocol of Delivery and Acceptance~~
30   ~~being duly signed by the representatives of both parties at the time of delivery of the~~
31   ~~Vessel.~~

32   3.   DOCUMENTATION *(See Clause 17 hereof also)*
33   ~~At the time of delivery of the Vessel, the Sellers shall furnish the Buyers with the following~~
34   ~~documents:~~
35   ~~(a) the Bill of Sale, duly attested by a Notary Public, specifying that the Vessel is free from all~~
36   ~~debts, encumbrances and maritime liens,~~
37   ~~(b) a letter from the Sellers undertaking to supply a Deletion Certificate from the~~
38   ~~..................................................Registry promptly after the Vessel's delivery, and~~
39   ~~(c) such other documents as may be mutually agreed.~~
40   Closing and exchange of *delivery* documents shall take place at *a place nominated by the*
     *Sellers.* ..........................................................................................................................

41   4.   DELIVERY PLACE AND TIME
42   ~~(a) The Sellers shall deliver the Vessel to the Buyers at / in ......................................................~~
43   ~~..............................not before..............................................................., and not later than~~
44   ~~...................................................................................("the cancelling date").~~
45   ~~b)  In the event the Sellers fail to make the Vessel ready for delivery on or before the cancelling~~
46   ~~date, the Buyers shall have the option of maintaining or cancelling this Agreement,~~
47   ~~provided such option shall be declared in writing within forty eight (48) hours (Saturdays,~~
48   ~~Sundays and Holidays excepted) from the cancelling date. However, any delay not~~
49   ~~exceeding thirty (30) days caused by force majeure and/or by repairs in order to pass the~~
50   ~~inspection under clause 6 of this Agreement shall be accepted by the Buyers.~~
51   *Notices, time and place of delivery*
     (a~~c~~)The Sellers shall keep the Buyers *well* informed of the Vessel's itinerary and *shall provide*
     ~~give~~ the Buyers *with twenty (20)/ten (10)/five (5)*
52   ~~thirty (30) / fifteen (15) / seven (7) / three (3)~~ days notice of *the estimated time of arrival at*
     *the intended place of drydocking/underwater inspection/delivery. When the Vessel is at the*
     *place of delivery and in every respect physically ready for delivery in accordance with this*
     *Agreement, the Sellers shall give the Buyers a written Notice of Readiness for delivery.*
     ~~approximate expected place and~~
53   ~~date of readiness for delivery.~~
     (b) *The Vessel shall be delivered and taken over safely afloat charter free at a safe and*
     *accessible berth or anchorage in a safe port worldwide at Sellers' option.*
     *Expected time of delivery:* _____
     *Date of cancelling: to be mutually agreed.*
     *Sellers and Buyers to agree to thirty (30) days laydays/cancelling spread.*
     (c) *If the Sellers anticipate that, notwithstanding the exercise of due diligence by them,*



*the Vessel will not be ready for delivery by the cancelling date they may notify the Buyers*
*in writing stating the date when they anticipate that the Vessel will be ready for delivery*
*and propose a new cancelling date. Upon receipt of such notification the Buyers shall*
*have the option of either cancelling this Agreement in accordance with Clause 14 within*
*seventy two (72) hours (Saturdays, Sundays and holidays excepted) of receipt of the notice*
*or of accepting the new date as the new cancelling date. If the Buyers have not declared*
*their option within seventy two (72) hours of receipt of the Sellers' notification or if*
*the Buyers accept the new date, the date proposed in the Sellers' notification shall be*
*deemed to be the new cancelling date and shall be substituted for the cancelling date*
*stipulated above date of cancelling. However delay not exceeding thirty (30) days*
*caused by force majeure and/or by repairs in order to pass the inspection under Clause 19*
*hereof shall be accepted by the Buyers. If this Agreement is maintained with the new*
*cancelling date all other terms and conditions hereof including those contained in this*
*Clause 4 shall remain unaltered and in full force and effect. Cancellation or failure to*
*cancel shall be entirely without prejudice to any claim for damages the Buyers may have*
*under Clause 14 for the Vessel not being ready by the original cancelling date.*

*(d) Should the Vessel become an actual, constructive or compromised total loss before*
*delivery the deposit together with interest earned shall be released immediately to*
*the Buyers whereafter this Agreement shall be null and void.*

54    5.   **DELIVERY CONDITION** *(See Clause 18 hereof)*

55    ~~The Sellers shall deliver to the Buyers the Vessel substantially in the same condition as when~~
56    ~~the Vessel was inspected by the Buyers at the place mentioned in the preamble, fair wear and~~
57    ~~tear excepted, but free from outstanding recommendations and average damage affecting her~~
58    ~~present class with all her class, national and international trading certificates clean and valid at~~
59    ~~the time of delivery.~~

60    6.   **DRYDOCKING** *(See Clause 19 hereof)*

61    ~~For the inspection by the Classification Society mentioned in (v) of the preamble of the Vessel's~~
62    ~~bottom and other underwater parts below the summer load line ("bottom and other underwater~~
63    ~~parts"), the Sellers shall place the Vessel in drydock at the port of delivery or near thereto prior~~
64    ~~to delivery.~~
65    ~~If the rudder, propeller, bottom or other underwater parts be found broken, damaged or~~
66    ~~defective so as to affect the Vessel's clean certificate of class, the same shall be made good at~~
67    ~~the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's class~~
68    ~~without qualification.~~
69    ~~While the Vessel is in drydock and if required by the Buyers or the Classification Society's~~
70    ~~surveyor, the tail-end shaft shall be drawn, and should the same be condemned or found~~
71    ~~defective so as to affect the Vessel's clean certificate of class, it shall be renewed or made good~~
72    ~~at the Sellers' expense to the Classification Society's satisfaction so as to retain the Vessel's~~
73    ~~class without qualification.~~



74 ~~The cost of drawing and replacing the tail-end shaft shall be borne by the Buyers unless the~~
75 ~~Classification Society requires the tail-end shaft to be drawn, made good or renewed.~~
76 ~~The expense of putting the Vessel in and taking her out of drydock and the drydock dues~~
77 ~~including the fee of the Classification Society's surveyor shall be paid by the Buyers unless the~~
78 ~~rudder, propeller, bottom, other underwater parts or tail-end shaft be found broken, damaged or~~
79 ~~defective as aforesaid, in which event the Sellers shall pay these expenses.~~
80 ~~The Sellers shall pay all costs of transporting the Vessel to the drydock and from the drydock to~~
81 ~~the place of delivery.~~

82  7.    NOTICE OF READINESS AND LIQUIDATED DAMAGES *(See Clause 18 hereof also)*
83       When ~~the Vessel has been approved by the Classification Society's surveyor following the~~
84       ~~inspection stipulated in the preceding clause,~~ the Vessel ~~shall be deemed~~ *is* ready for delivery *in*
         *accordance with this agreement,* ~~and~~
85       ~~thereupon~~ the Sellers shall tender to the Buyers a notice of readiness for delivery *("NOR").*
86       The Buyers shall take *delivery of* ~~over~~ the Vessel within three (3) *business* ~~banking~~ days
         *(Saturdays, Sundays, Holidays excluded) after the Sellers have tendered to the Buyers the*
         *NOR, the date of tendering such NOR not included.  The NOR shall be submitted by the*
         *Sellers to the Buyers once the Vessel has been ready for delivery at the delivery place.* ~~from the~~
         ~~day of the receipt~~
87       ~~of such notice inclusive.~~
88       In the event of the Buyers not taking delivery of the Vessel within the period specified above,
89       the Buyers shall pay to the Sellers the sum of *daily time charter rate as per Charter Party dated*
         _____ *(to be advised)* per day as
90       liquidated damages, but such detention shall not exceed ten (10) days.

91  8.    FORCE MAJEURE
92       Should the Vessel become an actual or constructive total loss before delivery or not be able to
93       be delivered through outbreak of war, political reasons, restraint of Governments, Princes or
94       People, or any other cause which either party hereto cannot prevent, this Agreement shall be
95       deemed to be null and void, and the deposit shall at once be returned in full to the Buyers.

96  9.    ALLOCATION OF RISK
97       The Vessel with everything belonging to her shall be at the Sellers' risk and expense until she is
98       delivered to the Buyers, and after the delivery of the Vessel in accordance with this Agreement
99       the Sellers shall have no responsibility for any possible fault or deficiency of any description.

100  10.   BELONGINGS AND BUNKERS *(See Clause 20 hereof)*
101       ~~The Sellers shall deliver to the Buyers the Vessel with everything belonging to her at the time of~~
102       ~~the superficial inspection mentioned in the preamble including all spare parts, stores and~~
103       ~~equipment, on board or on shore, used or unused, except such things as are in the normal~~
104       ~~course of operations used during the period between the superficial inspection and delivery.~~
105       ~~Forwarding charges, if any, shall be for the Buyers' account.~~



106   ~~The Buyers shall take over and pay the Sellers for remaining bunkers and unused lubricating~~
107   ~~oils at last purchased prices evidenced by supporting vouchers. Payment under this clause shall~~
108   ~~be made on or prior to delivery of the Vessel in the same currency as the Purchase Money.~~
109   ~~The Sellers shall provide an inventory list for the Buyers at the time of delivery.~~

110   **11.   EXCLUSIONS FROM THE SALE** *(See Clause 20 hereof also)*
111        The Sellers have the right to take ashore crockery, plate, cutlery, linen and other articles bearing
112        the Sellers' flag or name, provided they substitute for the same an adequate number of similar
113        unmarked items. Books, cassettes and forms etc., exclusively for use on the Sellers' vessels,
114        shall be taken ashore before delivery.
115        Personal effects of the Master, Officers and Crew including slop chest, *log books, ISM manuals,*
           *original certificates to be surrendered to competent authorities* and hired *or third party's items*
           ~~equipment, if~~
116        ~~any,~~ are excluded from this sale and shall be *taken ashore* ~~removed~~ by the Sellers *upon or*
           *before* ~~prior to~~ delivery of the
117        Vessel.
           *Provisions and bonded stores shall be settled at actual cost at the time of delivery.*
           *Hired or third party's items shall be listed before delivery of the Vessel.*

118   **12.   CHANGE OF NAME ETC.**
119        The Buyers *have the option to* ~~undertake to~~ change the name of the Vessel and *the option to*
           alter the funnel markings upon
120        delivery of the Vessel*, at Buyers' time and account.*

121   **13.   ENCUMBRANCES ETC.**
122        ~~The Sellers shall deliver to the Buyers the~~ *The* Vessel *shall be delivered* free from all ~~debts,~~
           encumbrances and
123        maritime liens, *mortgages or any other debts whatsoever at the time of delivery.*
124        The Sellers hereby undertake to indemnify the Buyers against all consequences of claims made
125        against the Vessel in respect of liabilities incurred prior to the time of delivery.

126   **14.   DEFAULT AND COMPENSATION**
127        Should the Buyers fail to fulfil this Agreement, the Sellers have the right to cancel the
128        Agreement, in which case the deposit shall be forfeited to the Sellers. If the deposit does not
129        cover the Sellers' loss caused by the Buyers' non-fulfilment of this Agreement, the Sellers shall
130        be entitled to claim further compensation from the Buyers for any loss and for all expenses
           *directly incurred by the Sellers in preparation of sale provided such losses and expenses have*
           *been caused by the Buyers negligent or intentional acts or omissions.*
131        If the Sellers should default in the delivery of the Vessel with everything belonging to her in the
132        manner and within the time herein specified, the deposit shall at once be returned to the Buyers
133        and in addition the Sellers shall, when such default is due to their negligent or intentional acts
134        or omissions, make due compensation for loss caused by their non-fulfilment of this Agreement



*directly incurred by the Buyers in preparation of purchase.*

*If for any reason whatsoever the Vessel fails to deliver under the terms of this Agreement, then all terms and conditions of the Charter shall continue to apply.*

135    15.    ARBITRATION

136    *This Agreement shall be governed by and construed in accordance with English law and any dispute arising out of this Agreement shall be referred to arbitration in London in accordance with the Arbitration Acts 1996 or any statutory modification or re-enactment thereof for the time being in force, one arbitrator being appointed by each party.  On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall apply.  If two arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.  The proceedings shall be conducted in accordance with the rules of London Maritime Arbitration.*

~~Any dispute arising out of this Agreement shall be submitted to arbitration held in Tokyo by the~~

137    ~~Tokyo Maritime Arbitration Commission ("TOMAC") of The Japan Shipping Exchange, Inc. in~~

138    ~~accordance with the Rules of TOMAC and any amendments thereto, and the award given by the~~

139    ~~arbitrators shall be final and binding on both parties.~~

The additional clauses from 16 to ...............*24*............... shall be deemed to be fully incorporated in this Agreement.

IN WITNESS WHEREOF the Sellers and the Buyers have signed and executed TWO COPIES of this Agreement the day and year first above written.

THE SELLERS                                   THE BUYERS

_____            _____

By :                                               By :
Title :                                            Title :

This Memorandum of Agreement is a computer generated copy of the "NIPPONSALE 1993" form printed by authority of the Documentary Committee of The Japan Shipping Exchange, Inc., using software which is the copyright of Strategic Software Ltd. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the reprinted text of this document which is not clearly visible, the original approved document shall apply.The DocumentaryCommittee of The Japan Shipping Exchange, Inc. and Strategic Software Ltd. assume no responsibility for any loss ordamage caused as a result of discrepancies between the original approved document and this document. damage caused as a result of discrepancies between the original approved document and this document.



**16. Payment :**

As security for the correct fulfillment of this Agreement, the Buyers shall pay a deposit of ten percent (10%) of the Purchase Price within three (3) banking days from the date of signing this Agreement by fax.   This deposit shall be placed with Sellers' nominated Bank, and held by them in a joint interest bearing account for the Sellers and the Buyers, to be released in accordance with joint written instructions of the Sellers and the Buyers and Sellers' nominated Bank form jointly signed by the Sellers and the Buyers representatives.   Interest, if any, to be credited to the Buyers. Any fee charged for holding the said deposit shall be borne equally by the Sellers and the Buyers. The Buyers shall remit the balance ninety percent (90%) of the Purchase Money and all other amounts payable to the Sellers pursuant to the MOA including but not limited for bunkers, unless already Buyers' property, and lub oils (the "Extra") in the name of the Buyers or of the Buyers' bank with the Sellers' Bank not later than three (3) banking days prior to estimated date of delivery of the Vessel.   Interest, if any, shall be for the Buyers' account.

Both ten percent (10%) deposit and ninety percent (90%) balance of the purchase money and the Extra shall be paid to the Sellers against the Sellers' presentation to the Sellers' Bank of a photocopy of the Protocol of Delivery and Acceptance duly signed by authorized representative of the Buyers and the Sellers on delivery of the Vessel but not later than three (3) banking days after the Vessel is in every respect physically ready for delivery in accordance with the terms and conditions of this Agreement and Notice of Readiness has been given in accordance with clause 4 hereof.

Any fees charged on both ten percent (10%) deposit and ninety percent (90%) balance of purchase money for holding/lifting etc. shall be borne equally by the Buyers and the Sellers.

**17. Documentation :**

At the time of closing the Sellers shall provide the Buyers with Bill of Sale and other delivery documents as reasonably required for Buyers' registration of the Vessel under the Buyers' intended flag, which shall be mutually agreed before delivery and incorporated into this Agreement as an addendum.

**18. Delivery Condition :**

The Vessel shall be delivered strictly on as she is condition basis.

Otherwise the Vessel shall be delivered to the Buyers substantially in the same condition as when inspected by the Buyers, fair wear and tear excepted.   The burden of proof of any difference in condition of the Vessel, if any, rests with the Buyers.

At the time of delivery the Sellers shall provide the Buyers with a Class Maintenance Certificate issued on the basis of the review of the survey records filed in the Class, bearing the date not more than three (3) business days prior to expected delivery of the Vessel, showing the class's characters of NS* MNS* is maintained without conditions/recommendations.

All of her present class, national and international trading certificates shall be delivered clean, unextended with at least two (2) months validity at the time of delivery.

The Vessel shall be delivered with swept holds at the time of delivery. The Sellers, however, have an option to leave the holds as they are as left by stevedores without holds cleaning after completion of discharging by paying US$5,000.- to the Buyers as lump sum holds cleaning charges.

## 19. Underwater Inspection :
No drydocking shall apply.

However, the Buyers, at their risk and account, have the right to carry out an inspection of under-water parts of the Vessel by the divers approved by present class in the presence of class surveyor and Buyers' and Sellers' representatives at the delivery port as soon as possible after the Vessel has arrived at the delivery port. If the conditions at the place of delivery are unsuitable for underwater inspection as recommended by the class and the diver, the Sellers and the Buyers shall agree a mutually acceptable alternative place to carry out the diver inspection, time and expense related to the shifting of the Vessel to alternative place to be equally shared between Sellers and Buyers. Said diver inspection to be carried out without delay to the delivery of the vessel and conditions under which the divers inspection is performed to be approval of the class surveyor.

Should any damage affecting present class be found out in under-water parts and class approves postponement of repair of such damage upto next class' periodical drydock or survey, then the Sellers have the option to repair same to class' satisfaction or to make a monetary settlement of same based on an average quotation made by two (2) reputable shipyards, one each selected by the Sellers and the Buyers respectively. It is understood by the both parties that the amount of the monetary settlement is confined to direct repair cost only and does not include indirect cost such as drydocking fee, general expenses, deviation cost, off hire and other costs whatsoever and that such amount of the monetary settlement is deducted from the Purchase Price at the time of delivery.

If present class requires repair of such damage before the next periodical drydocking or survey, then the Sellers shall repair it up to class's satisfaction at their account (including any drydocking expenses) prior to delivery and the cancelling date shall be extended by the corresponding days lost due to such repair including drydocking, waiting time for drydocking, deviation etc. Should such repairs require drydocking of the Vessel then lines 69-75 above shall be reinstated.

In the event that the Vessel is drydocked, the Buyers have the right to clean and paint the underwater parts below the summer loadline at the Buyers' risk and account without interfering with the Sellers' or the present class' work and without affecting the smooth and timely delivery of the Vessel.



If, however, the Buyers' work in drydock is still in progress when the Sellers have completed their work, the Sellers have the right to tender the Notice of Readiness for Delivery whilst the Vessel is still in drydock and the Buyers are obliged to take delivery of the Vessel immediately after such Notice of Readiness tendered, whether the Vessel is in drydock or not.   Any extra time and cost for the additional drydocking incurred by reason of such Buyers' work shall be at the Buyers' risk and account.

## 20. Belonging and Bunkers :

The Vessel shall be delivered with everything belonging to the Vessel on board, used or unused, including all spare parts and spare equipment, stores, radio installations and navigational equipment as they are at time of delivery.   Spare parts and spare equipment shall be at least as per minimum class' requirements applicable to the Vessel.

The Vessel has no spare propeller/tail shaft.

The Buyers shall take over and pay the extra money for remaining bunkers, unless already Buyers' property, and unused lubricating oils in tanks, sealed drums and sealed cans as onboard at the time of delivery.

Remaining bunkers, unless already Buyers' property, shall be settled at last purchase price as per invoice and unused lubricating oils including barging fee shall be settled at the Sellers' net purchase prices evidenced by supporting vouchers.

Exact quantities of such remaining bunkers and unused lubricating oils at the time of delivery shall be agreed by the Sellers' and the Buyers' representative before delivery of the Vessel on estimation basis.
The Sellers shall provide an inventory list for the Buyers at the time of delivery

Payment for the bunkers, if any, and for lubricating oils to be done simultaneously with the payment of the purchase price on the delivery day.

All plans, drawings copy of maintenance records and instruction manuals (excluding ISM manuals) which are on board shall be delivered to the Buyers Master as they are upon delivery of the Vessel.
All remaining plans, drawings and instruction manuals in the Sellers' possession shall be forwarded to the Buyers main office after delivery.   Forwarding charges, if any, shall be for the Buyers' account.

Log books shall be retained by the Sellers.   However the Buyers have the right to take photo copies of same before delivery at the Buyers' cost.



**21. Familiarisation :**

After signing the MOA and lodging the Deposit the Buyers have the right to place two (2) crew members onboard during the last voyage from the last loading port (if possible) to the delivery port for familiarization purpose only but for a period of minimum twenty (20) days.   Such crew members shall stay on board at the Buyers' risk and account until the time of delivery and shall always remain under the Master's command without any interference with the Vessel's operation and her schedule.

Indemnity letter satisfactory to the Sellers shall be provided to the Sellers before the above crew members' boarding.

Buyers' crews on board for familiarization are allowed to use all the Vessel's communication systems.   Buyers shall pay to the Sellers at the time of delivery USD10 per day per person as victualling/accommodation fee.

Buyers to pay Sellers on closing day USD10 for communication in total per day while Buyers' reps are onboard.

**22. Discussion for delivery port and timing :**

Both parties shall discuss in good faith and agree to the delivery port and timing taking into account of the availability as to underwater inspection and/or dry-dock under this Clause 19 hereof and the validity of Vessel's certificate under Clause 18 hereof.

**23. Pre-Closing Meeting :**

Meeting between the Sellers and the Buyers shall be held at least one (1) day prior to expected delivery of the Vessel at a place nominated by the Sellers in order to prepare smooth closing and delivery of the Vessel.

**24. Confidentiality :**

All details of these negotiations and any eventual sale shall be kept private and confidential among all parties concerned.

END OF MOA



FIRST ORIGINAL

14th October, 2011

Addendum No.1
To
Charter Party dated 14th October, 2011
for "Newbuilding Bulk Carrier to be named M.V. "BULK PATAGONIA"
to be built at Kawasaki Heavy Industries, Japan

With reference to the captioned Charter Party thereto (hereinafter called the "C/P"), it is mutually agreed and confirmed by and between Forever Shipping S.A. as Owners and Dry Bulk Handy Holding Inc. as Charterers that ; -

Modification of Specification

1. The Charterers have requested the Owners to modify the specification of the Vessel as follows;

   a) Adoption of the Slide Valve into Main Engine : JPY 6,000,000

   b) The installation of the equipments for loading Sulphur (categorized IMSBC Code Group B) : JPY 1,510,000

   Acquisition of IMSBC Code / Certificate of Fitness for Ship Carrying Dangerous Goods.
   Installation of four (4) jets of water.
   Equipment of Spark Arresting Screen on the Natural Ventilation System.
   Provision of additional four (4) sets of protective clothing.
   Provision of two (2) self contained breathing apparatuses with four (4) spare cylinders.

   | Total | JPY 7,510,000. - |
   |-------|------------------|

2. The Charterers shall pay to the Owners the total sum of Japanese Yen Seven Million Five Hundred Ten Thousand only (JPY 7,510,000.-) as the cost of additional modification mentioned in above 1. It shall be paid to the Owners bank account before the delivery of the vessel.

3. All other terms and conditions of the C/P shall remain unaltered.

IN WITNESS WHEREOF, the parties hereto have caused this Addendum to be duly executed on this 14th day of October, 2011.

Two (2) originals of this Addendum are made, mutually signed and possessed by both parties.

Owners :                                          Charterers :
Forever Shipping S.A.                             Dry Bulk Handy Holdings Inc.

Name : Chikashi Yamane                            Name  : ILIAS ILIOPOULOS
Title  : Representative Director / President       Title   : DIRECTOR